# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No. 1:16-cr-00106-JAW** |
| | ) | |
| **STEVEN NYGREN** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

NOW COMES the United States, by and through its attorneys, Halsey B. Frank, United States Attorney for the District of Maine, and Chris Ruge, Assistant United States Attorney, and submits this memorandum to assist the Court in its determination of an appropriate sentence.

## I.       Relevant Background

On June 20, 2017, Steven Nygren pleaded guilty to 63 counts of bank fraud, relating to 63 forged checks written against an account Brooklin Boat Yard ("BBY") held at Camden National Bank. He also pleaded guilty to a single count of access device fraud for the unauthorized use of BBY business credit cards, and to one count of evasion of payment of assessed taxes.

## II.      Contested Issues

As reflected in the objections to the presentence report (PSR), the parties have several outstanding disagreements relating both to the proper calculation under the sentencing guidelines and to facts relevant to consideration of § 3553(a) factors. The outstanding issues include:

- Whether the defendant employed sophisticated means in the course of his fraud or in his tax evasion pursuant to U.S.S.G. § 2B1.1(b)(10)(C) and § 2T1.1(b)(2);

- Whether the defendant furthered the execution or concealment of his fraud activities through the abuse of a position of trust pursuant to U.S.S.G § 3B1.3;

- Whether, pursuant to U.S.S.G. § 3C1.1, the defendant obstructed justice through attempted influence of witnesses, or through his later malingering during competency evaluations;

- Whether the defendant should have a reduction in offense level for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1

- Whether—as the result of his 2014 "continuance without finding" disposition in Massachusetts—the defendant was under a criminal justice sentence within the meaning of U.S.S.G. § 4A1.1(d) when he committed any of the instant offenses;

- Whether the defendant's criminal history is underrepresented or overrepresented by the resultant criminal history calculation, per U.S.S.G. § 4A1.3; and

- Several factual disputes of varying degrees of relevance, relating to the above sentencing factors and the proper ultimate sentence under U.S.S.G. § 5H1.4 and § 5K2.0, as well as under 18 U.S.C. § 3553(a).

## III. Argument.

The government will present these issues in the above order, which follows the numerical order of the relevant portions of the U.S. Sentencing Guidelines.

### a. The Court should impose an enhancement for the use of sophisticated means in both the fraud and tax schemes.

U.S.S.G. § 2B1.1(b)(10)(C) and § 2T1.1(b)(2) both contain substantially the same language in the application notes. As applicable to the fraud counts:

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating

2

the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1, application note 9(B).  Whereas the guidelines relevant to the tax count note:

For purposes of [§ 2T1.1] subsection (b)(2) "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."

U.S.S.G. § 2T1.1, application note 5.  The difference in these application notes is solely the example of a sophisticated fraud in the middle of the § 2B1.1 version.  Accordingly, a similar analysis will apply to both guidelines.

The conduct listed in the application note is not an exhaustive list of conduct warranting the enhancement.  United States v. Pacheco-Martinez, 791 F.3d 171, 179 (1st Cir. 2015); United States v. Foley, 783 F.3d 7, 25 (1st Cir. 2015).    The touchstone is the level of planning or concealment evinced by the offense as a whole, and that offense need not include any of the acts described in the guideline commentary.  Pacheco-Martinez, 791 F.3d at 179.  Indeed, the First Circuit has recognized that "the enhancement properly applies to conduct less sophisticated than the examples," and that "a scheme may be sophisticated even if the individual elements taken alone are not."  Foley, 783 F.3d at 25 (internal quotations and citations omitted).

The First Circuit has addressed the application of the sophisticated means enhancement in several recent cases.  In United States v. George, the circuit court found that the use of a corporation as the nominal owner of a bus-service used to defraud a transit authority constituted sophisticated means.  841 F.3d 55, 66 (1st Cir. 2016).  The court observed that the employment of corporate shells "is the prototypical example of the type of the type of sophisticated means

that might give rise to the enhancement," and that this fact alone was enough to justify the enhancements use.  Id.

Similarly, in United States v. Reyes-Rivera, the First Circuit found that the enhancement was correctly applied where the defendant concealed "the illegal nature and source of funds" from a Ponzi scheme by operating various corporations using bank accounts at different institutions across several countries.  The court went on to reject the argument that sophisticated means should be measured relative to similar schemes as having "no judicial, statutory, or regulatory support."  Id.

Although the use of corporate identities suffices to support imposing the enhancement, such means are not necessary to do so.  In Pacheco-Martinez, the First Circuit held that no checklist or particular act is required for a finding of sophisticated means.  791 F.3d at 179.  There, the court found the enhancement was proper where—in addition to using various corporate identities to shield assets from creditors—the defendant induced victims to sign an English-language contract different from the Spanish-language document previously provided to them, and employed "lulling payments" to convince victims that the investment contract would pay a return.  Id.  Likewise, in United States v. Evano, the court held the enhancement was properly employed in a fraud case where the defendants repeated claimed to have ingested glass from food sold at various supermarkets, restaurants, and hotels.  553 F.3d 109, 113 (1st Cir. 2009).  To carry out the scheme, the defendants used false names and social security numbers, in addition to purposefully ingesting glass fragments.  Although none of these means was particularly sophisticated when taken alone, the court held that together "this was enough to make their scheme more effective and difficult to thwart," thus properly justifying the enhancement.  Id.

