UNITED STATES DISTRICT COURT
DISTRICT OF MAINE


| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 1:16-CR-106 |
| | ) | |
| STEVEN NYGREN | ) | |

## DEFENDANT'S RESPONSE TO
## GOVENRMENT'S SENTENCING MEMORANDUM

Defendant Steven Nygren respectfully files this Response to Government's Sentencing Memorandum.

## I.     Introduction and Background Facts

On September 16, 2015, the defendant was arrested by the Maine State Police and charged with related state offenses. Nygren was released on bail September 23, 2015. On August 10, 2016, a 65-count indictment was returned and filed in the District of Maine – Bangor. Counts 1-63 charged Nygren with Bank Fraud. Count 64 charged Nygren with Access Device Fraud. Count 65 charged Nygren with Tax Evasion.

Based on the return of the indictment, the defendant was scheduled to appear before The Honorable John C. Nivison, U.S. Magistrate Judge, on August 25, 2016.  This date, the defendant initially appeared and was released pursuant to a $15,000 unsecured bond with Pretrial Services supervision. The Defendant suffered a stroke on or about April 9, 2016.  In July, 2016, the Defendant's primary treating neurologist, Dr. Alvin Das, MD, opined that the Defendant experienced significant cognitive impairment as a result of the stroke.  Dr. Das stated that the Defendant experienced "profound" cognitive deficits.  The arraignment was continued until

October 24, 2016, based on the defendant's medical condition and the motion from the defense to obtain an expert witness to conduct a competency evaluation.

On October 24, 2016, the defendant again appeared before Magistrate Judge Nivison and was arraigned on the indictment, pleading not guilty. Following arraignment, Nygren was released on the same bond as initially imposed.  On November 7, 2016, the defendant filed a motion for a hearing to determine competency. On January 12, 2017, The Honorable John A. Woodcock, Jr. U.S. District Judge for the District of Maine, issued an order for an evaluation of the defendant for his present competency to stand trial, pursuant to 18 U.S.C. § 4241(b).

On February 21, 2017, the defendant reported to FMC Devens in Ayer, Massachusetts, to commence with this process. Nygren was released from Devens, on March 23, 2017, following the completion of the evaluation. A competency hearing was scheduled for June 20, 2017, but not held because the defendant withdrew his motion for a competency hearing.  The very same day, June 20, 2017, the defendant appeared before Judge Woodcock and entered a guilty plea to all 65 counts of the 65-count indictment with attorney representation. There is no plea agreement in this case.

The remaining issues requiring resolution by the court at this time are as follows:

1. Whether the defendant employed sophisticated means in the course of his fraud or in his tax evasion pursuant to U.S.S.G. ' 2B1.1(b)(10)(C) and ' 2T1.1(b)(2);

2. Whether the defendant furthered the execution or concealment of his fraud activities through the abuse of a position of trust pursuant to U.S.S.G ' 3B1.3;

3. Whether, pursuant to U.S.S.G. ' 3C1.1, the defendant obstructed justice through attempted influence of witnesses, or through his later malingering during competency evaluations;

4. Whether the defendant should have a reduction in offense level for acceptance of responsibility, pursuant to U.S.S.G. ' 3E1.1

5. Whether—as the result of his 2014 "continuance without finding" disposition in Massachusetts—the defendant was under a criminal justice sentence within the meaning of U.S.S.G. ' 4A1.1(d) when he committed any of the instant offenses;

6. Whether the defendant's criminal history is underrepresented or overrepresented by the resultant criminal history calculation, per U.S.S.G. ' 4A1.3; and

7. Several factual disputes of varying degrees of relevance, relating to the above sentencing factors and the proper ultimate sentence under U.S.S.G. ' 5H1.4 and ' 5K2.0, as well as under 18 U.S.C. ' 3553(a).

8. Whether the Court should impose a sentence outside of the guideline range in accordance with Title 18 U.S.C. Section 3553(a), in accordance with Mr. Nygren's motion for such.

## II.    *Mr. Nygren should not receive an enhancement for the use of sophisticated means.*

In accordance with the following, U.S. probation has recommended that Mr. Nygren should not receive a two point enhancement for the use of sophisticated means relating to the bank fraud counts.  In relevant part the PSR states:

**PSR ¶29:**     **Specific Offense Characteristics:** Pursuant to USSG §2B1.1(b)(10)(C)& comment. (n.9), the Probation Office strongly considered an enhancement for the use of sophisticated means. This usually means especially complex or intricate offense conduct. Conduct such as hiding assets or transactions through fictitious entities, corporate shells, . . . ordinarily indicates sophisticated means. In this case, Nygren induced a relative to open an account in his business' name. He then sent checks for deposit into that account, many times to be returned to a different Maine corporation bank account, and then spent the money. The "use of shell corporations, straw entities, or even multiple corporations that also served a legitimate function to facilitate or conceal a crime will customarily constitute sophisticated means . . . as may the use of multiple accounts to launder money." *Federal Sentencing Guidelines Handbook, Text and Analysis*, Pg. 433, Haines,

3

Bowman, and Woll, 2016-2017 Edition. This was a close call to the Probation Office, but our office is not recommending the enhancement at this time. The listed cases in this resource all seemed to have involved fictitious entities. Nygren used multiple corporations and multiple accounts as part of this case. However, the account Nygren was sending the money to at Eastern Bank opened by his aunt was listed as with a d/b/a with the same name as the defendant's corporation he independently contracted with BBY for his services. Further, White allegedly knew of the defendant's role in Brooklin General. Therefore, even though Nygren used multiple entities and accounts, they were not truly "fictitious" or shell. The transfer of funds to those entities for deposit is not particularly complex in concealment and it does not appear to be an intent to launder funds.

The Court should accept Probation's assessment of the enhancement, and elect not to impose such in determining an appropriate sentence for the bank fraud counts.

The common thread among cases cited by the Government as an example where sophisticated means was used in bank fraud cases is the concept of "concealment." The act of concealment allowed for the parties in the cases cited by the Government to perpetrate the offenses. It is well established that Mr. White and Brooklyn Boat Yard ("BBY") itself dealt with Nygren and Mr. Nygren's consulting company, Continuum, for years. The act of fraud occurred when Mr. Nygren wrote checks to Continuum without the authorization of BBY. Mr. Nygren did not use a fake or fictitious company, unknown to BBY, in order to perpetrate the offense. Had Mr. Nygren done so, the Government's argument would have merit.

In order to for bank fraud to occur there has to some action by the party who committed the offense. Certainly not all acts of bank fraud are sophisticated. In fact, it is well accepted that a "sophisticated act" is distinguishable from other normal acts of bank fraud. *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015). The conduct will only qualify for the enhancement when the offense as a whole shows "'a greater level of planning or concealment' than a typical fraud of its kind." *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015), citing, *United States v. Knox, 624 F.3d 865, 870-72 (7th Cir. 2010)* (quoting *United States*

*v. Wayland, 549 F.3d 526, 528-29 (7th Cir. 2008))*.  The examples cited by the Government that qualified for an enhancement all involved complex planning and execution of an involved scheme to perpetuate the fraud.  Mr. Nygren's act of writing checks to Continuum is not a sophisticated act at all.

In support of its argument the Government points to the fact that the bank account maintained by Continuum was located in Massachusetts at Eastern Bank; the account was listed under a relative's name d/b/a Continuum; the funds were distributed to various entities or accounts after deposited in the Continuum account; and, the fact the company had not remained active with the Commonwealth of Massachusetts.  None of these factors actually relate to the act of committing the fraud itself, or assisted Mr. Nygren in committing the act.  It paints a picture of what occurred thereafter, only.  The accepted fact is, the checks were written to Continuum and deposited in an account listed as Continuum. What happened with the funds after the fact is not relevant to determining whether the methodology employed by Mr. Nygren (the check writing to a consulting company known by BBY) was a sophisticated act.

