# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 1:16-cr-00106-JAW |
| ) | |
| STEVEN NYGREN ) | |

## GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES the United States, by and through its attorneys, Halsey B. Frank, United States Attorney for the District of Maine, and Chris Ruge, Assistant United States Attorney, and submits this memorandum in reply to the defense sentencing memorandum (ECF No. 59) to assist the Court in its determination of an appropriate sentence.

**I.     Relevant Background**

On October 19, 2017, the government filed its sentencing memorandum in the above-captioned case. ECF No. 51. On November 20, 2017, the defendant filed his response memorandum. ECF No. 59. That same day, the defendant also filed a motion for a variant sentence, arguing for a downward departure based on the defendant's alleged marijuana and alcohol abuse, as well as the defendant's alleged gambling addiction. ECF No. 58. This reply memorandum relates to matters raised in the defendant's response brief at ECF No. 59. The government will file a separate response to ECF No. 58.

**II.    Argument.**

The government reasserts the facts and arguments set forth in its original sentencing memorandum, and offers this reply to certain arguments and assertions presented in the defense response.

### a. The Court should impose an enhancement for the use of sophisticated means in both the fraud and tax schemes.

The defendant makes a number of arguments asserting why the "sophisticated means" enhancements under U.S.S.G. §§ 2B1.1(b)(10)(C) and 2T1.1(b)(2) should not apply to this case. As set forth in the government's sentencing memorandum, the use of sophisticated means can be based on the use of a number or means, none of which need be particularly sophisticated in itself. Moreover, those means may relate to concealment of the crime, rather than the initial criminal act. In this context, the defendant's attempt to avoid the enhancement by focusing on the granular facts sidesteps the proper analysis of the case. Nonetheless, the defendant's specific arguments are addressed as follows:

#### 1. Use of "Continuum" was part of the defendant's sophisticated scheme.

The defense first argues that because Nygren "did not use a fake or fictitious company, unknown to BBY, to perpetuate the offense," the web of financial transactions that funneled stolen funds through accounts in the name of Continuum could not have aided in the concealment of the crimes. ECF No. 59, p. 4. The government disagrees. First, the fact that the Continuum name was known to BBY management could very well aid in the concealment of the criminal nature of individual transactions. Nygren's work as a contractor created legitimate ongoing payments to Nygren (as "Continuum"), and if a member of management did spot-check any individual check or monthly statement, Nygren might have been able to represent those discrete expenditures as legitimate. In other words, the use of the "Continuum" name on any one or few the of the individual checks was less likely to raise an alarm than would have his own name or the name of Individual 3. Moreover, the use of the out-of-state accounts and the identity of Individual 3 furthered the object of the offense, by allowing Nygren to spend considerable

2

funds in Brooklin, Maine and elsewhere, without the fraudulent source of his wealth immediately coming to light.

The defendant asserts that Nygren's use of "Continuum" was distinguishable from the use of a shell corporation in United States v. George, 841 F.3d 55, 66 (1st Cir. 2016), pointing out that in George, the defendant "actually created a shell corporation for which the sole design was to perpetuate the fraud and crimes of the defendant." ECF No. 59, p. 8. The government disagrees that this accurately reflects the factual posture in George. In any case, contrasting how Continuum came to be used in Nygren's fraud scheme is a distinction without a difference. Whether Nygren employed a defunct Massachusetts LLC or had Individual 3 create a notional sole proprietorship could have relevance in some other legal contexts; here, however, all roads lead to the same destination: Nygren used alternate identities, of both entities and of Individual 3, to execute his scheme and obscure his tracks through the use of out-of-state bank accounts. These are the quintessential sophisticated means described in U.S.S.G. § 2B1.1, Application Note 9(B).

### 2. Use of Individual 3 and false Social Security number to evade payment of taxes was also a sophisticated means.

As to sophisticated means particularly relating to the tax count, there is no doubt that the use of Individual 3's name and Social Security number on the account receiving the BBY checks made it far less likely that the IRS would detect Nygren's legal or illegal income derived from BBY or the Brooklin General Store (BGS).

In a similar vein, the defendant asserts that his use of a false Social Security number while working at Wolfington is "essentially negated" in part by his 2016 filing of his 2011 taxes. ECF No. 59, p. 6. The defendant specifically claims that taxes "were deducted from his paychecks during his employment with Wolfington Group," and that "[t]here is no allegation that

3

Mr. Nygren failed to pay the amount of taxes owed." Id. As a primary matter, these assertions are beside the point, because Count 65 relates to evasion of payment, not evasion of assessment. Some portion of his income may have been withheld to pay the tax obligation owed on that new income, but that does nothing to mitigate the use of the false SSN to avoid payment of the substantial amount he owed to the IRS for prior tax years.