Here, defendant Nygren's acts fall within the heartland of the sophisticated means by the use of various identities, tax identification numbers, and the movement of funds between jurisdictions. As to the fraud schemes, Nygren's acts clearly demonstrated a well-honed scheme to move money from BBY into an account outside of the State of Maine, much of which he later funneled back into Maine using different accounts in the name of the same relative and the Maine LLC he set up to run the Brooklin General Store. The defendant has admitted that the funds from the forged checks were sent to a bank account he controlled at Eastern Bank in Massachusetts. ECF No. 1 (Indictment) at ¶¶ 5, 6, 11(g), 11(h); ECF No. 45 (Prosecution Version) at pp. 1-2. This fact is also confirmed by the bank records associated with the account in Massachusetts. ECF No. 45 at p. 5. While this account was opened by Nygren's relative in Massachusetts (hereinafter "Individual 3")[1] under her name and social security number, it was done with the relative "d/b/a" Continuum, Nygren's then-defunct Massachusetts LLC, which had been his former management consulting service. ECF No. 1, ¶ 11(g); G.E. 1 (Eastern Bank Signature Card), G.E. 2 (Eastern Bank Signature Card), G.E. 3 (Certificate of Organization), G.E. 4 (Massachusetts Sec of State Record of LLC Status).

In fact, Nygren had Individual 3 set up two accounts at Eastern, depositing the stolen funds into a second account set up after Nygren had received legitimate compensation from BBY. ECF No 1, ¶ 5; G.E 1, 2. Once the money went into the Massachusetts account, Nygren used various means to access the funds for his personal use, including: the use of a signature stamp in Individual 3's name to write checks on the Easters Bank account himself; Individual 3's movement of funds at Nygren's direction; and Nygren's use of a debit card associated with the account. ECF No. 1, ¶¶ 6, 11(g)-(k). Eventually, Nygren purchased the Brooklin General

---

[1] This individual is referred to as Individual 3 in the Indictment, and that identifier will be continued here for consistency.

Store, again using Individual 3 by Maine opening bank accounts and establishing a Maine LLC in her name. ECF No. 1, ¶ 11(j), G.E. 5 (Maine 2015 Corporation Records for Brooklin Center, LLC); G.E. 6 (Camden National Signature Card); G.E. 7 (Key Bank Signature Card). Nygren then made payments toward the purchase of the store and gave the store operating funds from the stolen money funneled through the Eastern Bank accounts. ECF No. 1, ¶¶ 6, 11. Accordingly, Nygren was able to spend the money he stole from BBY just up the street from the boatyard, and right under the nose of the victim of his crime.

Nygren's course of conduct envelops the acts described in the application notes. By using the an account associated with a corporate identity (albeit a suspended one), the payments were less obviously fraudulent then they would have been if he had made the checks payable to himself, or even to Individual 3, thus making discovery by the Camden National or outside accountants less likely. In addition, his use of an individual and a bank in Massachusetts to receive the money he stole in Maine made the victim's pursuit of the stolen funds through civil process significantly more difficult.

Moreover, Nygren's use of Individual 3 constitutes sophisticated means of itself. Were Individual 3 criminally liable for her acts—that is, a co-conspirator or an abettor—Nygren would be eligible for a role enhancement as a manager in a criminal enterprise. As it is, his use of Individual 3 to open accounts at his direction, to use corporate names of his devise, and to move funds in sums less than $10,000, shows a high level of planning aimed at avoiding detection, and thus effecting perpetuation of the scheme.

Under these circumstances, the fraud against BBY was sophisticated within the meaning of § 2B1.1(b)(10)(C).

Similarly, the tax evasion scheme used sophisticated means for all the same reasons and more. In addition to the means described above, to avoid the IRS seizing what it was owed, Nygren also used his wife's name and multiple bank accounts in her name. ECF No. 1, ¶11(c); ECF No. 45, p. 4; G.E. 8, 9 (Direct Deposit Instructions). He also used a false social security number, as was the case in <u>Evano</u>, employing the TIN from his defunct LLC when called upon to fill out a W-4 or provide information for a 1099. ECF No.1, ¶ 11(a), (b); ECF No. 45, p. 4; G.E. 10 (Nygren W-4 dated 2010); G.E. 11 (2010 W-2); G.E. 12 (2011 W-2); G.E. 13 (2011 Form 1099). He managed to spend hundreds of thousands over the course of years through these means, including the vast sums spend on and through the Brooklin General Store, which he operated basically under the assumed identity of Individual 3, an LLC in her name, and a series of bank accounts she opened at his direction. Again, these facts more than satisfy the level of sophistication required by § 2T1.1(b)(2).

The Probation Office opines that § 2B2.1(b)(10)(C) does not apply because Continuum was not a "fictitious" or "shell" corporation. PSR at ¶ 29. The government respectfully submits that this is not the relevant analysis. First, the use of a "shell" corporation is not required to impose the enhancement. <u>See</u>, <u>e.g.</u>, <u>Evano</u>, 553 F.3d at 112-13. Second, a corporation could be legitimately formed under the laws of a state and still serve as means of subterfuge. <u>See</u> <u>United States v. George</u>, 841 F.3d at 66. Third, to the extent Continuum constituted a legal entity, it was "fictitious" in the sense that it no longer existed as such under the laws of Massachusetts. At the time of the alleged offense, Continuum was basically a sole proprietorship of Individual 3, in that she opened the accounts at Eastern Bank as if she herself were "doing business as" Continuum. But in the end, the legal status of Continuum has little bearing on the actual sophistication of the scheme. Associating the Continuum accounts with another

individual in another state is even more sophisticated than using a corporate shell. Add to that the further use of the Brooklin General Store entity, "Brooklin Center, LLC," and the sophistication is compounded, not to mention the series of bank accounts associated with that enterprise in its brief existence.

The defendant suggest that the neither the fraud scheme nor the tax evasion were carried out through sophisticated means, noting that he disputes "much of the factual basis" supporting such an enhancement. PSR, Defendant's Objection #6. The government respectfully disagrees for the reasons set forth above, and further submits that the facts admitted by the defendant as set forth in the Indictment and Prosecution Version of the Offense are more than sufficient to carry the enhancement. ECF Nos. 1, 45.