Although Probation did not recommend the enhancement for use of sophisticated means for the bank fraud counts, Probation has elected to recommend that Mr. Nygren receive the enhancement for the tax evasion counts.  In relevant part, Probation stated:

**PSR ¶36**  **Specific Offense Characteristics:** Pursuant to USSG §2T1.1(b)(2), and comment. (n.5), if the offense involved sophisticated means the offense level is increased by two. Conduct such as hiding assets or transactions or both through the use of fictitious entities, or corporate shells, ordinarily indicates sophisticated means. While sophisticated means for the bank and credit card fraud was a close call, sophisticated means for the tax evasion appear to be clear. The defendant hid assets and income. He used a fake social security number. He lied to authorities and submitted false forms to the IRS. He asked to be paid to his wife's accounts and created an account that was not reported to the IRS, in order to hide assets. Nygren asked to not be directly hired by an employer but to continue on as a subcontractor. He converted income payments to cash rather than have the money deposited into any account. He had bank accounts and a corporation created by

his aunt and put everything in his aunt's name. These activities were not really done to conceal the bank and credit card fraud; however, they were done to make sure he did not own anything, so the IRS could not levy any of his assets or income.

The Government also seeks an enhancement for sophisticated means relating to the same. Certainly Mr. Nygren did not pay his taxes. However, Mr. Nygren did not utilize a means involving a high degree of complexity to do so.

It is alleged that beginning in 2010 Mr. Nygren primarily worked with two companies, The Wolfington Group and BBY. During such time he concealed income received from such entities from the IRS, constituting in tax evasion. Mr. Nygren has admitted to such by pleading guilty.

While working with the Wolfington Group worked with as an employee and subcontractor, Mr. Nygren utilized a false social security number. In addition, Mr. Nygren directed the company to issue payments for his services and employment to an account under his wife's name. While Mr. Nygren did not file his taxes in a timely manner, and admits to the above-mentioned misconduct, Mr. Nygren did file his taxes for 2011, 2012, and 2013. These tax returns encapsulate all the compensation received by Mr. Nygren during those years, including that received from the Wolfington Group. Although belated, the returns were eventually filed, revealing the true extent of the compensation Mr. Nygren received. Taxes were also deducted from his paychecks during his employment with Wolfington Group. There is no allegation that Mr. Nygren failed to pay the amount of taxes owed. Accordingly, the argument that he used a sophisticated means to evade taxes is essentially negated by the filing of such, and payment of taxes owed, by Mr. Nygren.

That being said, the use of a false social security number is, in itself, is not evidence of sophisticated means. The Government cites to *United States v. Evano*, 553 F.3d 109, 113 (1st Cir.

2009), as an example justifying why Mr. Nygren should receive an enhancement because he issued a false social security number to his prior employer. However, the acts engaged by Mr. Nygren, and those of the defendant in *Evano*, are entirely distinguishable.  The defendant in *Evano* used social security numbers of at least eight individuals in order to get documents such as driver's licenses and Social Security cards. *United States v. Evano*, at 109.  As for the two-level enhancement for use of sophisticated means, the district judge imposed it not simply because defendant used false IDs and documents but because he undertook elaborate efforts to conceal his scheme.  *Id.*  In addition*,* the Evanos targeted multiple restaurants, hotels, supermarkets, hospitals, doctors and insurance companies in several different regions, including Massachusetts, Rhode Island, Maryland, Virginia and the District of Columbia. *United States v. Evano*, at 113.  They used fictitious names, fake identifications such as false social security numbers, and most importantly, they actually ingested glass particles. *Id.*  All this was enough to make their scheme more effective and difficult to thwart, and it is enough to justify the enhancement. *Id*.  The scheme employed by the Evanos was far more complex than Mr. Nygren arranging for a company to pay his wife, or Mr. Nygren submitting a false social security number to the same.

 We have to start with the underlying concept, just as in bank fraud, that not all acts of tax evasion are sophisticated, and that Mr. Nygren would need to have engaged in some activity that that is distinguishable from other acts of tax evasion to receive an enhancement for use of sophisticated means. *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015).  In order to accomplish the act of tax evasion, there needs to be some act of concealment.  Mr. Nygren did not engage in any activity that one could say is truly distinguishable from others who commit tax evasion.  There is simply nothing remarkable that would justify the enhancement.

 The Government also argues that the manner by which Mr. Nygren used the funds from BBY justifies the enhancement. Mr. Nygren utilized a relative (Individual 3), to disguise his income

and control his assets.  Specifically, Individual 3 was used to set up bank accounts in her name for Continuum and Brooklyn Center, LLC.  As indicated above, Continuum was the consulting company used by Mr. Nygren, known to BBY and its employees.  It was an actual company, not "fictitious" as the Government has alleged.  It was only "defunct" because Mr. Nygren failed to pay the annual fee necessary to keep the company in good standing with the Commonwealth of Massachusetts.  Continuum's status with the state did not assist with tax evasion in any way.

The fact that the bank account for Continuum was in the name of Individual 3 d/b/a Continuum did allow for Mr. Nygren to conceal that the funds were taken from BBY form the IRS.  In addition, the use of the funds to renovate and operate the Brooklyn General Store did perpetuate Mr. Nygren's ability to avoid taxes.  Individual 3 was also used to establish the company Brooklyn Center, LLC, and maintain a bank account for the same company.  However, the processes necessary to establish bank accounts or start a company in Individual 3's name was not difficult to accomplish, not require sophistication to do so.  Even the Government has concluded that Individual 3 did nothing illegal when either setting up the bank accounts or assisting Mr. Nygren in establishing, maintaining the bank account associated with Continuum or Brooklyn Center, LLC.  There has to be some mechanism to effectuate the tax evasion.  The one Mr. Nygren utilized does not distinguish itself from others have used to evade paying taxes to justify the enhancement.

The Government uses *United States v. George*, 841 F.3d 55, 66 (1st Cir. 2016), as an example justifying the enhancement, concluding that Mr. Nygren's actions were similar to those in such case.  The actions taken by the defendant in *George* are entirely more complex and sophisticated than those of Mr. Nygren.  In *George*, the defendant actually created a shell corporation, for which its sole design was to perpetuate the fraud and crimes of the defendant.  That is simply not the case in this matter.

## II.  *Mr. Nygren should not receive an enhancement for abuse of a position of trust.*

Section §3B1.3 of the Sentencing Guidelines provides for a two-level increase in offense level if the defendant abused a position of private trust "in a manner that significantly facilitated the commission or the concealment of the offense." U.S.S.G. §3B1.3.  To justify this enhancement, a sentencing court must find that the defendant held a position of public or private trust and that he used the position to facilitate or conceal his offense. See *United States v. Pacheco-Martinez, 791 F.3d 171, 178 (1st Cir. 2015).*  Probation has recommended that Mr. Nygren receive such an enhancement:

**PSR ¶36**  **Adjustment for Role in the Offense:** The defendant abused a position of public or private trust, in a manner that significantly facilitated the commission or concealment of the offense; therefore, the offense level is increased by two (2) levels pursuant to USSG §3B1.3. Nygren occupied a position of substantial discretionary judgement that is ordinarily given considerable deference and one which facilitated the commission or concealment of the offense. Specifically, Nygren was the CFO of BBY, as described earlier in the report. He holds a Bachelor's Degree in Business Administration. As such, Nygren had substantial control and significant discretion over the business and its funds, and, at least, without meaningful oversight. While Nygren did not have authority to sign the checks he issued to himself, have a credit card, or make the charges he made, it does not appear that White reviewed any of the statements for accuracy. White appears to have completely trusted Nygren with the financial aspects of the business. BBY "imbued" the defendant with the broad power over the use of funds, conferred a special trust and confidence by proxy with a lack of oversight, and the defendant abused that trust to facilitate or control the criminal activity. See *U.S. v. George*, 841 F.3d 55 (1st Cir. 2016), and *U.S. v. Chanthaseng*, 274 F.3d 586 (1st Cir. 2001).