In addition to being irrelevant, these assertions by the defendant are somewhat misleading in their own right. In his W-4 with Wolfington, Nygren claimed nine dependents, the maximum allowed, thus minimizing the amount withheld. G.E. 10. Nothing in the PSR indicates that Nygren has ever had 9 dependents. Moreover, the notion that Nygren paid his taxes for 2011 is hard to square with his 2011 Form 1040, filed in July of 2016, showing an amount owed of over $11,000. G.E. 41A. Thus, it would appear that Nygren used a false SSN to avoid collection of his back taxes, and in so doing, failed to timely file his then-current taxes or to timely pay the additional taxes owed.

### 3. The First Circuit has rejected the "relativity" test for sophisticated means.

The defendant also argues, at pages 4 and 7 of his response memo, that he would have had to "have engaged in some activity that is distinguishable from other acts" of tax evasion and bank fraud to receive a sophisticated means enhancement, citing United States v. Pacheco Martinez, 791 F.3d 171, 179 (1st Cir. 2015). Pacheco-Martinez offers no support for this assertion. In fact, the notion that a scheme must be sophisticated relative to other similar schemes was specifically rejected by the First Circuit in United States v. Reyes-Rivera. 812 F.3d 79, 87 (1st Cir. 2016).

### b. The defendant's position of trust at BBY enabled him to commence, conceal, and continued his acts of fraud.

The defendant claims that the defendant's role at the company was undefined and unknown. ECF No. 59, p. 10. This is simply false. The government has provided two sworn declarations regarding Nygren's duties at BBY. The defendant neither directly contests these declarations nor offers any evidence to the contrary. Accordingly, the only evidence identified on this issue is that presented by the government. G.E 14 & 15. This evidence, the government respectfully submits, proves beyond a preponderance that Nygren's position at BBY was precisely what allowed him to carry out the fraud for any period longer than one month. Moreover, these declarations are consistent with the Indictment and Prosecution Version, as well as with a common-sense understanding of division of labor in a small business.

The defendant suggests that it "makes no sense that Mr. Nygren would be assigned to reconcile accounts to which he had no access to, or ability to control." The government submits that such an arrangement, where a CFO watches over those who have authority to move the funds, is a fairly standard, common-sense arrangement of checks-and-balances employed to assure that no one individual has complete control over a financial transaction. See, e.g., https://www.omh.ny.gov/omhweb/resources/internal_control_top_ten.html (accessed Dec 1, 2017). The problem at BBY was that Nygren was the watcher. Moreover, as the business consultant who designed the division of labor at BBY (a fact he cites proudly at ECF No. 58, p. 13), Nygren was well-positioned to know exactly what the other managers did and did not do. He was hired to root out problems and inefficiencies at BBY. Id. He used that knowledge to execute a fraud that would not be detected, at least so long as he was CFO—or until he ran the well dry, as he did in September, 2015.

5

Nygren's assertion that "there is no evidence Mr. Nygren became a salaried employee; i.e. payroll records or the like" (ECF No. 59, p. 10) underscores precisely why he was in a position of trust: he was the one who would know about this missing documentation, because he is the one who should have prepared these records. And he could accordingly cover up his thefts or mislead management about the propriety of checks to "Continuum," should any have come to light.

As the defendant offers no evidence to rebut that provided by the government and cited in the PSR, his arguments are factually unsupported. The enhancement for abuse of position of trust should accordingly be imposed.

**c. The obstruction of justice enhancement is appropriate in this case.**

The defendant denies he exaggerated his memory problems to avoid or delay trial, and separately denies any attempt to influence a witness. These issues are each addressed below.

**1. The preponderance of the evidence confirms the defendant malingered to delay or avoid trial.**

The government has previously submitted the report of Dr. Miriam Kissin of the Bureau of Prisons. ECF No. 39. Dr, Kissin's report found "significant evidence that Mr. Nygren is feigning or exaggerating cognitive deficits" and opined that "the nature of the memory lapses Mr. Nygren has endorsed is not indicative of known memory processes." ECF 39, p. 23. The possibility of malingering was identified by the defendant's own expert in 2016. ECF 20-2. Prior to the scheduled competency hearing in June of 2017, the defendant submitted a second expert report opining that the defendant was then competent to stand trial. ECF 46. The progression of medical and psychological evaluation, then, is:

July, 2016:         Dr. Das[1] letter opines Nygren "unfit to participate in a trial as a witness," with deficits expected to last for "several months."