**b. The Court should impose the enhancement for abuse of a position of trust.**

Section § 3B1.3 of the Sentencing Guidelines provides for a two-level increase in offense level if the defendant abused a position of private trust "in a manner that significantly facilitated the commission or the concealment of the offense." U.S.S.G. § 3B1.3. The First Circuit has established a two-step analysis trial courts must perform to apply this guideline: first, the trial court must find that the defendant occupied a position of public or private trust; if such a position is established, the court must then find the defendant abused this position in committing the crime of conviction. United States v. Pacheco-Martinez, 791 F.3d 171, 178 (1st Cir. 2015); United States v. Zehrung, 714 F.3d 628, 630 (1st Cir. 2013); United States v. Reccko, 151 F.3d 29, 31 (1st Cir. 1998). The burden is on the government to prove facts, by a preponderance of the evidence, supporting each element. United States v. Sicher, 576 F.3d 64, 70 (1st Cir. 2009).

The determination of what constitutes a position of trust is not formulaic or subject to a check-list type analysis. In basic terms, "positions of trust are characterized by significant

discretion and minimal supervision." United States v. Reccko, 151 F.3d 29, 31 (1st Cir. 1998). But, in assessing the relative levels of discretion and supervision an offender enjoyed, the trial court does not apply any *per se* rule to the type of position the defendant held; rather, the court must make a determination of whether the relationship between defendant and victim was one of trust based on the facts of the case, considering primarily "the perspective of the victim." United States v. George, 841 F3d 55, 66 (1st Cir. 2016). Job-titles and enumerated duties alone do provide the whole picture. Because each individual case presents its own unique circumstances, a particular position will fall somewhere on a spectrum of discretion and supervision. Zehrung, 714 F.3d at 630.

Relevant considerations include not only the type of discretion normally afforded the particular position, and the amount of supervision that type of employee normally receives, but also the personal relationship between the defendant and victim, the type of access to sensitive processes the defendant is granted, and the development of these relationships over time. See United States v. O'Connell, 252 F.3d 524 (1st Cir. 2001) (finding a position of trust under the Sentencing guidelines where the defendant had authority to transfer funds from a line of credit and where the defendant's relationship with the victims "rendered him a uniquely trusted employee."). See also Pacheco-Martinez, 791 F.3d at 178 ("[w]e may also consider whether the defendant used a personal relationship with the victim in order to facilitate the fraud");

For example, in United States v. Sicher, the defendant was the secretary and sole employee of an eye surgeon. 576 F.3d at 66-67. In addition to his busy medical practice and teaching duties, the surgeon also ran a charitable organization dedicated to raising funds and providing grants to combat child glaucoma. Id. Eventually, the surgeon made Sicher the effective manager of the charitable fund, where she was unsupervised in tasks relating the receipt

and disbursement of funds.  Id.  Although only the surgeon had signing authority for the fund's checking account, Sicher nonetheless forged 61 checks made payable to herself, and deposited them into her personal account, stealing over $172,000 in the process.  576 F.3d at 68.  In finding that the position of trust enhancement had been properly applied, the circuit court noted that it was not the defendant's position as a secretary alone that warranted the enhancement.  576 F.3d at 72.  Rather, the relevant factors were the lack of supervision she received in her duties while the surgeon focused on medicine and teaching, as well as the level of autonomy and discretion that was granted.  Id.

The First Circuit's decision in George is also instructive on this point.  There, a high-ranking employee of a government contractor became so trusted by the defrauded government entity that he effectively gained a position of trust vis-à-vis that entity.  841 F.3d at 67.  In reaching this conclusion, the First Circuit held that the lack of meaningful supervision the entity exerted over the defendant's use of government funds was sufficient grounding for finding a position of trust.  Id. at 69.

Application of this circuit's ample explication of the Guideline to the case at hand shows that Mr. Nygren occupied a position of trust vis-à-vis BBY, and that he used that position to both carry out and conceal (and thereby continue to carry out) the fraud crimes to which he has pleaded guilty.  Nygren himself had created the position description of BBY's financial manager.  G.E.14, ¶ 5.  This description specifies that the manager in that position "will act in a fiduciary capacity," and "is responsible for all activities related to cash management."  G.E.14, Exhibit 1, p. 1.  The job description created by Nygren also states that the position has authority, as delegated by the owners, "to make decisions and take action in order to satisfy the duties of the position."  Id., at p. 5.

Nygren took on this position knowing of these duties, responsibilities, and authorities. In the event, although he eschewed direct authority over the company checkbook (G.E. 14, ¶ 9), he was still the critical check on the financial health of the business. He had a fiduciary duty to the owner, who relied on Nygren to monitor and manage cash flow, to reconcile accounts, and to provide timely information on cash flow. Id. at ¶ 9, G.E. 15 (Hull Declaration), ¶¶ 2, 5 & 8. Regardless of his actual authority to write checks or use company credit cards, Nygren was in the position with the authority, discretion, and duty to alert ownership of any financial discrepancy. He was the watcher when it came to cash flow. Had anyone else been in that position, Nygren's fraudulent activity would have been discovered in the first month, and therefore would have likely ended before some 99% of the money was stolen.

The pivotal nature of the defendant's position in concealing the fraud (and thereby carrying it out) is made all the more plain by the chronology. Nygren came back to BBY as a consultant in late 2013. G.E. 14, ¶ 3. The then –CFO left around May, 2014, due in part to friction between her and Nygren. Id., ¶ 4. Nygren then conducted the search for a replacement candidate and, after rejecting some applicants, eventually nominated himself to the positon around June of 2014. Id., 7, 8. The first check forged in Nygren's 14-month-plus fraud was deposited into the Eastern Bank account on June 23, 2014. ECF No. 1, p. 3, ct. 1. After this, Nygren continued to steal money—including the credit-card scam beginning in January 2015— at an average rate of over $50,000 a month, until the well was dry. Not until the operating account was insolvent and the payroll checks were sure to bounce, did Nygren's activities come to light. G.E. ¶ 12. Even then, Nygren was in a position to deflect suspicion by bluffing that large receivables were incoming. Id., ¶ 15. It cannot be plausibly denied that the defendant's

position of trust "contributed in some significant way to facilitating the commission or concealment of the offense." U.S.S.G. § 3B1.3, application note 1.