The Government is also seeking such an enhancement.

There is no dispute that Mr. Nygren maintained a positon of trust with Mr. White, and BBY.  However, the dispute involves whether that position allowed Mr. Nygren actually commit or conceal the offense of bank fraud.  The act of the fraud itself was the signing of checks from BBY's bank account.  Mr. Nygren's position at the company did not allow him to gain access to the account, nor did Mr. Nygren have check writing authority with the account.  The assertion

that Mr. Nygren had broad use over the BBY bank account, or was deemed a proxy to exercise control over the funds in the account is not accurate. The only way Mr. Nygren was able to access such funds was to forge the names of those who actually had authority or control over such. If Mr. Nygren was to use funds in the BBY account he had to obtain permission from those who had authority and control over the funds. There is simply no evidence that Mr. Nygren's position with the company allowed him to write the checks and commit the fraud.

The only remaining question that must be answered to determine whether Mr. Nygren should receive the enhancement is whether Mr. Nygren's position with the BBY allowed him to conceal the fraud. First, there is nothing indicating in writing what Mr. Nygren's role at the company actually was. The Government refers to an exhibit (14.1 and 15.1) where a written description of "Financial Manager" position at the company is laid out. As indicated on the exhibit, the position was actually defined and created in 2004. While as a consultant to the company, Mr. Nygren created the position description, as well as numerous other positions for Steve White. Mr. Nygren was tasked to assist Mr. White in 2004 to help structure BBY by writing the descriptions for a number of employment positions, including the position of financial manager. Mr. Nygren did not draft this description of financial manager to define the work he performed for BBY in 2014. In fact, there is no evidence Mr. Nygren became a salaried employee; i.e. payroll records, or the like.

Mr. Nygren's role at the company was unique, and somewhat undefined. The Government has not produced any exhibit where Mr. Nygren has signed a document acknowledging he is assuming the responsibilities alleged by the Government. Even the owner of BBY uses the terms CFO and financial manager interchangeably when referring to Mr. Nygren's job at the company. There were a number of individuals at the company who were

responsible for monitoring and reconciling the BBY accounts. Frank Hull (Vice President), Brent Morey (Operations Manager), and Steve White (Owner and President), all had access to and controlled the BBY primary bank account, from which Mr. Nygren withdrew the funds. It was simply not Mr. Nygren's job to do so. Mr. Nygren's job at the company primarily involved monitoring and directing company payroll, materials, marketing, and accounts receivable

It is not disputed that all paper statements were sent directly to Mr. White directly with the account balances and activity of the BBY bank account, from which Mr. Nygren wrote the checks and took ho took the funds. It is not disputed that Mr. Nygren had no check writing authority for the subject account. There is no evidence that Mr. Nygren had any other authority over the subject account that would allow him to monitor or access such.

Both Frank Hull, Brent Morey routinely accessed the subject account electronically, because they were the only employees of the company who had authority to do so. When Mr. White confronted Mr. Nygren about the theft, the conversation was recorded. During such time it is revealed that Brent Morey was the individual in the company who was authorized to engage in wire transfers. GE 16 at 16. Because of Brent Morey's responsibilities at company relating to bank transactions even Mr. White thought that Brent Morey was working in concert with Mr. Nygren. GE 16 at 18. Mr. Nygren could not transfer funds, withdraw funds, or manage funds without he express authorization of someone else at the company with that authority. It makes no sense that Mr. Nygren would be assigned to reconcile accounts to which he had no access to, or authority to control.

In addition, the mere fact that Mr. Nygren's illicitly used a credit card that was issued to him is not evidence of violating a position a trust. Mr. Nygren was given a credit card, like many others at the company. Mr. Nygren clearly used such beyond the scope of what acceptable.

However, his role at the company had nothing to do with the act of using the credit card, or concealing the usage.  Mr. White received an accounting of the credit card usage, not Mr. Nygren.  Mr. Nygren simply would have been unable to conceal the activity on the card from Mr. White.

The cases cited by the Government as examples where the enhancement was warranted are distinguishable from this case.  In every example cited by the Government, the defendants had authority and access over the funds that were utilized to perpetuate the fraud.  There is no dispute that there was nothing inherent in Mr. Nygren's position with BBY that allowed him access to the funds that were taken from BBY.

### III.     Mr. Nygren should not receive an enhancement for obstruction of justice.

The Government and Probation have elected to recommend that Mr. Nygren receive an enhancement for obstruction of justice.  Probation states in relevant part:

**PSR ¶19**     Pursuant to USSG §3C1.1, comment. (n.3), the obstruction of justice enhancement can apply to feigning incompetence. See *U.S. v. Greer*, 158 F.3d 228 (5th Cir. 1998). The enhancement is meant to apply to wrongful behavior whose execution requires a significant amount of planning and presents an inherently high risk that justice will be in fact obstructed. Putting on the pretense of incompetency demands not only dramatic ability but planning and resolve. It is not the result of a spur of the moment decision. The Court must carefully consider whether the defendant engaged in such behavior in a conscious and deliberate attempt to obstruct or impede the administration of justice. Was the feigned incompetence willful (conscious, deliberate, voluntary, and intentional)? It is a factual determination to be made by the Court that a defendant made a calculated attempt to mislead the Court. It is not suggested that every instance of feigned incompetence justifies an enhancement for obstruction of justice. See also *U.S. v. Cline*, 332 Fed.Appx. 905 (4th Cir. 2009) – Cline malingered on psychiatric and psychological evaluations which were furnished to the district court in support of a downward departure, and *U.S. v. Batista*, 483 F.3d 193 (3rd Cir. 2007), further citing *U.S. v. Patti*, 337 F.3d 1317 (11th Cir. 2003). *Batista* was evaluated five times over the course of two years and similar to this case, a doctor initially concluded *Batista* was not competent but testing consistently indicated a malingering of memory problems.

**PSR ¶20**     The Probation Office is recommending that the enhancement be applied in this case, as the evidence suggests that Nygren engaged in a sustained pattern of trying to appear more impaired than his actual condition.