November, 2016:     Not competent but possibly malingering, per Dr. Donnelly

April 2017:         Competent and likely malingering, per Dr. Kissin

June, 2017:         Competent, per Dr. Donnelly

Thus, there was an indication that Nygren was malingering when he made his initial bid for a competency hearing. Even if this were not the case, there is no evidence contradicting that Nygren was—at the very least—malingering while under BOP observation. In fact, the conclusion that he was competent but malingering while at BOP is supported by the July 2016 opinion of Dr. Das predicting improvement over time and the June 2017 opinion of Dr. Donnelly that Nygren was fit for trial. Dr. Das said Nygren would get better. The evidence shows that he did recover, but that he also exaggerated certain symptoms and continued to exaggerate those symptoms at FMC Devens. When BOP reported this exaggeration to the Court in plain terms, Nygren got another report from Dr. Donnelly, in which Nygren's performance indicated he was then competent to stand trial. The defendant urges the Court to consider the inconsistencies in Nygren's purported progress as part of the non-linear progression common to recovery from a brain injury. ECF No. 59, p. 17. The government does deny that recovery can be a dynamic process, but nonetheless respectfully submits that the evidence in this case, including the reports provided by the defendant's own medical expert, is more consistent with a pattern of malingering through feigned memory symptoms.

The defendant also submits that "it would make no sense to feign impairment; to do so would only delay the inevitable." ECF 59, p. 17. While this may be true, the defendant

---

[1] Dr. Das acknowledged that he only met Nygren once, and issued the letter to Nygren's primary care provider without knowing Nygren was facing any criminal charges. G.E. 44 (Das 302).

nonetheless had motive to interpose delay. First, the Court may consider that many people might find it desirable to delay the inevitable when the "inevitable" is prison. Second, the defendant may have thought that if he could continue to be found unfit, the indictment could possibly be dismissed pursuant to 18 U.S.C. 4246. Third, the Court might look to the defendant's background as set forth in the the PSR, the government's sentencing exhibits, and as alleged in the Indictment, and determine that delaying the consequences of his actions is a common theme in Mr. Nygren's personal history. In any case, whether or not feigning impairment "makes sense" is a separate question from whether Mr. Nygren did so. Here, the evidence strongly indicates he did.

Similarly, the defendant claims that his commitment to recovery is inconsistent with malingering. ECF No. 59, p. 17. This assertion ignores the fact that someone can set forth significant effort on speech, walking, and cognition, while still feigning lapses in memory. Indeed, the government submits this was the case, and is likely why Nygren's wife described his memory issues as "weird," and why Dr. Kissin noted that his memory symptoms were not consistent with "known memory functions." Taken as a whole, the medical records and psychiatric opinions are consistent with someone who wanted to recover from a stroke, but also sought to feign memory problems to avoid trial.

The defendant also repeats his claim that he "withdrew his motion to determine competency," and cites it as evidence that he was not malingering. ECF No. 59, p. 17. This assertion is not accurate. First, the defendant could not withdraw his motion, because the motion was granted on December 21, 2016. ECF No. 33. Moreover, the docket reveals that a competency hearing was held on June 20, 2017, and the defendant was found competent. ECF No 47. It is true that at the time of his competency hearing the defendant asserted he was then

competent, which streamlined the hearing significantly. However, the defendant did not abandon his incompetency claim "as soon as there as an evaluation declaring him competent." ECF No. 59, p. 18. The BOP evaluation was docketed May 12, 2017, and the defendant did not seek to change his plea until after the hearing had been scheduled and he had obtained a second opinion from his own expert, confirming his competence. ECF Nos. 40 & 46. While this change, on the eve of the schedule hearing, saved neither the Court nor the government much effort in preparation, it did prevent the Court from having to determine at that time if the defendant was malingering. The inevitable determination of that question was thus delayed until now, at the sentencing phase.

Finally, the defendant states that the Government has cited no case in which a defendant suffered an actual injury. ECF No. 59, p. 18. The government directs attention to page 16 of its sentencing memorandum, and the discussion of <u>United States v. Patti</u>, 337 F.3d at 1319 (11th Cir. 2003), therein.