In addition, the ownership and other management of BBY did, in fact, have trust and confidence in Nygren as someone who had worked at business and delivered positive results. G.E. 14, ¶ 11; G.E. 15, ¶ 9. As was the case in <u>Sicher</u>, this contributed greatly to the autonomy he was afforded, and the great faith placed in his fidelity. <u>See</u> <u>George</u>, 841 F.3d at 68.

In light of all these factors, the Court should impose the two level enhancement for abuse of position of trust in this case.

**c. The defendant should receive a two-level enhancement for obstructing justice.**

The sentencing guidelines provide a two-point enhancement where the defendant "attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution, or sentencing of the offense of conviction." U.S.S.G. § 3C1.1. Here, the defendant has obstructed or attempted to obstruct the administration of justice, first by attempting to influence the testimony of the victim through persuasion and threat, and then by malingering memory symptoms in the hopes he would be found unfit to stand trial.

**1. The defendant obstructed justice by attempting to influence the victim in this case.**

The commentary to the Guidelines provides specific examples of the type of conduct covered by the obstruction enhancement. U.S.S.G. § 3C1.1, application note 4. Included among these are:

(A) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so; . . . and

(K) threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constitution the offense of conviction.

12

Id.

The First Circuit has recently observed that "[a]ttempting to influence a witness not to cooperate with the government, either directly or indirectly, is just the type of conduct covered by § 3C1.1." United States v. O'Brien, 870 F.3d 11, 18 (1st Cir. 2017). In O'Brien, the defendant was a financial planner who had defrauded several of her elderly clients. Knowing of the proceedings against her, the defendant indicated to an attorney for one of her victims that her (the defendant's) ability to continue to repay the swindled funds might be contingent on what the victim told the U.S. Attorney. This attempted influence was held to be a proper basis for imposing the enhancement. Id. See also United States v. Anderson, 139 F.3d 291, 298 (1st Cir. 1998) (upholding obstruction enhancement where defendant instructed son to pay victim to retract accusations).

Here, the defendant made direct attempts to influence the testimony of the BBY owner, the victim of the instant fraud offenses and—as one of the people whose signatures were forged— a principal witness against him. In a recorded and transcribed statement, the defendant at first tried to beg or pay his way out:

| | |
|---|---|
| Nygren: | There's no other way to save face then is there? |
| Witness: | I don't see how. I mean, unless you can pay me back every penny right now, which I know you can't. |
| Nygren: | That's the only way? |
| Witness: | What other way would there be? |
| Nygren: | And what if, what if I can guarantee to go to AA and you f-----g got something signed every f-----g week that I went and signed a promissory note. I could pay you two thousand dollars a week for seven years. |
| Witness: | Seven years. |

| | |
|---|---|
| Nygren: | (Unintelligible) back.  I gave you half the store. |
| Witness: | I'm not going to make any deals.  Not, certainly without talking to my lawyer about it. |

G.E. 16 (Transcript of September 13, 2015 conversation), p. 20.  At this point in the

conversation, Nygren changes tack and begins to threaten his employer:

| | |
|---|---|
| Nygren: | But, Steve, this is gonna get really ugly.  Then I'll have to [unintelligible]. |
| Witness: | It's a serious crime. |
| Nygren: | I know and I'm gonna have to hire an attorney. |
| Witness: | That's right. |
| Nygren: | And he's gonna come up with a defense. |
| Witness: | I'm sure he will. |
| Nygren: | And it's gonna make everyone look f-----g bad.  I didn't want to do it. |
| Witness: | But you did, you just admitted to me you did it. |
| Nygren: | Yeah, I'm gonna admit to him, too, but he's gonna f-----g defend me.  That's why it's, that's why it's better to die. |
| Witness: | Steve, I don't want that to happen. |
| Nygren: | Because if this thing goes to court, everything's gonna, it's not gonna be pretty for anybody.  I can already see it, I've already thought about it like, f-----g.  I don't want to do that. |
| Witness: | I don't either. |
| Nygren: | But they're gonna ask questions, you know what I mean? |
| Witness: | Yeah, they are |
| Nygren: | And his job's gonna be to get me off.  I don't want to go down that road, I really don't   [Unintelligible] I did this.  I was thinking of you as a friend. |
| Witness: | I know you were. |

G.E. 16, p. 21.

The conduct in <u>O'Brien</u> was mild compared to Nygren's ham-fisted attempts to cajole or bully his victim. In first trying to pay or beg his way out, and then trying to threaten his victim into silence, Nygren had no other purpose but to influence what the witness would do or say. Clearly, he saw having "this thing go to court" as the alternative he was trying so fervently to avoid, and he indicated flatly that should "this thing" proceed criminally, his primary directive would be to "get off," regardless of his actual culpability.

This was not, however, the end of Nygren's threats to publically disparage the man from whom he had just stolen over $800,000. Having failed to move his victim to remain silent at the recorded meeting, Nygren then posted a letter on the door of the Brooklin General Store, the store he had purchased with stolen money, and which was the crossroads of the small coastal community where he committed the bulk of the charged offenses. In this letter to the community, Nygren claimed there were "at least two sides to every story" and that "there is a lot that goes on at BBY that is very well hidden." G.E. 17 (Brooklin General Store Letter dated September 15, 2015). He made reference to budget overruns and "'extracurricular affairs' that people hear about but believe not to be true." <u>Id</u>. He claimed that the boatyard was "in the red probably worse than ever," but distanced himself from causing this predicament by insinuating that he was being set up to take the fall as an "outsider" who was "obviously the easiest target." <u>Id</u>. Through this letter, Nygren communicated his intention to make good on the threat he had made in person two days before.

These acts alone warrant the obstruction enhancement set forth in the Guidelines.