**PSR ¶21**    The facts and objective testing is this case are clear. The defendant was arrested and charged by state authorities in September 2015. In April 2016, Nygren suffered a stroke. Spaulding Rehabilitation Hospital medical records demonstrate Nygren relayed to treatment providers within a month after the stroke his physical functioning returned to 99%. The only problems that remained were with body temperature regulation and diminished vision acuity. He noticed diminished memory capacities; however, he noticed a lot of improvement and recovered from 50% at the start of the evaluation to 90% by the end. On or about July 21, 2016, the defendant's wife requested a letter from Nygren's neurologist, undated, that stated his medical condition prevented him from participating "in any trial as a witness" as the result of deficits in his cognitive and memory functions secondary to a stroke. The letter noted that deficits are expected to last for several months and improve over time. Brenda Nygren did not accurately report Nygren was a criminal defendant or likely subject to prosecution. The doctor was interviewed by the FBI and reported to FBI agents he was unaware of any pending criminal charges against Nygren, he provided the letter to Nygren's primary care physician, that the letters "are fairly common," and are "generally used to give to employers to justify an employee's absence." After the completion of 37 rehabilitative sessions at Spaulding, Nygren made gradual gains throughout treatment, and exhibited improvement across all domains. Of particular note, Nygren was administered a battery of tests at Spaulding and results were "inconsistent with expected progressive rehabilitation." He was tested in May, July and September 2016. Over the three testing periods, results went from borderline to average, then low average in Immediate Memory. Visuopatial subtests went from average to superior to average. His Attention subtest was average twice, then extremely low in September (a 51 point difference). Delayed Memory subtests were extremely low for all three periods and Full Measure went from low average to average to extremely low in September 2016. "In light of the unusual inconsistencies between and across measures the validity is suspect." In order to determine competency in this case, the defendant underwent a forensic evaluation by Dr. Peter Donnelly, with a report prepared on October 15, 2016. Dr. Donnelly concluded, in his October 2016 evaluation, at that time, Nygren lacked legal competency. However, Dr. Donnelly noted "caution" was taken with the recommendation as malingering testing "could have" indicated Nygren was exaggerating the extent of his memory loss. Specifically, Dr. Donnelly administered the Test of Memory Malingering. On second retention trial, Nygren scored 28 out of 50. "On second retention trial, scores of less than 45 are suggestive of not putting forth sufficient effort during the test taking and may be associated with exaggeration of memory problems." The defendant was re-evaluated by Bureau of Prisons (BOP) staff. The BOP evaluator noted that several empirical measures confirmed a persisting tendency toward applying insufficient effort during testing procedures, which resulted in feigned or exaggerated cognitive limitations consistent with malingering. "Notably, the nature of the memory lapses Nygren endorsed is not indicative of known memory processes. Nygren's endorsed memory deficits associated with the instant charges are focused narrowly on the facts related to the instant allegations against him. . . . Such selective memory impairment is inconsistent with any known memory functions." The BOP evaluation found Nygren competent to stand trial in a report dated April 25, 2017. Dr.

Donnelly authored a supplemental report on June 16, 2017, upon re-examination and review of updated records, and concluded Nygren demonstrated legal competency.

**PSR ¶22**    This history suggests to the Probation Office strong evidence that the defendant has engaged in a systematic, sustained, and intentional under performance on objective testing as part of his evaluations in an effort to present as incompetent to avoid legal culpability. Nygren submitted to testing and evaluation three times, over the course of approximately one year. All three demonstrate an intentional lack of effort. The results were reported as "suspect," "of concern," and finally "inconsistent with any known memory functions." These efforts took planning and resolve, were not spur of the moment, and presented an inherent risk justice would be obstructed, as he was in fact found to be incompetent at a point in this case.

The Government also seeks an adjustment for obstruction of justice based upon the same argument that Mr. Nygren

Mr. Nygren should not qualify for an upward adjustment for obstruction of justice. Although it possible for defendants to receive an enhancement for obstruction of justice because they have deemed to have malingered during competency evaluations, the adjustment is only given in extreme circumstances. This case is not one of them. In addition, the question of whether Mr. Nygren actually malingered is still an unsettled question.

The Defendant suffered a stroke on or about April 9, 2016. In July, 2016, the Defendant's primary treating neurologist, Dr. Alvin Das, MD, opined that the Defendant experienced significant cognitive impairment as a result of the stroke.[1] Dr. Das stated that the Defendant was unfit to participate in any trial because the Defendant experienced "profound" cognitive deficits. This confirmed the voluminous medical records that documented the fact that Mr. Nygren suffered a stroke and was struggling to recover.

In order to address the impact of cognitive impairment on this case this Court continued the Arraignment for sixty (60) days on August 25, 2016. During the sixty (60) day continuance it was expected that the Defense would obtain the voluminous medical records relating to the

---

[1] Please see attached letter from Dr. Alvin Das, MD.

Defendant, and provide such to an expert witness, who would conduct a competency evaluation. It was anticipated that if the expert witness identified competency issues the Defense would produce a report of the findings to the Government. The Government would, in turn, determine what impact, if any, the findings had on the case. There would be a number of options available to the parties in the event an expert witness determined the Defendant incompetent.

The Defense counsel complied with the Court's directive. The Defense obtained the hundreds of pages of medical records, and produced such to an expert witness, Dr. Peter Donnelly, Psy.D., who conducted a competency evaluation. The evaluation was somewhat delayed because a complete neuro psych evaluation of the Defendant was completed the first week of the September, 2016. A report of the evaluation was not completed for several weeks following the evaluation. The neuro psych report was obtained and provided to the Defense expert witness conducting the competency evaluation on October 14, 2016. The findings contained within the neuro psych report were essential to the competency evaluation process.

On October 14, 2016 the Defense expert witness completed the second phase of the evaluation process. Dr. Donnelly generated the competency evaluation report on October 15, 2016, and provided such to the Defense on October 20, 2016. Dr. Donnelly concluded that the Defendant was not competent to assist properly in his defense.[2] At Arraignment on October 24, 2016, the Court directed Defense counsel to file a motion for a competency hearing because of the findings made by Dr. Donnelly.

As indicated by probation, Mr. Nygren was subsequently evaluated at Fort Devens by the Bureau of Prisons (BOP) staff. The BOP evaluator determined that Mr. Nygren was competent to stand trial and that he was malingering, in a report dated April 25, 2017. Dr. Donnelly authored a supplemental report on June 16, 2017, upon re-examination and review of updated records, and

---

[2] Attached hereto is Dr. Donnelly's competency evaluation report.

concluded Nygren demonstrated legal competency. Dr. Donnelly adheres to the opinion that it cannot be concluded either way whether Mr. Nygren was malingering.

An example provided by Probation where the obstruction enhancement was justified involved a defendant that engaged in extreme behavior to perpetuate his alleged incompetence. See *U.S. v. Greer*, 158 F.3d 228 (5th Cir. 1998). There are numerous factors that warranted an enhancement in *Greer* that are simply absent in this case. For instance, it was determined that Greer never suffered from any mental disease or defect; he made it up. In addition, even after a competency hearing at which time the court concluded that the defendant was competent to stand trial, the defendant continued to engage in abhorrent behavior. The defendant leapt out of his chair and caused a scene during trial, intentionally flushed his clothes down the toilet, and cut the back of his throat to cough up blood. Interestingly enough, before the Government objected, Probation in Greer did not recommend that the defendant receive an enhancement for obstruction.

This case distinguishes itself from *Greer* in many accounts. Mr. Nygren actually suffered from a mental disease or defect following a stroke in April 2016. Mr. Nygren did not fabricate the mental disease or defect like the defendant in *Greer*. In July, 2016, his treating neurologist wrote an opinion letter that Mr. Nygren suffered from severe cognitive deficits as a result of his stroke. It is curious why Probation attempts to erode that opinion letter by stating that the doctor did not know that Mr. Nygren was facing criminal charges, or did not know what the letter was for. Certainly the doctor's medical opinion would not change because he did not have this information. To this date the doctor has not retracted his original assessment that Mr. Nygren suffered from profound mental defect as a result of the stroke.

Unlike the defendant in *Greer*, Mr. Nygren accepted BOP's determination that he was competent to stand trial and aid in his defense, and did not require the Court to conduct a

competency hearing. Unlike the defendant in *Greer*, Mr. Nygren withdrew his motion to

determine competency, and pleaded guilty to all charges alleged against him, forgoing the need

for a competency hearing or trial.

In this case all treatment providers expected Mr. Nygren to get better after his stroke.

The question was just when he would heal to a point where he was competent. This was

expressed to Mr. Nygren throughout the duration of his treatment regime.[3] Accordingly, it

makes no sense that Mr. Nygren would attempt to feign his impairment; to do so would only

delay the inevitable. Dr. Donnelly has not had the opportunity to provide an opinion regarding

the BOP determination that Mr. Nygren engaged in malingering. It is anticipated that, at

sentencing, Dr. Donnelly will testify to the following:

- The nature and course of recovery from the stroke induced brain injury clouds the overall issue. There is no static, constant gain in recovery, which is often dynamic. Gains in recovery can be idiosyncratic, which would affect impressions regarding malingering.