### 2. The evidence shows that defendant's words and actions were aimed at influencing a witness.

The defendant also denies that he attempted to influence the victim through threats to his reputation. Specifically, the defendant characterizes his admonition

> "If this thing goes to court, everyone's gonna, it's not gonna be pretty for anybody. I can already see it, I've already thought about it, like f-----g, I don't want to do that"

as an "off-the-cuff remark." ECF 59, p. 18. The statement itself, which has been audio recorded and presented to the Court, indicates that it was not "off-the-cuff." G.E. 43. Indeed, Nygren plainly stated "I can see it, <u>I've already thought about it</u>." G.E. 16. This indicates, rather clearly, that Nygren had "already thought about" how he would besmirch the character of his victim should the matter go to court, a litigation position not without precedent in Nygren's prior

9

professional disputes. PSR, ¶ 80; <u>American Management Services, Inc. v. Nygren</u>, 10 Mass. L. Rptr 494 (Supr. Ct. Mass 1999), 1999 WL 852831, *1, *2.

As the government submitted in its original brief, the intent of this threat to intimidate and influence was confirmed by the subsequent publication of the letter at G.E. 17. The defendant does not deny authorship of the letter, but does deny that it was ever published. ECF No. 59, p. 20. The available evidence indicates the letter was published, and in support of this fact, the government submits G.E. 14A, (Second White Declaration), indicating that there was a stack of copies of this letter at the counter of the Brookilin General Store, that they were seen by at least one employee of BBY, and that the victim of the crime himself retrieved one from the pile set out at the store. G.E. 14A.[2]

### d. The defendant should not receive a guideline reduction for acceptance of responsibility.

The defendant argues that he should receive a reduction for acceptance of responsibility. In addition to the obstruction and continued frivolous denials of relevant conduct, the government also submits that the defendant's continued acts of fraud and theft even after he was caught for the crimes of conviction show a lack acceptance of responsibility. See <u>United States v. Robinson</u>, 433 F.3d 31, 38 (1st Cir. 2005).[3] These acts are largely related to his activity at Brooklin General Store from October 2015 through February 2016.

---

[2] Undersigned counsel notes that in the government's sentencing memorandum, counsel noted that the letter was "posted" at the store. This was error on the part of counsel. The mode of publication was through copies left at the store counter.

[3] The defendant takes exception to the applicability of <u>Robinson</u> to this case. In <u>Robinson</u>, the court found that the defendant's threats toward his wife in violation of a standing protective order were "flatly inconsistent with an acceptance of responsibility for the prior violation of that protective order." The government respectfully submits that the legal principle identified by the First Circuit in Robinson is not grounded in threatening behavior per se, but rather in the broader concept of continuing to commit the same offenses as the crime of conviction.

First, Nygren states that his mother and individual 3 assisted him in getting a loan from Rapid Financial. ECF No. 59, p. 24. However, both of these parties have denied assisting with a $38,000 loan when questioned by the FBI. G.E. 46 & 47. His mother's pleading in the civil suit against her further indicates that she did not authorize the use of her signature. G.E. 47. In one sense, it doesn't matter if his mother and Individual 3 did assist him getting the loan. The defendant admits that only some $20,000 of the $38,000 received was used for legitimate store obligations.[4] ECF No 59, p. 25. Even under the defendant's version of events, Nygren likely engaged in wire fraud against Rapid Financial, his mother, and Individual 3, by representing through interstate wires that the funds would be used to purchase inventory for the store (and thus protect the investment in future receipts) when nearly half of the money was instead destined to satisfy Nygren's outstanding gambling debts and personal expenses. The government submits that the defendant's own admissions, in conjunction with the documentary evidence, indicate acts of fraud and identity theft akin to those employed in the counts of conviction and in his prior relevant conduct.

Aside from this activity, the defendant also breached his contract with the owners of the property the store was in, and finished his tenure at the property by stripping it of equipment that did not belong to him, which might be termed "conversion," "larceny," or "theft." G.E. 45 (Email from BGS property owner).

e. **The defendant's criminal history is underrepresented**.

The defendant continues to deny his prior similar criminal acts without providing any evidence to rebut the exhibits presented by the government.

---

[4] The government does not agree that Nygren's expenditures on personal expenses using the Rapid Advance funds were limited to $18,000.

11

As to the Wolfington checks, the government has provided a declaration, statement to federal law enforcement, copies of the checks written to the defendant's social club, and a police report detailing the alleged forgery. G.E. 42, 25, 26, 27, 29. These acts amount to bank fraud, identity theft, forgery, and the interstate transfer of stolen property, for which Nygren was never charged or convicted.