## 2. The defendant obstructed justice by attempting to avoid or delay trial through malingering.

Attempting to avoid or delay trial by malingering is also well within the scope of conduct constituting obstruction of justice under U.S.S.G. § 3C1.1. United States v. Batista, 483 F.3d 193, 197-98 (3rd Cir. 2007) (finding obstruction enhancement appropriate where defendant feigns mental illness); United States v. Greer, 158 F.3d 228, 238-39 (5th Cir. 1998) (holding obstruction enhancement proper where defendant feigned mental illness to avoid standing trial). Feigning memory problems is a recognized form of this malingering. Batista, 483 F.3d at 195-96; United States v. Patti, 337 F.3d 1317, 1325 (11th Cir. 2003). That a defense expert has opined the defendant incompetent at some point in the proceedings does not rectify or excuse the conduct as anything other than obstruction of justice. See, e.g., Batista , 438 F.3d at 195 (defendant underwent five examinations, the first of which found him incompetent); United States v. Aldawsari, 740, F.3d 1015, 1021 (finding no error where district court relied on physician's report concluding the defendant was feigning symptoms, despite defense expert testimony of incompetence).

While the government has found no First Circuit case directly on point, several other circuits have addressed the issues relevant to Nygren's conduct. For example, in the Eleventh Circuit case of United States v. Patti, the defendant was indicted for various tax violations, and the case was set for trial. 337 F.3d at 1319. Prior to the trial date, however, the defendant was involved in a car accident, after which he claimed to be unfit to stand trial. Id. at 1320. As a result, Patti was committed to a federal medical facility pursuant to 18 U.S.C. § 4241(d)(1). Id. After a hearing, the trial court found the defendant was malingering, and thus competent to stand trial. The defendant then agreed to plead guilty to certain charges, and at sentencing, the district court imposed the enhancement for obstruction. Id. at 1325. The Eleventh Circuit affirmed. Id.

The Third Circuit addressed a similar pattern in United States v. Batista. 483 F.3d 193. There, shortly after an unsuccessful proffer session with the government, the defense requested a

competency evaluation for defendant Batista.  483 F.3d at 195.   The doctor who initially examined

Batista found that he was likely not competent to stand trial.  A second doctor initially agreed, but

found the result was likely due to malingering; Batista had performed far worse on a memory test

than would someone with severe brain damage, an indication of feigned symptoms.  Id.   Batista

underwent three more evaluations, each concluding, in effect, that he was "faking or exaggerating

psychiatric symptoms in order to avoid going to trial."  Id.  The district court found Batista

competent to stand trial, at which point he pleaded guilty to a single count of conspiracy to distribute

crack cocaine.  At sentencing, the district court imposed the enhancement for obstruction based on

Batista's malingering.  The Eleventh Circuit affirmed, finding the enhancement appropriate where

the defendant feigns mental deficiency.

 The Fifth Circuit has also held that conflicting expert opinions on the defendant's

competence do not prohibit the sentencing court from finding malingering.   In United States v.

Aldawsari, the district court imposed the § 3C1.1 enhancement for feigning mental illness, even

though the defense had offered expert testimony to the contrary.  740 F.3d 1015, 1021 (5th Cir.

2014).  The court of appeals found that the district court's review of a physician's report concluding

the defendant was "trying to exaggerate his difficulties so he can appear mentally ill" was sufficient

grounds to reject the defense expert's opinion and impose the enhancement.  Id.

Here, Nygren's path was quite similar to that of the defendants in both Patti and Batista.

Nygren had been notified he was a target in a federal investigation prior to his reported stroke in

April 2016.  The government delayed action for some time, but in the absence of detailed

information on Nygren's medical condition from the defense, the prosecution proceeded; the

defendant was indicted on August 11, 2016, and a summons issued.  ECF No. 1.  The initial

appearance was held on August 25, 2016, at which time the defense moved to continue arraignment.

ECF No. 9.  The arraignment was reset for October 24, 2016.  ECF No. 12.  On October 18, 2016,

the defense moved to again continue the arraignment. ECF No. 14. This motion was denied by the Court, and the arraignment proceeded as set. ECF Nos. 16, 17. The defendant entered pleas of not guilty.

On November 7, 2016, the defense moved for a competency hearing. ECF No. 20. The motion was supported by a report by the defense expert, Dr. Donnelly, opining that Nygren was not at that time competent to stand trial. ECF 20-2. Dr. Donnelly's report also noted that Nygren's chief complaint to his neurologist was memory (ECF 20-2 at p. 5), that Nygren's wife described Nygren's memory issues as "weird," (ECF 20-2 at p. 6) and that Nygren's performance on the Test of Memory Malingering was consistent with a lack of effort and an "exaggeration of memory problems." The Court granted the motion for a competency hearing on January 12, 2017, over government objection, and ordered an evaluation of the defendant. ECF No. 36. The defendant asked that his evaluation be delayed to accommodate other treatment and the preparation of a discharge report from one treatment provider. This request was granted without objection.

The ordered psychiatric report was submitted to the Court on May 12, 2017. ECF No. 39. In that report, the FMC Devens psychologist found that Nygren was competent to stand trial, and further opined that he was, in fact, malingering. She went on to assert that Nygren's selective memory symptoms—similar to those described by his wife in Dr. Donnelly's report— were not consistent with any known memory functions. ECF No. 39 at p. 23. The matter was set for hearing on June 20, 2017. On June 16, 2017, the parties held a conference of counsel, at which the defense indicated the defendant's improved condition (see ECF No. 46) and intention to plead guilty on June 20, 2017. On June 20, 2017, the Court held the competency hearing, found the defendant competent, and accepted Nygren's pleas of guilty on all counts. ECF No. 47.

Like the defendant in <u>Patti</u>, Nygren apparently suffered some injury that could plausibly affect his mental function.  Also like the defendant in <u>Patti</u>, Nygren's chief complaint relating to his ability to stand trial concerned his memory.  And, like the defendants in both <u>Patti</u> and <u>Batista</u>, Nygren's scores on memory tests indicated he was feigning his symptoms.  These acts delayed the disposition of this case significantly, and are highly indicative of the defendant's continued desire to "get off" of his criminal liability by subverting the truth.