- There are a number of characteristics found in Mr. Nygren's recovery that are inconsistent with malingering. For instance, Mr. Nygren was dedicated to rehabilitation (physical, cognitive, and emotional) and that he sustained effort and motivation to reach treatment goals. More often than not malingerers lack sustained motivation, knowing that any improvement in their symptoms would be counter-productive in their efforts to avoid prosecution.

- Malingering tests have a margin of error or potential for inaccuracies due to other conditions. Other conditions experienced by Mr. Nygren as a result of his stroke could account for or impact the results of the tests for malingering.

Not every instance of feigned incompetency by defendants warrant an enhancement for

---

[3] See attached treatment records relating to Mr. Nygren. Mr. Nygren had not returned to 99% of physical functioning within a month following the stroke. In fact, Mr. Nygren was still admitted to inpatient treatment at such time. Mr. Nygren continued treatment and therapy to address the impact of the stork for many months following his release from the inpatient facility at Spaulding. Mr. Nygren continues to receive treatment relating to the shunt that has been placed in his head to relieve the pressure experienced as a residual effect of the stroke he suffered in 2016.

obstruction of justice.  This case distinguishes itself from the cases cited by Probation and the

Government supporting its recommendation that Mr. Nygren receive an enhancement for

obstruction of justice.  Unlike the cases cited by Probation and the Government, Mr. Nygren

suffered from an actual medical event that caused him cognitive deficits.  In all cases cited by the

Government and Probation the cognitive deficit that served as a basis for the alleged

incompetency was a fabrication itself.

In addition, unlike the case cited by the Government and Probation, Mr. Nygren

withdrew his motion for competency, did not require a hearing regarding the issue, and pleaded

guilty to all charges (without a plea agreement), following the most recent assessment performed

by BOP.[4]  Unlike the other defendants profiled in the cases relied upon by Probation and the

Government, Mr. Nygren did not perpetuate his pursuit of any defense relating to competency as

soon as there was an evaluation that declared him competent.

The Government is also seeking an upward adjustment for obstruction of justice because

of an off-the-cuff remark made by Mr. Nygren during a discussion with Mr. White about what

had occurred.  Probation has not sought an adjustment based upon the same.  Under _U.S.S.G. §_

_3C1.1_, a defendant's offense level is increased by two levels if "(1) the defendant willfully

obstructed or impeded, or attempted to obstruct or impede, the administration of justice with

respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and

(2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant

conduct; or (B) a closely related offense." Covered conduct includes, among other things,

"threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . or attempting to

do so." Id. _cmt. n.4(A)_. _United States v. O'Brien_, 870 F.3d 11, 18 (1st Cir. 2017).

---

[4] It should also be noted that Mr. Nygren submitted to a comprehensive evaluation process in order to
obtain social security benefits.  That agency approved disability benefits for Mr. Nygren, and did not
conclude that he was malingering.

The Government is alleging that Mr. Nygren threatened and or intimidated Mr. White during the conversation with him. The Government relies on the following discussion in seeking the upward adjustment:

Nygren: There's no other way to save face then is there?

Witness: I don't see how. I mean, unless you can pay me back every penny right now, which I know you can't.

Nygren: That's the only way?

Witness: What other way would there be?

Nygren: And what if, what if I can guarantee to go to AA and you f-----g got something signed every f-----g week that I went and signed a promissory note. I could pay you two thousand dollars a week for seven years.

Witness: Seven years.

Nygren: (Unintelligible) back. I gave you half the store.

Witness: I'm not going to make any deals. Not, certainly without talking to my lawyer about it.

•••••••

Nygren: But, Steve, this is gonna get really ugly. Then I'll have to [unintelligible].

Witness: It's a serious crime.

Nygren: I know and I'm gonna have to hire an attorney.

Witness: That's right.

Nygren: And he's gonna come up with a defense.

Witness: I'm sure he will.

Nygren: And it's gonna make everyone look f-----g bad. I didn't want to do it.

Witness: But you did, you just admitted to me you did it.

Nygren: Yeah, I'm gonna admit to him, too, but he's gonna f-----g defend me. That's why it's, that's why it's better to die.

Witness: Steve, I don't want that to happen.

19

Nygren: Because if this thing goes to court, everything's gonna, it's not gonna be pretty for anybody. I can already see it, I've already thought about it like, f-----g. I don't want to do that.

Witness: I don't either.

Nygren: But they're gonna ask questions, you know what I mean?

Witness: Yeah, they are
Nygren: And his job's gonna be to get me off. I don't want to go down that road, I really don't [Unintelligible] I did this. I was thinking of you as a friend.

Witness: I know you were.

It is apparent that by reviewing the conversation mentioned above that there certainly is not any explicit threat made by Mr. Nygren to Mr. White to obstruct or impede the administration of justice. The Government must engage in an intensive exercise of extrapolation and insert innuendo into the worded exchange in order to support its conclusion that Mr. Nygren attempted to obstruct justice. It is Mr. White who confronted Mr. Nygren and initiated the conversation, while recording it. It is Mr. White who suggests to Mr. Nygren that the only way out may be if Mr. Nygren pays back everything he has taken. It is Mr. Nygren who apologizes for the fact that the anticipated process encountered with lawyers maybe unpleasant. (See G.E. 16).

The Government also indicates that Mr. Nygren posted a letter (G.E. 17) at the Brooklyn General Store that allegedly serves as an additional basis for the obstruction enhancement. First, the letter was never published. There is no evidence supporting such. Second, even if it is believed the letter was published, the letter hardly constitutes an act that would qualify as an act of obstruction of justice.

*IV.     Mr. Nygren should receive a guideline reduction for acceptance of responsibility.*

According to Probation Mr. Nygren should not receive a reduction for acceptance of responsibility:

PSR ¶23     The defendant entered a guilty plea to all counts of the indictment thereby sparing the government of the burden of having to prepare and prove the case at trial. On July 6, 2017, the defendant was interviewed by the probation officer, in the presence of counsel, at his attorney's office located in Portland, Maine. The defendant admitted involvement in the offense. The defendant stated that he charged approximately $60,000 to $70,000 to BBY credit cards, without permission, and wrote 63 checks on BBY's account to take funds that were not his. The defendant did not pay his taxes and knew he should have paid his taxes. The defendant stated he previously overdrew approximately $7,000 on a business checking account that the bank disposed of as a "charge off." As such, his name was added to a banking list whereby financial institutions would not allow the defendant to open an account. Therefore, he had a family member open an account with a d/b/a in the same business name so he could use banking services, and he wrote the checks to that account. The defendant noted he was full of himself and local people in the community wanted him to re-open the local store. Nygren agreed and was so confident in his business abilities he was sure he could earn a substantial profit in this endeavor. While the defendant did well with Brooklin General, he did not do well enough. A lot of the money he stole was used to try and make the store viable and, while he increased gross sales, Nygren noted he did miscalculate price points and did not charge enough. He also failed to realize how much had to be done to the store. He lowered prices in an effort to drive volume up, but the volume was not enough to make it profitable. Nygren said he knew he was stealing the money but that he thought he would generate enough profit from Brooklin General to repay the money. Nygren expressed remorse for his conduct, he noted he is embarrassed by his behavior and he can only hope he has the chance to repay what he took and to apologize for his actions. Nygren asserted he had a life change after suffering his stroke. Nygren basically described himself as a "lout." He was an alcoholic who drank to excess. He smoked marijuana daily. He had a gambling problem. More importantly, he was selfish, had an unhealthy ego and essentially felt he could do what he wanted whenever he wanted. These also contributed to the crime. Following his stroke everything changed. Nygren felt he stopped drinking and smoking marijuana immediately. He stopped gambling. He is there for his family.