In the Bonded Transmission matter, the government has provided copies of the checks, police reports, statement to a federal agent, and email correspondence between Nygren and the victim. G.E. 40, 36, 35, 37. These documents make clear that Nygren may have been paying that victim back for money owed as an advance (with money stolen from BBY), but it also shows that Nygren committed forgery and bank fraud with additional checks stolen from the business and written out to his social club. G.E. 48. Nonetheless, Nygren characterizes these forgeries as "some discrepancy between the parities regarding a minor amount of money," and suggests that larceny under $250 best describes Nygren's actual criminal conduct. Given the evidence, a rational basis this characterization is hard to discern.

It may well be that Nygren was only charged with theft of the checks themselves, and that the nominal value of the paper they were written on was less than $250. This would be consistent with the known facts, as Framingham is in a different county (Middlesex) than Salem (Essex), so the police and courts of Fraingham would not necessarily have jurisdiction over forgery and bank fraud consummated by Nygren closer to his home. Moreover, the victim business appears to have reached an accord with the defendant to settle the outstanding debt for fee advances, while the bank absorbed the losses for the forged checks.[5] G.E. 37. Indeed, Nygren attempted to obtain a similar outcome in the BBY brank fraud, when he offered the

---

[5] Nygren makes no claim that he attempted to pay back Avidia Bank for its losses of $9,800.

victim of the crime $2,000 a week for seven years not to report the crime to authorities. G.E. 16, p. 20. That Nygren has not been previously charged with forgery and bank fraud does not mean that Nygren did not commit those serious crimes; it merely means that he was not held to account for them. This is the essence of the government's argument that Nygren's criminal history is underreported.

Finally, Nygren does not deny having conducted a sales promotion for Michaud motors. He does not provide any evidence controverting Michaud's statement that Nygren charged him for serves not provided, which would constitute fraud and theft by deception.

The evidence of forgery, fraud (including bank and wire fraud), and identity theft in these incidents is fairly established by the evidence presented by the government. The defendant's denials are not only frivolous, but continue his long-standing pattern of unfounded recriminations against his victims, in these cases implicitly, or explicitly, accusing each of these businessmen of lying to federal agents or filing false reports with the police. Given the repeated pattern in each of these cases, the preponderance of the evidence is not on Nygren's side. The Court should therefore add two criminal history points, or simply increase the defendant's Criminal History Category to III.

    **f.  Additional Sentencing Considerations.**

Due to the scope of the charged offenses, the larger course of conduct, and the multiple avenues of obstruction, the court should also consider a departure based on § 5K2.0. Section 5K2.0 departures are appropriate where the aggravating circumstances are to a degree or of and kind not adequately considered by the guidelines. U.S.S.G. § 5K2.0(a)(1); see also Koon v. United States, 518 US 81, 94 (1996); United States v. Munyenyezi, 781 F.3d 532, 543 (1st Cir. 2015).

<mark>13</mark>

This analysis applies, where, as here, the defendant engages in multiple, separate forms of obstruction. United States v. Black, 78 F.3d 1, 6 (1st Cir. 1996) (secreting funds was a new a different from of obstruction from the defendant's perjury, warranting an enhancement under 2K2.0 in addition to the enhancement under 3C1.1). The Court might also consider that the conduct in this case was part of a longer chain of fraudulent and deceitful acts, each causing financial harm to individuals and entities unfortunate enough to have placed trust and confidence in the defendant.

### III. Conclusion.

The government respectfully submits that the defense has set forth no evidence rebutting the exhibits presented by the government, and has cited insufficient legal authority to otherwise support its positions on the individual sentencing guidelines at issue.

Dated: December 4, 2017                   Respectfully submitted,

                                          HALSEY B. FRANK
                                          UNITED STATES ATTORNEY


                                          /s/Chris Ruge
                                          Assistant United States Attorney
                                          U.S. Attorney's Office
                                          202 Harlow Street, Room 111
                                          Bangor, ME  04401
                                          (207) 945-0373
                                          chris.ruge@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2017, I electronically filed the GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING MEMORANDUM with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Roger F. Brunelle, Jr., Esq.

HALSEY B. FRANK
United States Attorney

/s/ Chris Ruge, Esq.
Assistant United States Attorney
United States Attorney's Office
202 Harlow Street, Suite 111
Bangor, ME 04401
(207) 945-0373
chris.ruge@usdoj.gov