The fact that Nygren may have duped his own expert hardly inures to his benefit.  While stroke recovery may be a "dynamic" process, the evidence showing he feigned his memory symptoms has been consistent.  And, even if he had improved somewhat from August 2016 to March 2017, his prior condition would hardly excuse malingering while at FMC Devens in 2017.

The defendant's objections to the PSR's conclusion, recited in Defendant's Objection #3, are largely red herrings.  Certainly the defendant may have had a commitment to his therapy, and may have had a sincere desire to recover physically and mentally.  Making strides in those areas would not, and apparently did not, prevent him from continuing to fake memory problems in order to avoid trial.  Similarly, there is no indication that SSA's determination of disability turned on the defendant's memory or on his ability to stand trial.  Because Nygren attempted to obstruct and impede these proceedings—and did so for some period of time—the enhancement is appropriate on this additional basis.

### d.  The defendant should not receive a guideline reduction for acceptance of responsibility.

Section § 3E1.1(a) of the Guidelines indicates a two-point reduction in offense level if the defendant "clearly demonstrates acceptance of responsibility for his offense."[2]  Here, the

---

[2] Section 3E1.1(b) allows for an additional one-point reduction in certain circumstances, upon motion by the government.  For the myriad reasons set forth herein, the government is not so moving in this case.

defendant has not clearly indicated an acceptance of responsibility. First, he has obstructed justice. Second, even after he admitted his crime to the victim, was arrested on state charges, and was released on bail, the defendant appears to have continued to engage in the type of fraudulent activity that has become his way of life. And third, the defendant continues to frivolously deny certain conduct relating to the charges of conviction.

### 1. The defendant obstructed of justice.

The commentary to the Guidelines states that "[c]onduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." A defendant is not entitled to the acceptance reduction simply because he pleaded guilty. United States v. D'Angelo, 802 F.3d 205, 210 (1st Cir. 2015); United States v. McDowell, 888 F.2d 285, 292 n. 2 (3rd Cir. 1989). In cases where the defendant has also obstructed justice, a reduction for acceptance is quite uncommon, and the defendant bears the burden of showing his is extraordinary case, United States v. Maguire, 752 F3d 1, 6 (1st Cir. 2014; United States v. Gonzalez, 12 F.3d 298, 300 (1st Cir. 1993).

In United States v. D'Andgelo, the First Circuit reiterated that cases in which both the obstruction enhancement and the acceptance reduction simultaneously lie are "hen's-teeth rare." 802 F.3d at 210. There, the defendant had denied certain relevant conduct and written letters to his codefendant suggesting that they engage in fabrications to make their case more viable. 802 F.3d at 208. The sentencing court found a basis for obstruction on the letters, and declined to give a reduction for acceptance, even though the defendant argued that he had not committed any new criminal conduct since entering his guilty plea. The circuit court affirmed the sentence, and noted that both the obstruction and the frivolous denial of relevant conduct were bases for denying the acceptance reduction. Id. at 211.

Mr. Nygren's situation is similar. There is nothing rare about this case, save, perhaps, the defendant's continued dedication to obstructing justice and evading responsibility for his actions.

### 2. The defendant's continued conduct after the offense shows a lack of acceptance.

Continuing to engage in similar conduct after being caught committing the crime of conviction also demonstrates a lack of acceptance of responsibility. United States v. Robinson, 433 F.3d 31 (1st Cir. 2005) (holding that trial court appropriate denied acceptance of responsibility where the defendant continued to write threatening letters to his wife from jail). The Guidelines commentary indicates that voluntary termination of criminal activity is a relevant consideration in determining acceptance of responsibility, as is voluntary payment of restitution. U.S.S.G. §3E1.1, application note 1 (B),(C). Here, even after his arrest by the state, the Nygren continued to engage in fraudulent financial shenanigans, and continued to attempt to intimidate the victim of is crime. The government has no information indicating Nygren has paid any restitution to BBY at any time.

As stated above, Nygren used Individual 3 to operate several bank accounts associated with Continuum and also with the Brooklin General Store ("BGS"). One of these accounts was a Key Bank checking account held by "Brooklin Center LLC," the entity associated with the store. G.E. 18 (Brooklin Center Bank Statement, October 2015). After Nygren's thefts were discovered, the pipeline of money from BBY to Eastern Bank and back to the Brooklin General Store was interrupted, imperiling the viability of the store as a going concern. In this time of need, BGS managed to secure a $38,000 injection of funds from a company called Rapid Financial, also known as Rapid Advance. G.E. 19 (Wire Transfer from Rapid Financial). This money basically represented BGS selling money to be taken out of its future credit card receipts in exchange for $38,000 cash in hand. Nygren was not a signatory to the contract; the main

applicant was Individual 3, his elderly aunt and the sole member of Brooklin Center LLC. The co-signer was Nygren's mother. The money came in on October 16, 2015. G.E. 18, 19. Also on October 16, 2015, Brooklin Center LLC issued a check to Nygren's wife for $2,500, and one to "Company D" for $6,800. G.E. 21 (Checks from Brooklin Center's Key Bank records).

Company D is the entity referred to in Paragraph 16 of the PSR and is associated with "Individual 4".[3]  In his objections to the PSR, Nygren has claimed that Individual 4 was his "bookie" and that the transactions he had with him, most notably several thousand dollars of PayPal transactions constituting a sizable part of the conduct in Count 64, were bets Nygren placed. PSR, Defendant's Objection #2. The memo line of the $6,800 check indicates that it is for certain PayPal transactions. G.E. 21. And indeed, Individual 4's PayPal account records for that same time period show the reversal of multiple payments from Steven Nygren, likely due to Nygren's BBY credit card fraud coming to the attention of the issuing banks. G.E. 22. Nygren's claim of his relationship with Individual 4 is supported by the pattern of the transactions, and the fact that around the time of Nygren's payments to Individual 4, Individual 4 used his own PayPal account to make payments to whowillcover.com, a site dedicated to sports gambling odds.[4] Additional checks went from Brooklin Center to Company D on October 30, 2015 ($4,400) and on November 14, 2015 ($2,000). G.E. 21. Other checks, some for $1,500 each, also went to Nygren's wife. G.E. 21.