PSR ¶24     While the defendant entered a guilty plea and admitted to the offense behavior the Probation Office is not recommending that he receive the acceptance of responsibility reduction in this case because our office is recommending the obstruction of justice enhancement. This is based on USSG §3E1.1, comment. (n.4). An obstruction enhancement ordinarily indicates the defendant has not accepted responsibility. There may be extraordinary cases where both the obstruction of justice enhancement and the acceptance of responsibility reduction apply. Nygren continued his alleged malingering until at least March of 2017. He did so while in BOP custody and when being evaluated by the government's independent expert. It occurred well after the

detection of the offense by authorities. Further, the defendant consistently reported that his stroke created a significant life change, but these assertions are questionable to the Probation Office, as it appears he used his medical condition in an effort to avoid final responsibility for the criminal behavior. It is also consistent with the above-cited obstruction cases.

The Government is also recommending that Mr. Nygren not receive an reduction for acceptance of Responsibility based upon the same analysis.

At its core, *"acceptance of responsibility"* is a means of rewarding both remorse and efficiency. The provision requires judges to make highly subjective and often shifting determinations. It is an ambiguous wide-ranging category that awards a defendant with a two-or three-level sentence reduction based on a wide range of factors. According to the no exhaustive list in the Commentary, these factors range from whether a plea was entered in a timely fashion, to whether frivolous legal arguments were made, to whether the defendant agreed to be  interviewed by the court's probation officer or to participate in other activities contributing to the administration of justice. U.S.S.G., supra note 13, 3E1.1(b)(2); see also infra Part II.C.2. ; U.S.S.G., supra note 13, 3E1.1, cmt. n.1(a); see also infra Part II.C.1.; See infra notes 176-85 and accompanying text. Certainly, the Court may deny Mr. Nygren a reduction for acceptance of responsibility in the vent he is found to have obstructed justice. *United States v. D'Angelo*, 802 F.3d 205, 210 (1st Cir. 2015).

The Government cites to *D'Angelo* as an example where a court denied the defendant a reduction for acceptance of responsibility. The factors in that case are distinguishable from this matter. In *D'Angelo* the defendant did not contest the obstruction of justice enhancement. Mr. Nygren has presented significant evidence to the contrary as outlined above. Also, in *D'Angelo,* the defendant continued to contest key factual issues that were not in dispute through the end of his case, even at the final sentencing proceedings. Mr. Nygren accepts full responsibility for his actions, and admits to engaging in the underlying offenses.

The baseline rule, of course, is that "[c]onduct resulting in an enhancement [for obstruction of justice] ordinarily indicates that the defendant has not accepted responsibility." *USSG §3E1.1*, comment. (n.4).   Yet, the sentencing guidelines explicitly confirm that there may be "extraordinary cases" in which adjustments for both obstruction of justice and acceptance of responsibility can coexist. *Id*. In such instances, the defendant has the burden of proving that an adjustment for acceptance of responsibility is warranted.  *United States v. Maguire*, 752 F3d 1, 6 (1st Cir. 2014; See, *United States v. Gonzalez*, 12 F.3d 298, 300 (1st Cir. 1993).

As indicated above, Mr. Nygren did not require the court to engage in a competency hearing after he received the report from BOP that declared that he was competent to stand trial. Mr. Nygren also did not require the Government to conduct a trial of any of the offenses charged. Mr. Nygren pleaded guilty to all charges without the benefit any plea agreement.  In addition, Mr. Nygren has complied with all conditions of pretrial release that have been imposed, for over a year.  Even if this Court finds that Mr. Nygren engaged in obstruction of justice, the circumstances surrounding this case are not ordinary, and Mr. Nygren should receive the applicable reduction because he accepted responsibility.

The Government is also contending that Mr. Nygren should not receive a reduction for acceptance because Mr. Nygren continued "to engage in similar conduct after being caught committing the crime of conviction."  The Government also states that the Guidelines commentary indicates that voluntary termination of criminal activity is a relevant consideration in determining acceptance of responsibility, as is voluntary payment of restitution. U.S.S.G. '3E1.1, application note 1 (B),(C). The Government alleges that even after his arrest by the state, Mr. Nygren "continued to engage in fraudulent financial shenanigans, and continued to attempt to intimidate the victim of is crime. The government has no information indicating Nygren has paid any restitution to BBY at any time."

The Government cites to *United States v. Robinson*, 433 F.3d 31 (1st Cir. 2005) as an example where a defendant's conduct following his placement in jail for the underlying offense constituted basis for the court to deny a reduction for acceptance. That case is entirely distinguishable from this matter. In *Robinson* the court stated:

> Even more important to the district court's determination, however, was the fact that, while in prison pending sentencing, Robinson wrote a series of threatening letters to his wife, a form of communication that the protective order then in force expressly, and by Robinson's own acknowledgment, forbade. The district court thought that Robinson's ongoing violation of the very protective order for whose violation he was then incarcerated was flatly inconsistent with an acceptance of responsibility for the prior violation of that protective order. That determination appears to us to be utterly supportable, and we therefore find no error in the district court's decision not to reduce Robinson's sentence under *USSG § 3E1.1*. *United States v. Robinson*, 433 F.3d 31, at 38.

Unlike in *Robinson*, there is no evidence of alleged continued witness intimidation in this case after Mr. Nygren was arrested by local authorities. The Government does not actually mention what the form of continued intimidation is. The defense assumes the Government is alluding to the letter allegedly posted by Mr. Nygren at the Brooklyn General Store. As indicated above, although the letter was drafted, it was never posted or disseminated to any third-party by Mr. Nygren. There is simply no evidence of such, nor is there any evidence that Mr. Nygren contacted any known witness in order to intimidate them.

The Government also asserts that because Mr. Nygren obtained a $38,000 loan from Rapid Financial with the assistance from Individual 3 and his mother in October, 2015, he should not receive a reduction for acceptance. For lack of a better word, the Government calls the act "shenanigans." Mr. Nygren did not engage in any illegal act. Individual 3 and his mother acted voluntarily when they cosigned for the loan. Brooklyn General Store was still in operation and was a viable/active company. The main reason for the loan was to obtain funds in order to maintain operations at the Brooklyn General Store. While Mr. Nygren concedes that some

money from the store account was used to pay other individuals, a majority of the funds ($20,000) were used to keep the store a float by paying employees and vendors.

Mr. Nygren always intended to keep the store running and was hoping to do so with the infusion of money from the loan. It was always Mr. Nygren's hope and intention to make the store successful, from the beginning. At the end, a concerted effort was made by Mr. Nygren, Individual 3, and Mr. Nygren's mother in order to obtain the loan and salvage the store. Mr. Nygren did not try to take advantage of individual 3 or his mother. It is unfortunate that Individual 3 was required to file for bankruptcy, and that his mother has been sued because the loan was in default. Both individuals have been discharged from that debt. The aftermath is a an unfortunate result of a failed business venture. However, as discussed, all parties were dedicated to its success, and hopeful for a positive return on their investment.

The Government is also alleging that Mr. Nygren is frivolously denying relevant facts, and therefore, should be denied a reduction for acceptance. The Government is alleging that Mr. Nygren's assertion that he was not in position to conceal his crimes "in any way" is frivolous. Just because there is a disagreement between the parties does not make an argument frivolous. There are material disagreements regarding Mr. Nygren's role at the company, and the impact of such on his ability to commit the offense, or conceal the crimes.