The store closed in the February of 2016. The contract with Rapid financial was soon in default, and a lawsuit against Brooklin Center LLC, Individual 3, and Nygren's mother followed. G.E. 23. Individual 3 discharged the debt as to herself and Brooklin Center through Bankruptcy.

---

[3] Because the defendant has alleged he engaged in criminal conduct with this unindicted individual, the government will refer to this company and Company D and the owner of the company as Individual 4.

[4] Counsel for the government was not able to attach a screen capture from this website, as gambling sites are restricted on Department of Justice computers.

U.S. Bankruptcy Court, D. Mass, Case 16-11982, Doc 1, p. 27; G.E. 23.  Nygren's mother now remains as the sole obligor on the contract, and is being sued for the outstanding balance.  G.E. 23.

All this documentary evidence, in light of the timing of the defendant's charged offenses, indicates the following likely scenario:  once caught stealing from BBY, after running the accounts dry there, Nygren still had gambling debts to pay and an unsustainable lifestyle in Massachusetts to keep up with.  With no more funds coming from BBY, he needed another source of cash.  When the Rapid Advance money came in, he took a sizeable part of it off the top for expenses having nothing to do with keeping the store open—namely, his gambling habit and personal expenses.  The store faltered, and Nygren's elderly relatives were left holding the bag.  Sadly, this story fits all too well with Nygren's other activities in the preceding months and years, and shows that even when feigning remorse to the BBY owner, Nygren had not changed his conduct at all, and had very little intention of accepting responsibility for his actions.

### 3. The defendant's denial of relevant facts and relevant conduct show a lack of acceptance of responsibility.

Frivolous denials of relevant conduct are inconsistent with an acceptance of responsibility.  See U.S.S.G. § 3E1.1, application note 3; D'Angelo, 802 F.3d at 209.  Here the defendant has made many such denials, in addition to other denials that have little bearing to the outcome of the case (discussed below).

In Defendant's Objection #5, as related in the Revised PSR, Nygren claims that he was not in a position to conceal his crimes "in any way."  Nonetheless, Nygren claimed in his open letter posted at the Brooklin General Store that he had a vantage point that gave him insights on the finances and a position that made him easy to blame for financial losses.  G.E. 17.  In addition, he claims that BBY did not allow him check-writing authority.  These claims are

contradicted by Both White and Hull, who point out that Nygren's duties involved account reconciliation, and that it was Nygren who insisted that he not be given check-signing authority. G.E. 14, 15.

Nygren also claims that any failure to effectuate the IRS garnishment on his wages at the Wolfington Group were a result of the firm's failures, not Nygren's own acts. PSR, Defendant's Objection #2. This denial is not only frivolous, but also somewhat odd, given that the defendant has pleaded guilty to all counts of the indictment, including Count 65 which alleges his use of a false Social Security Number as an employee and as a subcontractor, as well as his use of accounts in his wife's name to receive his remuneration. ECF No.1, ¶¶ 11(a), (b), (c). See also, G.E. 8 through 13.

Nygren also appears to deny that he stole from Bonded Transmission in Framingham, Massachusetts, as he claims he only received an advance on his salary and subsequently paid it back. PSR, Defendant's Objection #2. What is odd about this denial is that he pleaded guilty to theft relating to this incident (see G.E. 24), and that he does not appear to deny that he forged the checks, or that he funneled some of the money through AOH, where he was an officer. PSR, ¶ 15. For the reasons set forth in sub-section (5), below, any denial of theft from Bonded Transmission is similarly frivolous.

### 4. The Court should impose a two-point enhancement under U.S.S.G. 4A1.1(d) because the defendant was under a criminal justice sentence at the time of certain instant offenses.

As set forth in Paragraph 51 of the PSR, the defendant was under a criminal justice sentence at the time he committed some of the crimes of conviction. Specifically Nygren was subject to the constraints of a "continuance without finding" disposition relating to a larceny in Framingham Massachusetts. G.E. 24. Under U.S.S.G. § 4A1.1, application note 4, a "criminal

justice sentence" is "a sentence countable under § 4A1.2." Section § 4A1.2(a)(3), in turn, requires convictions "for which the imposition or execution of sentence was totally suspended or stayed to be counted. United States v. Fraser, 388 F.3d 371, 374 (1st Cir. 2004). In addition, § 4A1.2(f) counts diversionary dispositions, such as continuances without findings as imposed in Massachusetts. United States v. Morillo, 178 F.3d 18, 21 (1st Cir. 1999). It follows, as the First Circuit has observed, that while the defendant was under conditions in his continuance without filing, he was "subject to a criminal justice sentence" within the meaning of the guideline. United States v. Fraser is directly on point. There, the First Circuit looked to the Massachusetts probation violation rules to confirm that CWOF dispositions have a "custodial or supervisory component" by merit of the consequences available for those who violate condition during the continuance. 388 F.3d at 376. Nygren's Massachusetts disposition counts because he was on "administrative supervision" during the continuance. G.E. 24, p. 2. Therefore, as set forth correctly in the PSR, at least some of the crimes of conviction in this case were committed when Nygren was under another sentence, making the two-point increase in criminal history proper.

> **5. The Court should impose and upward departure in this case because the defendant's criminal history would be substantially underrepresented by only three criminal history points.**

The Guidelines permit the Court to impose an upward departure if the defendant's criminal history is underrepresented due to the existence of similar adult criminal conduct not resulting in convictions. U.S.S.G. § 4A1.3(a)(2)(E). The first Circuit has recently endorsed the application of this Guideline. In United States v. Eustis, the district court imposed an upward departure in a 18 U.S.C. 922(g)(9) case based on additional uncharged acts of domestic violence, moving the criminal history category from II to III. The circuit court found no procedural error and affirmed the sentence.