As discussed above, when Mr. Nygren 's role at the company was unique, and somewhat undefined. The Government has not produced any exhibit where Mr. Nygren has signed a document acknowledging he is assuming the responsibilities alleged by the Government. Even the owner of BBY uses the terms CFO and financial manager interchangeably when referring to Mr. Nygren's job at the company. There were a number of individuals at the company who were responsible for monitoring and reconciling the BBY accounts. Frank Hull (Vice President),

Brent Morey (Operations Manager), and Steve White (Owner and President), all had access to and controlled the BBY primary bank account, from which Mr. Nygren withdrew the funds. It was simply not Mr. Nygren's job to do so. Mr. Nygren's job at the company primarily involved monitoring and directing company payroll, materials, marketing, and accounts receivable

It is not disputed that all paper statements were sent directly to Mr. White directly with the account balances and activity of the BBY bank account, from which Mr. Nygren wrote the checks and took ho took the funds. It is not disputed that Mr. Nygren had no check writing authority for the subject account. There is no evidence that Mr. Nygren had any other authority over the subject account that would allow him to monitor or access such.

Both Frank Hull, Brent Morey routinely accessed the subject account electronically, because they were the only employees of the company who had authority to do so. When Mr. White confronted Mr. Nygren about the theft, the conversation was recorded. During such time it is revealed that Brent Morey was the individual in the company who was authorized to engage in wire transfers. GE 16 at 16. Because of Brent Morey's responsibilities at company relating to bank transactions even Mr. White thought that Brent Morey was working in concert with Mr. Nygren. GE 16 at 18. Mr. Nygren could not transfer funds, withdraw funds, or manage funds without he express authorization of someone else at the company with that authority. It makes no sense that Mr. Nygren would be assigned to reconcile accounts to which he had no access to, or authority to control.

In addition, as previously argued, the Government's continued reliance on an unpublished letter (G.E.17) is misplaced. First, it was never published, and has no basis on this case. Second, the Government continues paraphrase and extrapolate from the contents without basis to do so. There is nothing in the content of the letter that demonstrates that Mr. Nygren had

control over the bank accounts from which the funds were taken.  Mr. Nygren never specifically

identified what his position at the company was, and actually stated that he worked in many

different capacities.  While Mr. Nygren may have had information regarding certain projects that

failed and cost the company money, does not mean it can be concluded that his position allowed

for him to commit or conceal the underlying offense.

The Government is indicating that Mr. Nygren's denial of certain facts relating to the

Wolfington Group are frivolous and not in line with acceptance of the facts surrounding the tax

evasion for income received from that employer.  The PSR states in relevant part:

**PSR ¶14**  **…**As part of this agreement, Nygren executed IRS Form 2159 in May 2011 to effectuate this garnishment. This form has an employer section that is completed by an individual's employer so that the employer retains the levy amount and forwards those monies to the IRS. The Wolfington Group had no record of this form or agreement and it was concluded that Nygren forged the employer section of the form because he had no intention of complying with the agreement. In July 2012, the IRS contacted the Wolfington Group to issue a wage levy and were advised by the Wolfington Group that Nygren's employment ended. The Wolfington Group also reported to the IRS that the defendant verbally provided them his Social Security Number of 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. A check with the Social Security Administration (SSA) revealed that this number has never been issued by the SSA. This number was also the Employer Identification Number for Nygren's business entity - Continuum.

Mr. Nygren responded:

Mr. Nygren never forged any IRS forms.  As indicated above, Mr. Nygren disclosed all income derived from the Wolfington Group when he filed his taxes. Any failure to effectuate the garnishment can be attributed only to the company for its failure to follow procedure, not Mr. Nygren.

The social security number listed (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) is the EIN for Continuum, not Mr. Nygren's social security number.

In this statement, Mr. Nygren is addressing the garnishment form (IRS Form 2159) only.

There is a dispute regarding whether or not he forged such.  Mr. Nygren does not recall forging the

instrument, therefore, he is denying such.  Mr. Nygren does not deny the material elements of the

offense to which he pleaded guilty.  It is alleged that beginning in 2010 Mr. Nygren primarily

worked with two companies, The Wolfington Group and BBY. During such time he concealed income received from such entities from the IRS, constituting in tax evasion. Mr. Nygren has admitted to such by pleading guilty to all counts, and agreeing the Prosecution Version.

Mr. Nygren admits that while working with the Wolfington Group worked with as an employee and subcontractor Mr. Nygren utilized a false social security number. In addition, Mr. Nygren admits that directed the company to issue payments for his services and employment to an account under his wife's name. These acts allowed for Mr. Nygren to conceal his income and avoid paying taxes. While Mr. Nygren did not file his taxes in a timely manner, and admits to the above-mentioned misconduct, Mr. Nygren did file his taxes for 2011, 2012, and 2013. These tax returns encapsulate all the compensation received by Mr. Nygren during those years, including that received from the Wolfington Group. Although belated, the returns were eventually filed, revealing the true extent of the compensation Mr. Nygren received. Taxes were also deducted from his paychecks during his employment with Wolfington Group. There is no allegation that Mr. Nygren failed to pay the amount of taxes owed. The mere fact that he contests forging a single form is not frivolous, nor does it constitute any erosion of his acceptance of responsibility.

Finally, the Government states that Nygren also *appears* to deny that he stole from Bonded Transmission in Framingham, Massachusetts, as he claims he only received an advance on his salary and subsequently paid it back and that any denial of theft from Bonded Transmission is similarly frivolous.Mr. Nygren wrote in his response to the PSR regarding the same:

> Mr. Nygren did not conceal any income he derived from Bonded Transmission. Mr. Nygren filed his taxes and all W-2 forms relating to the income he derived from his employment with this company.

> Mr. Nygren received an $11,000 advance on his salary by the owner of the company. When the owner's wife discovered the loan she demanded that Mr. Nygren pay it back. Mr. Nygren complied with her request.

There is discrepancy regarding what occurred with Bonded Transmission. Mr. Nygren contests that he took $11,000 from the company and maintains that he received a loan from it, which Mr. Nygren paid back. There seemed to be some discrepancy between the parties, regarding a minor amount of money that allegedly was not authorized for use by Mr. Nygren. As is demonstrated by the court pleadings relating to such (G.E. 24), Mr. Nygren pleaded guilty to the offense of larceny under $250, which is demonstrative of the actual amount in dispute. The case was continued, and ultimately dismissed. Mr. Nygren did not receive any conviction for such. Mr. Nygren is not making a frivolous argument by making the above statement.

A guilty plea and a truthful account of the conduct constituting an offense are significant evidence of a defendant's acceptance of responsibility. *United States v. Robinson*, 433 F.3d 31 (1st Cir. 2005); *See United States v. Hardy, 99 F.3d 1242, 1246 (1st Cir. 1996)*; *USSG § 3E1.1, cmt. n. 3*. Mr. Nygren should be entitled to a reduction for acceptance of responsibility because pleaded guilty to all counts alleged by the Government, and has accepted the account as set forth by the Government in the Prosecution Version. Any disagreements regarding certain aspects relating to the underlying offenses are not facts alleged by the Government in its Prosecution Version, have merit, and are not frivolous.

**V.      *The Court should impose a two-point enhancement under U.S.S.G. 4A1.1(d) because the defendant was under a criminal justice sentence at the time of certain instant offenses.***

As set forth in Paragraph 51 of the PSR, the defendant was under a criminal justice sentence at the time he committed some of the crimes of conviction. Specifically Nygren was subject to the constraints of a "continuance without finding" disposition relating to a larceny in Framingham Massachusetts. G.E. 24. Under U.S.S.G. ' 4A1.1, application note 4, a "criminal justice sentence" is "a sentence countable under ' 4A1.2." Section ' 4A1.2(a)(3), in turn, requires convictions "for which the imposition or execution of sentence was totally suspended or stayed to be counted. United States

v. Fraser, 388 F.3d 371, 374 (1st Cir. 2004). Therefore, although the case was eventually dismissed, as set forth correctly in the PSR, at least some of the crimes of conviction in this case were committed when Nygren was under another sentence, making the two-point increase in criminal history proper. Mr. Nygren withdraws his objection to this enhancement.