Here, Nygren has engaged in significant additional criminal conduct, all also pertaining to significant fraud and the forging of checks. Indeed, these crimes all interconnected in a string of conduct, where the fraud against one victim is used to pay off a previous mark.

Although Nygren has denied forging checks stolen from Mr. Wolfington, the available evidence strongly supports the conclusion he did. Mr. Wolfington's statement explains that two checks were stolen—out of order—from his personal checkbook. G.E. 25. He noticed the theft when he saw two strange transactions involving a Massachusetts social club, the Ancient Order of Hibernians, or AOH. G.E. 26, 27. Alarmed, he reported this to the local police, as well as to his bank. G.E. 28, 29. His bank was able to determine that Nygren was involved with AOH. Armed with this information, Wolfington confronted Nygren, who eventually admitted to the theft and agreed to pay the money back. Nygren also admitted his theft to two other Wolfington employees. Nygren did return the funds to Wolfington promptly, although not without attempting to pay for a portion of the money with a check from AOH backed by insufficient funds. G.E.30. These acts constitute additional bank fraud and identity theft for which the defendant was not criminally charged.[5]

After leaving Wolfington, Nygren used the Wolfington Group name to defraud an auto dealership in Massachusetts and New Hampshire, contracting to perform promotion services he never performed, but nonetheless receiving and advance up front. G.E. 33 (Michaud Interview Report), 34 ("Wolfington" invoices for Michaud Motors). These acts, at the very least, constituted theft by deception.

---

[5] The defendant has disputed this conduct in PSR Defendant's Objection #2. It may be that the defendant was confusing this with another questionable transaction reflected in G.E. 31 and G.E. 32. To the government's knowledge, this other loan drawn on the company account was repaid as described by the defendant.

After defrauding Mr. Michaud, Nygren was able to secure consulting work at Bonded Transmission in Framingham, Massachusetts. Nygren eventually gained access to the checkbook and issued stolen and forged checks to various accounts he had access to at the Salem post of the Ancient Order of Hibernians (the same organization that received the funds stolen from Wolfington). The owner of Bonded Tranmission found out and reported the stolen checks to police. G.E. 35 (Hines Interview Report), G.E. 36 (Framingham Police Report). While Nygren did have a criminal justice sentence for stealing the checks (larceny under $250), there is no indication he was ever held accountable for that act of bank fraud. Indeed, it appears the bank has never been repaid from Nygren's fraud. G.E. 35, 37 (email between Nygren and Hines). In June of 2014, Nygren did agree to pay back the advances he still owed Bonded Transmission, at the rate of $1000 per month on the debit card connected to one of the Eastern Bank accounts "d/b/a" Continuum. G.E. 37, G.E. 38 (Bonded Debit Card Receipts) , G.E. 39 (Eastern Bank POS receipts). Not coincidentally, June of 2014 is the month when Nygren began stealing money from BBY at the rate of over $50,000 per month and transferring it into that same Eastern Bank account. ECF No. 1, G.E 1.

As noted with the Wolfington and Bonded capers, Nygren made liberal and fraudulent use of the AOH checking accounts in this same timeframe, very likely committing other acts of bank fraud and forgery in the process. G.E. 40.

Nygren claims that he never conspired with Individual 4 to commit tax fraud through false business deductions. Given the record, it makes more sense that Nygren would have been involved in that scheme, as the tax savings involved with the fraudulent deduction are in line with Nygrens gambling habits. It also makes sense because it explains how Individual 4 could have gotten the tax id number for Continuum. Moreover, since Nygren was already in debt to

the IRS for around $1million, there is a certain logic to his willingness to take on potential ne tax liability.  Nonetheless, the government has no more information than that just cited.  It is possible that Nygren's claim is accurate and he did nothing more than gamble with stolen money, potentially aiding and abetting 18 U.S.C. 1084 in the process, and eventually sticking his mother with the bill.

### 6.  The remaining factual disputes are either resolved by documentary evidence or have little bearing on the proper sentence in this case.

In addition to the above-described denials, Nygren also quibbles with several additional details.  The government respectfully submits that, for the most part, the resolution of these matters is not central to determination of the proper sentence.

For example, Nygren objects that his daughter's wedding cost something less than $70,000.  This number came from Nygren's recorded conversation with the victim.  G.E. 16, p. 19.  The government has little choice but to accept the defendant may have been lying to the victim to cover for the fact he spent much of the money on gambling.

Other denials are telling in how little they actually deny.   The defendant denies he dined out at the Brooklin Inn Pub "daily"; perhaps not, but neither, apparently, did he subsist on locusts and wild honey while stole hundreds of thousands of dollars and evaded his million dollar debt to the government.  He claims he did not buy jewelry for his daughter "with the proceeds of" the charged offenses; perhaps not, but setting aside the fact that money is fungible, it seems likely that stealing over $50,000 a month on average may have opened up his other finances for such expenditures.

### III. Additional Sentencing Considerations.

Due to the scope of the charges offenses, the larger course of conduct, and the multiple avenues of obstruction, the court should also consider a departure based on § 5K2.0.

Dated: October 19, 2017                        Respectfully submitted,

                                                            HALSEY B. FRANK
                                                            UNITED STATES ATTORNEY

                                                            /s/Chris Ruge
                                                            Assistant United States Attorney
                                                            U.S. Attorney's Office
                                                            202 Harlow Street, Room 111
                                                            Bangor, ME  04401
                                                            (207) 945-0373
                                                            chris.ruge@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 19, 2017, I electronically filed the GOVERNMENT SENTENCING MEMORANDUM with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Roger F. Brunelle, Jr., Esq.

HALSEY B. FRANK
United States Attorney

/s/ Chris Ruge, Esq.
Assistant United States Attorney
United States Attorney's Office
202 Harlow Street, Suite 111
Bangor, ME 04401
(207) 945-0373
chris.ruge@usdoj.gov