## VI.    *The Court should not impose and upward departure in this case because the defendant's criminal history would be substantially underrepresented by only three criminal history points.*

The Guidelines allow an upward departure "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). The Government is seeking an upward departure because it believes Mr. Nygren's criminal history is underrepresented due to the existence of similar adult conduct not resulting in convictions. U.S.S.G. ' 4A1.3(a)(2)(E).

The Government relies upon a recent case *U.S. v. Eustis*, No. 15-1850 (1st Cir. 2017) in supporting its argument for an upward departure against Mr. Nygren. The two cases could not be more distinct. In *Eustis*, the defendant had been charged with illegal possession of a firearm by an unauthorized person. The district court found that Eustis had brought the subject pistol to the campfire "to intimidate" his girlfriend "during an argument," making his possession offense more serious than a normal possession conviction. It also determined that, during Eustis's pretrial detention, he called his girlfriend and convinced her to write a letter to the district court recanting her prior truthful statements. *U.S. v. Eustis*, No. 15-1850 (1st Cir. 2017).

The district court also looked at the facts surrounding three of Eustis's prior assault convictions against domestic partners, including one in which he threatened a girlfriend with a loaded pistol, and found that they "portray[ed] a person who is very dangerous to intimate partners." Finally, the district court discussed two incidents in which Eustis threatened a

girlfriend, including one in which he used "a firearm in a threatening manner," but for which he was not convicted. Examining these facts, the district court determined that "the need to impose a sentence that reflects the seriousness of this crime and . . . protects the public and, in particular, [Eustis's] intimate partners" required an above-Guidelines sentence "on the grounds that . . . [Eustis's] criminal history [was] understated."

Unlike the defendant in *Eustis* who had three prior convictions for extreme behavior, Mr. Nygren has lived a life of fifty years without any criminal convictions. Mr. Nygren has already received 3 criminal history points as a result of a petty theft, that was ultimately dismissed by the Commonwealth of Massachusetts. The fact that such low level offense that was ultimately was dismissed received such weight almost warrants a reduction in criminal history points, rather than in increase. In addition, unlike *Eustis*, in this case, all factors surrounding the ultimate offenses have been taken into account when determining an appropriate sentence as revealed by the numerous enhancements sought by the Government. No upward departure is necessary to accommodate for such. Finally, Mr. Nygren did not engage outrageous witness tampering or witness intimidation as was demonstrated by the defendant in *Eustis*.

The Government indicates that Mr. Nygren stole money from the Wolfington Group, and although all the money was recovered, Mr. Nygren should receive an increase in criminal history points because he allegedly committed bank fraud. Probation reported the following:

**PSR ¶13**     On August 2, 2010, the defendant was converted to an employee of the Wolfington Group and paid an annual salary of $200,000. This employment lasted until October 2011, when he resigned following detection by the Wolfington Group that he embezzled/stole3 $6,000 from them. According to the Wolfington Group, it was discovered that Nygren removed checks, out of sequential order, from the business' checking account and issued those checks to entities in which Nygren possessed an ownership interest. Nygren was issued an ultimatum, return the money in 24 hours or face prosecution. Nygren returned $5,300 in U.S. currency and a check for $700 drawn on a "club" and this club

check also appeared to be stolen. The Wolfington Group declined this check and the following day, Nygren paid the remaining $700 in U.S. currency.

The information provided by the Government regarding the alleged theft is somewhat inconsistent regarding the amount that was allegedly taken. It is telling that the information provided by Mr. Wolfington to Probation and the Government differs. The fact is Mr. Wolfington, through his own admission, loaned or advanced money to Mr. Nygren on a consistent basis. Mr. Nygren paid back the loan as requested by the company before his departure. Mr. Nygren never admitted to stealing any money. All checks issued to Mr. Nygren were authorized by Mr. Wolfington. Although this case was reported to law enforcement, Mr. Nygren was never charged with any wrongdoing.

The Government also alleges that Mr. Nygren engaged in theft by deception by failing to perform work for a company called Michaud Motors. Mr. Nygren admits to engaging in work Michaud Motors. Mr. Nygren contests the fact that he did not perform services for Michaud Motors. Mr. Nygren admits that the initial sales event was not successful. However, Mr. Nygren is only guilty of failing at arranging for a successful sales event. Mr. Nygren can understand why Mr. Michaud is upset, because the sales event did not go as planned. However, Mr. Nygren attempted to perform his job pursuant to the arrangement he had with Michaud Motors. Other than when Mr. Michaud spoke with U.S. Treasury department when they contacted him, there is no evidence Mr. Michaud ever reported that Mr. Nygren had engaged in theft by deception to anyone.

The Government indicates Mr. Nygren's dealing with Bonded Transmission constitutes additional misconduct warranting an upward departure. There is discrepancy regarding what occurred with Bonded Transmission. Mr. Nygren contests that he took $11,000 from the company and maintains that he received a loan from the company, which Mr. Nygren paid back.

Mr. Hines routinely advanced/loaned money to Mr. Nygren.  There seemed to be some discrepancy between the parties regarding the amount of money that allegedly was not authorized for use by Mr. Nygren.  After law enforcement conducted its investigation of Mr. Nygren's alleged theft of funds from Bonded Transmission, it recommended that Mr. Nygren be charged only with theft of funds less than $250.  As is demonstrated by the court pleadings relating to such (G.E. 24), Mr. Nygren pleaded guilty to the offense of larceny under $250, which is demonstrative of the actual amount in dispute.  The case was continued, and ultimately dismissed.  Mr. Nygren did not receive any conviction for such.  The actions involving Mr. Nygren and Bonded Transmission have been investigated and prosecuted.  Mr. Nygren should not receive any additional enhancement for such.

The remainder of the Government's argument for an upward departure is vague and baseless.  Mr. Nygren has little criminal history, and received points for a petty theft that was ultimately dismissed.  All factors have been taken into consideration, and there is no justification for an increase.

## VII.    *The Court should not depart in accordance with 5K2.0.*

The Government makes a final argument that due to the scope of the charges offenses, the larger course of conduct, and the multiple avenues of obstruction, the court should also consider a departure based on ' 5K2.0.  However, the Government does not provide any legal framework of argument, itself, supporting such a contention.  The Court should disregard any request by the Government to do so.

Dated at Portland, Maine this 20th day of November, 2017.

/s/ Roger F. Brunelle Jr.
Roger F. Brunelle Jr., Esquire
Attorney for Defendant

LAW OFFICES OF ROGER F. BRUNELLE, JR.
75 Pearl St., 2nd Floor
Portland, ME 04101
(207) 699-4357
[roger@rbrunellelaw.com](mailto:roger@rbrunellelaw.com)

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November, 2017, I electronically filed Defendant Steven

Nygren's Response to Government's Sentencing Memorandum with the Clerk of Court using the

CM/ECF system which will send notification of such filing(s) to the following:

Chris Ruge, Esq.
Assistant United States Attorney
U.S. Attorney's Office
202 Harlow Street, Room 111
Bangor, ME 04401
(207) 945-0373
chris.ruge@usdoj.gov
(Attorney for United States of America)

Respectfully submitted,

 /s/ Roger F. Brunelle Jr._____
Roger F. Brunelle Jr., Esq.