UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:16-cr-00106-JAW |
| | ) | |
| STEVEN NYGREN | ) | |

**SENTENCING ORDER**

Steven Nygren pleaded guilty to sixty-three counts of bank fraud, one count of using an unauthorized access device, and one count of tax evasion. The Government and Mr. Nygren raise a series of sentencing issues. The Court concludes:

1.      Mr. Nygren employed sophisticated means in the course of his tax evasion pursuant to U.S.S.G. § 2T1.1(b)(2) but not his fraud pursuant to § 2B1.1(b)(10)(C).

2.      Mr. Nygren did not further the execution or concealment of his fraud activities through the abuse of a position of trust pursuant to § 3B1.3.

3.      Mr. Nygren attempted to obstruct justice pursuant to § 3C1.1 by malingering during competency evaluations.

4.      Mr. Nygren is not entitled to a reduction in offense level for acceptance of responsibility pursuant to § 3E1.1.

5.      Mr. Nygren's criminal history is not substantially underrepresented by the guideline calculation pursuant to § 4A1.3(a)(2)(E).[1]

---

[1]      The parties originally contested another issue: whether the enhancement under U.S.S.G. § 4A1.1(d) applied to Mr. Nygren's 2014 conviction that was subject to "continuance without finding."

# I.    BACKGROUND

## A.    Procedural History

On September 16, 2015, Mr. Nygren was arrested by the Maine State Police and charged with related state offenses. *Presentence Investigation Report* ¶ 1 (*PSR*). He was released on bail on September 23, 2015. *Id.*

On April 9, 2016, Mr. Nygren suffered a stroke and was hospitalized. *Def. Ex.* 1 (*Massachusetts General Hospital Records*). On April 22, Mr. Nygren had surgery to create a shunt in order to relieve pressure in his head. *Id.* On April 26, 2016, he was discharged for rehabilitation. *Id.*; *See also Def. Ex.* 1 (*Spaulding Rehabilitation Hospital Records*). Although Mr. Nygren made progress in his recovery, in July 2016, the Defendant's primary treating neurologist, Dr. Alvin Das, M.D., opined that the Defendant experienced significant cognitive impairment as a result of the stroke. *Mot. to Determine Competency and Exclude Time Under the Speedy Trial Act* Attach 1 (ECF No. 20).

---

On February 3, 2014, Mr. Nygren was arrested and charged in Framingham, Massachusetts with larceny of less than $250. *Presentence Investigation Report* (*PSR*) ¶ 50. The PSR reflects that on March 13, 2014, he was convicted of the charge and the matter was continued without finding (CWOF) until September 12, 2014. *Id.* The matter was dismissed on September 7, 2016. *Id.* The PSR states that in Massachusetts a person is on probation for the duration of a CWOF. *Id.* The Probation Office (PO) assigned one criminal history point for this conviction; however, because he was on probation at the time of his commission of the instant offenses, the PO assessed two additional criminal history points pursuant to U.S.S.G. § 4A1.1(d) for a total criminal history score of three and a criminal history category of II. *PSR* ¶ 51-52. At the September 21, 2017 conference, Mr. Nygren withdrew his objection to the PO's criminal history calculation. He was wise to do so. *See* U.S.S.G. § 4A1.2(f), cmt. n.9.

Also, the parties also raised some minor factual disputes but the Court only addresses them to the extent they are significant.

Finally, the Government also suggested that the Court should consider a departure under U.S.S.G. § 5K2.0 based on what it characterizes as the scope of the charges, the larger course of conduct, and the multiple avenues of obstruction. The Government did not elaborate. The Court will not address this request here but will consider the Government's arguments at the sentencing hearing.

On August 10, 2016, a federal grand jury returned an indictment charging Mr. Nygren with sixty-three counts of bank fraud, one count of unauthorized use of an access device, and one count of tax evasion. *Indictment* (ECF No. 1). On August 25, 2016, Mr. Nygren appeared before the Magistrate Judge and was released pursuant to a $15,000 unsecured bond. *Min. Entry* (ECF No. 9). On August 30, 2016, the arraignment was continued for sixty days until October 24, 2016 to allow defense counsel to review medical records and prepare an expert witness on competency. *Notice of Hr'g* (ECF No. 13). On October 18, 2016, defense counsel moved to continue the arraignment to allow more time to review Mr. Nygren's neuropsychological evaluations in order to determine his competency. *Opposed Mot. to Continue Initial Appearance/Arraignment* (ECF No. 14). The Magistrate Judge denied the motion, indicating that defense counsel should file a motion for a competency hearing. *Order* (ECF No. 16). The arraignment went forward and Mr. Nygren pleaded not guilty to all counts on October 24, 2016. *Min. Entry* (ECF No. 17).

On November 7, 2016 Mr. Nygren filed a motion for a competency hearing and submitted an October 15, 2016 psychiatric evaluation from Dr. Peter Donnelly, Psy. D., expressing doubts about Mr. Nygren's ability to assist in his own defense. *Mot. to Determine Competency and Exclude Time Under the Speedy Trial Act* Attach 2 *Forensic Evaluation* (ECF No. 20) (*First Donnelly Report*). On January 11, 2017, the Government filed a motion for a psychiatric exam. *Mot. for Psychiatric Evaluation* (ECF No. 35). On January 12, 2017, the Court issued an order for an evaluation of Mr. Nygren's competency to stand trial. *Order* (ECF No. 36).

On February 21, 2017, Mr. Nygren reported to Federal Medical Center Devens for the evaluation. *PSR* ¶ 2. He was released on March 23, 2017. *Id.* The Court received the psychological report from the Bureau of Prisons evaluator, Dr. Miriam Kissin, Psy. D., on May 12, 2017 and received a supplemental report from Dr. Donnelly on June 19, 2017. *Forensic Report* (ECF No. 39) (*Kissin Report*); *Forensic Evaluation* (ECF No. 46) (*Second Donnelly Report*). Dr. Kissin found that Mr. Nygren was exaggerating his reported memory problems and concluded that his current functioning was not consistent with any significant cognitive deficits. *Kissin Report* at 23-24. Dr. Donnelly also concluded that Mr. Nygren was competent. *Second Donnelly Report* at 3-4.

The Court scheduled a competency hearing for June 20, 2017. *Notice of Hr'g* (ECF No. 40). At the hearing, Mr. Nygren no longer contested his competency. The Court received evidence, including two forensic reports and medical records from Spaulding Rehabilitation Hospital, and the Court found him competent to stand trial. *Min. Entry* (ECF No. 47); *Ct. Ex. List* (ECF No. 48). Immediately after this conclusion, Mr. Nygren pleaded guilty to all sixty-five counts. *Id.*

On October 19, 2017, the Government filed its sentencing memorandum. *Gov't's Sentencing Mem.* (ECF No. 51) (*Gov't's Mem.*). On November 20, 2017, Mr. Nygren filed his response to the Government's sentencing memorandum. *Def.'s Resp. to Gov't's Sentencing Mem.* (ECF No. 59) (*Def.'s Opp'n*). The Government filed its

reply on December 4, 2017. *Gov't's Reply to Def.'s Sentencing Mem.* (ECF No. 60) (*Gov't's Reply*).[2]

**B.      Tax Evasion Conduct**

Mr. Nygren has been in collection with the IRS since at least 2005 for outstanding taxes, penalties, and interest he owed the United States for seven of the years from 1996 through 2009. *Prosecution Version of the Offense* at 4 (ECF No. 45). To defeat the IRS's ability to collect his outstanding tax debt, Mr. Nygren engaged in a course of conduct to disguise his income and his control of assets. *Id.* He used a false social security number on an employment form, had an employer wire compensation into accounts under his wife's name, and directed an employer to treat him as an independent contractor, not an employee. *Id.* at 4. Mr. Nygren also directed another individual, a relative, to open a bank account in Massachusetts for his use, and he created and operated an LLC in the relative's name for a business venture – the Brooklin General Store. *Id.* at 5.

**C.      Fraud Conduct**

In 2013, Mr. Nygren performed consulting work for Brooklin Boat Yard (BBY) in Maine. *Id.* at 1. In June 2014, BBY hired Mr. Nygren as Financial Manager or Chief Financial Officer. *Id.* His duties included maintenance of accurate financial records and controls, as well as reporting the company's financial status to ownership. *Id.* Mr. Nygren wrote sixty-three unauthorized checks from BBY's operating account

---

[2]      Mr. Nygren has also filed a motion for a variant sentence. *Def. Steven Nygren's Mot. for Variant Sentence Pursuant to Title 18 U.S.C. Section 3553(a)* (ECF No. 58). The Court will address that motion at a sentencing hearing.

at Camden National Bank to "Continuum", his consulting business. *Id.* at 1-2. Mr. Nygren forged the signatures of two other BBY officers and deposited the checks into the Massachusetts bank account his relative had opened for him. *Id.* The amounts on the checks totaled more than $732,000. *Id.* at 1. Mr. Nygren also used two company credit card numbers without authorization, totaling roughly an additional $83,000. *Id.* at 3; *PSR* ¶ 9. Mr. Nygren used nearly all of the stolen funds for personal expenses. *Id.* at 2. Nearly half of the money funded Mr. Nygren's purchase and operation of the Brooklin General Store, and he used roughly $70,000 to pay for his daughter's wedding. *Id.*

## II. THE PRESENTENCE INVESTIGATION REPORT

The Probation Office (PO) determined that the base offense level for the tax fraud count group is twenty, which is increased two levels for failing to report proceeds of criminal activities. *PSR* ¶¶ 34-35. The PO recommended applying the two-level sophisticated means enhancement to the tax fraud count. *PSR* ¶ 36.

Regarding the fraud count group, the PO determined that the base offense level is seven, which is increased fourteen levels for the amount of loss. *PSR* ¶¶ 27-28. The PO recommended against applying the two-level sophisticated means enhancement to the fraud counts, *PSR* ¶ 29, but did recommend applying the two-level enhancement for abuse of a position of trust. *PSR* ¶ 31.

The PO recommended applying the two-level enhancement for obstruction of justice to both count groups because there is evidence that Mr. Nygren was malingering in order to delay or avoid punishment. *PSR* ¶¶ 19-22; 32, 39. The PO

also recommended against applying the two or three-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility.  *PSR* ¶¶ 23-24.

The PO determined that Mr. Nygren's combined total offense level is twenty-eight. *PSR* ¶ 47.

The PO concluded that Mr. Nygren's criminal history category is II.  *PSR* ¶ 52. Mr. Nygren received one criminal history point for a February 3, 2014 Massachusetts conviction for larceny less than $250 and two additional points because he committed the instant offenses while under probation for that crime.  *PSR* ¶¶ 50-51.

## III.    THE PARTIES' POSITIONS

### A.    Sophisticated Means

#### 1.    The Government's Memorandum

The Government argues that Mr. Nygren's conduct "fall[s] within the heartland of the sophisticated means by the use of various identities, tax identification numbers, and the movement of funds between jurisdictions." *Gov't's Mem.* at 5.  The Government suggests that the tax evasion conduct was sophisticated because he used a false social security number as well as bank accounts and a corporate entity in a relative's name to hide his assets.  *Id.* at 7.

The Government contends Mr. Nygren's fraud was sophisticated because using an out-of-state bank account associated with a corporate identity meant that "the payments were less obviously fraudulent than they would have been if he had made the checks payable to himself. . . ."  *Id.* at 6.  The Government asserts that using a relative to open bank accounts shows sophistication and "a high level of planning aimed at avoiding detection, and thus effecting perpetuation of the scheme."  *Id.*  The

Government also insists that Mr. Nygren used a "fictitious" or "shell" corporate entity by employing a defunct Massachusetts corporation, Continuum. *Id.* at 7-8.

### 2. Mr. Nygren's Response

Mr. Nygren argues that all acts of tax evasion involve some degree of concealment and that not all acts of tax evasion involve sophisticated means. *Def.'s Opp'n* at 7. He distinguishes cases cited by the Government where defendants used a series of false social security numbers and identification cards and received a sophisticated means enhancement. *Id.* Mr. Nygren argues that his acts of evasion and fraud were not more sophisticated than other acts of tax evasion and bank fraud. *Id.*

Regarding the fraud, Mr. Nygren argues that he did not use any fictitious or shell corporations, rather he used the name of his actual preexisting consulting corporation which was only technically "defunct" because he had simply failed to pay state renewal fees. *Id.* at 5, 8. Mr. Nygren points out that he used the name of his consulting business, Continuum, on the forged checks, which was known to the other BBY officials and could hardly have concealed his involvement. *Id.* at 4.

### 3. The Government's Reply

The Government replies that Mr. Nygren's use of the real Continuum name that was known to BBY management could very well have aided in the concealment of the fraudulent nature of the checks because if other managers happened to see a record of one of those transactions Mr. Nygren would have been able to represent those expenditures as legitimate. *Gov't's Reply* at 2. The Government also contends that the "relativity" test that Mr. Nygren advocates – a comparison to the level of

sophistication of typical comparable crimes of the same type – is not valid under First Circuit law. *Id.* at 4.

## B. Abuse of a Position of Trust

### 1. The Government's Memorandum

The Government claims that Mr. Nygren abused a position of trust because he helped draft the job description for his position and he knew that it was his job alone to monitor and manage cash flow and reconcile accounts. *Gov't Mem.* at 10-11. The Government emphasizes that if anyone else had held his position and he had held a different one, his fraud would have been discovered immediately after the first forgeries. *Id.* at 11. The Government also suggests that the owners of BBY placed extraordinary trust in Mr. Nygren because he had worked for the business before and delivered positive results. *Id.* at 12.

### 2. Mr. Nygren's Response

Mr. Nygren does not dispute that he held a position of trust with BBY and its owner. *Def.'s Opp'n* at 9. Instead, he argues his position did not enable him to commit or conceal the offense. *Id.* Mr. Nygren contends that his position did not enable his fraud because he had no check writing authority. *Id.* at 9-10. He asserts that his job duties were ill-defined and he lacked the requisite discretion for the enhancement because there were other officials responsible for monitoring the accounts. *Id.* at 10-11.

### 3. The Government's Reply

The Government replies that Mr. Nygren's position enabled him to perpetuate his fraud because he "was the watcher" and was well positioned to know what the

other managers did and did not do regarding the monitoring of their financial accounts and records. *Gov't's Reply* at 5.

### C.     Obstruction of Justice

#### 1.     The Government's Memorandum

The Government asserts that Mr. Nygren attempted to obstruct justice by feigning or exaggerating his memory problems in an effort to delay or avoid the proceedings against him. *Gov't's Mem.* at 16-19.  The Government also argues that Mr. Nygren attempted to unlawfully influence a witness during a secretly recorded conversation with BBY's owner. *Id.* at 13-15.  The Government construes a certain exchange of words as a threat to destroy the reputation of the victim if he did not make a deal with Mr. Nygren to avoid criminal prosecution, a threat which the Government suggests Mr. Nygren carried out when he distributed a letter hinting at certain secrets or scandals at BBY. *Id.* at 15.

#### 2.     Mr. Nygren's Response

Mr. Nygren insists that he was not feigning or exaggerating his memory loss or cognitive difficulties in order to be found incompetent; rather, he claims that mental recovery following a stroke can be inconsistent and unpredictable. *Def.'s Opp'n* at 14-18.  Mr. Nygren distinguishes other cases where courts applied the enhancement based on malingering because they involved completely fabricated conditions or symptoms, whereas there is no dispute that Mr. Nygren actually suffered a stroke which resulted in impairment. *Id.* at 17-18.  Mr. Nygren also points out that "[u]nlike the other defendants profiled in the cases relied upon by Probation and the Government, Mr. Nygren did not perpetuate his pursuit of any defense

relating to competency as soon as there was an evaluation that declared him competent." *Id.* at 18.

Mr. Nygren also characterizes the exchange with BBY's owner as "an off-the-cuff remark" and was not a threat or intended to obstruct or impede the administration of justice. *Id.* at 18-20. Mr. Nygren portrays the Government's arguments as "an intensive exercise of extrapolation" and points out that it was BBY's owner, not Mr. Nygren, that initiated the conversation and suggested the only way to avoid punishment was to pay everything back. *Id.* at 20.

### 3. The Government's Reply

The Government reiterates that "[t]aken as a whole, the medical records and psychiatric opinions are consistent with someone who wanted to recover from a stroke, but also sought to feign memory problems to avoid trial." *Gov't's Reply* at 8. The Government also points out that Mr. Nygren did not drop his competency argument and seek to change his plea immediately after the BOP evaluation was docketed; rather, he waited over a month until just before the scheduled competency hearing and after he obtained a second opinion from his expert. *Id.* at 9.

The Government also suggests that the alleged threat was not an "off-the-cuff-remark" because Mr. Nygren indicated he had thought about the impacts on others and the community before the conversation, and the Government contends that Mr. Nygren adopted a similar strategy to avoid liability in the past. *Id.* at 9-10.

### D. Acceptance of Responsibility

#### 1. The Government's Memorandum

The Government first argues that Mr. Nygren is not entitled a downward adjustment for acceptance of responsibility because he obstructed justice and there are no exceptional circumstances that would justify applying both provisions. *Gov't's Mem.* at 20-21. Second, the Government puts forth certain post-arrest conduct with a financial company, Rapid Financial, that is similar to the instant offenses. *Id.* at 21-23. Third, the Government argues that Mr. Nygren has continued to frivolously deny relevant facts about his position at BBY and incidents with previous employers. *Id.* at 23-24.

#### 2. Mr. Nygren's Response

Mr. Nygren responds that even if the Court concluded the obstruction of justice enhancement applies, he has accepted responsibility because he pleaded guilty and did not require the Government to conduct a trial nor require the Court to engage in a competency hearing once the BOP report declared him competent. *Def.'s Opp'n* at 23. He submits that he broke no laws after the instant offenses by obtaining a loan from Rapid Financial and that the financial problems with the Brooklin General Store were just an unfortunate result of a failed business venture. *Id.* at 24-25. Mr. Nygren also disputes the Government's claim that he has frivolously denied relevant facts by arguing against contested sentencing enhancements. *Id.* at 25-29.

#### 3. The Government's Reply

The Government contends that Mr. Nygren's relatives deny they authorized the Rapid Financial loan, but that even under Mr. Nygren's admitted version of the

events following his arrest, he diverted funds from the business to satisfy outstanding gambling debts and personal expenses. *Gov't's Reply* at 10-11.

### E. Criminal History Underrepresented or Overrepresented

#### 1. The Government's Memorandum

The Government urges the Court to enhance Mr. Nygren's criminal history category from II to III as a result of several uncharged incidents. *Gov't Mem.* at 25. The Government submits evidence that Mr. Nygren perpetrated similar acts of fraud against prior employers, clients, and associations including the Wolfington Group, *id.* at 26, Michaud Motors, *id.*, Bonded Transmission, *id.* at 27, and the Order of the Ancient Hibernians. *Id.*

#### 2. Mr. Nygren's Response

Mr. Nygren opposes an enhanced criminal history category, noting that he has never been incarcerated in a life of over fifty years and has already received three criminal history points for what he characterizes as a petty theft that the commonwealth of Massachusetts ultimately dismissed. *Def.'s Opp'n* at 31. Mr. Nygren also disputes several key facts with each of the incidents. For example, Mr. Nygren highlights some inconsistencies between the figures the Government cited and the information Mr. Wolfington provided to the Probation Office, and Mr. Nygren raises several loans and advances that Mr. Wolfington admitted giving him. *Id.* at 32. Mr. Nygren does not admit to any fraud against Michaud Motors. *Id.* He says that he was paid for and performed work for the company but merely failed to arrange a successful sales event. *Id.* Mr. Nygren maintains that he never stole anything from Bonded Transmission. *Id.* at 32-33. He claims that he was routinely loaned or

advanced money, and that there was merely "a discrepancy between the parties" regarding the amount of authorized money. *Id.* at 33.

### 3. The Government's Reply

The Government reiterates that it has provided copies of checks, police reports, declarations, and emails evidencing acts which amount to bank fraud. *Gov't's Reply* at 12. The Government argues these acts establish a pattern of criminal behavior not reflected in Mr. Nygren's criminal history score. *Id.* at 13.

## IV. DISCUSSION

### A. Mr. Nygren employed sophisticated means in the course of his tax evasion but not his fraud.

The offense levels for tax evasion and theft crimes are increased by two levels when a defendant uses "sophisticated means." U.S.S.G. §§ 2T1.1(b)(2); 2B1.1(b)(10)(C). The application notes state:

> "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(2) cmt. n.9(B).[3] "The enumerated examples are by no means exhaustive" and the sophistication of a whole scheme may be greater than the sum of its parts. *United States v. Foley*, 783 F.3d 7, 25 (1st Cir. 2015).

---

[3]    The application note for § 2T1.1(b)(2) is identical except the telemarketing example is removed.

### 1. Tax Evasion: § 2T1.1(b)(2)

The Government contends that Mr. Nygren used the following sophisticated means to justify the imposition of a two-level enhancement for tax evasion under § 2T1.1(b)(2): (1) a corporate shell, (2) multiple bank accounts, (3) ownership of the accounts by a relative, (4) movement of funds between the state of Maine and the commonwealth of Massachusetts and back, (5) his wife's name, (6) a false social security number, and (7) independent contractor as opposed to employee status.

The Prosecution Version confirms that Mr. Nygren had been "in collection with the IRS from at least 2005." *Prosecution Version* at 4. Despite being in "regular contact with the IRS, both personally and through his designated representatives," as revealed by the Prosecution Version, Mr. Nygren engaged in the following: He presented a false social security number to two of his employers. He directed one employer to wire his compensation to accounts under his wife's name. He failed to timely file his federal income tax returns for 2011, 2012 and 2013. He told BBY to treat him as an independent contractor. He directed that BBY compensation be paid to a Massachusetts bank account. The account was opened in the name of a relative under a d/b/a "Continuum", the name of Mr. Nygren's consulting business. Using a signature stamp and other means, he deposited checks from the Massachusetts account into a Maine LLC, which he also set up using the same relative's name. The Maine LLC owned and operated the Brooklin General Store in Brooklin, Maine. He then used checks from the Maine LLC account to fund store and personal expenses. *Id.* at 4-5.

There is nothing particularly sophisticated about presenting a false social security number to an employer, if the person providing the false number is otherwise readily identifiable. In *United States v. Evano*, 553 F.3d 109 (1st Cir. 2009), the First Circuit affirmed a conclusion that the defendants used sophisticated means by employing "fictitious names[ and] fake identifications[,] such as false social security numbers" as part of their scheme. *Id.* at 113. Here, Mr. Nygren gave his true name to the employers, a name that presumably resonated with IRS officials, and there is no allegation that his other personal information, such as his address, was false. Using a false social security number and a real name does not seem either smart or sophisticated.

Asking an employer to send compensation to the employee's spouse also does not appear to be much of a ruse. The PSR states that Mr. Nygren has been married to Brenda Nygren since 1997. *PSR* ¶ 62. Exactly how payments directly to his spouse constitute a sophisticated means of tax evasion is not explained.

Nor is requesting BBY to treat him as an independent contractor, not an employee, particularly sophisticated. There is no allegation that BBY did not know Mr. Nygren's real identity or true social security number. There is no evidence that BBY did not report Mr. Nygren's income to the IRS under Form 1099 as opposed to a W-2 Form.

The simple failure to file tax returns, particularly for an individual in "regular contact with the IRS" again seems foolish, not sophisticated.

The Government's most salient point concerns Mr. Nygren's use of the Massachusetts account under a relative doing business as a LLC to funnel money to a Maine LLC. Although Mr. Nygren used the name of his consulting business, Continuum, as the d/b/a for the Massachusetts account, he used his relative's name and signature to open the accounts and transact account business. Even though BBY knew that Mr. Nygren operated his consulting business under the name "Continuum" and the link between BBY's payments to the Massachusetts account and Mr. Nygren was obvious and direct, the trail would have been stymied by the absence of any indication on the face of the Massachusetts bank account that Mr. Nygren was involved. *Gov't Ex.* 3. To ferret out his involvement with the Massachusetts bank account, it would have been necessary to investigate publicly-filed corporate documents in Massachusetts that list Mr. Nygren as the manager for Continuum Management Services, LLC and then to leap to conclusions about the relationship between his relative (who did not bear Mr. Nygren's last name) and Mr. Nygren himself. *Id.*[4]

The use of a corporate shell is a hallmark for application of the enhancement. Indeed, § 2T1.1, application note 5, lists the use of "fictitious entities, corporate shells, or offshore financial accounts" as indicative of sophisticated means. In *United States*

---

[4] The Government mentions Continuum's status as a defunct corporation under Massachusetts law. *Gov't Mem.* at 5 ("Nygren's then-defunct Massachusetts LLC"). Mr. Nygren says that the reason Continuum Management Services, LLC became defunct is that he failed to pay the annual corporate registration fee in Massachusetts. *Def.'s Opp'n* at 8. As this statement of fact appears only in the Defendant's sentencing memorandum and is not corroborated, the Court has not considered it. Even so, the status of the LLC does not make a difference since its existence, including Mr. Nygren's role, is a matter of public record. *Gov't Ex.* 3, 4. The Court does not find that Continuum Management Services, LLC as a defunct corporation made Mr. Nygren's tax evasion or fraud more sophisticated.

*v. George*, 841 F.3d 55 (1st Cir. 2016), the First Circuit viewed the defendant's use of a shell company as "one manifestation" of the sophistication of the defendant's "complex and intricate" scheme. *Id.* at 66. The *George* Court noted that the defendant used the shell corporation "to facilitate and to help to conceal his perfidy." *Id.* Similarly, in *United States v. Pacheco-Martinez*, 791 F.3d 171 (1st Cir. 2015), the First Circuit affirmed application of the sophisticated means enhancement to a defendant who had set up three corporations, two in Puerto Rico and one in Nevada, to perpetrate a fraudulent scheme. *Id.* at 174-76.

More significantly, it is difficult to view the transfer of funds from the relative's account in Massachusetts to an LLC in Maine as anything but a ruse to "facilitate [tax evasion] and to help conceal his [income and assets]." *See George*, 841 F.3d at 61. Unlike Continuum Management Services, LLC, the Maine LLC was established without any mention of Steven Nygren. *Gov't's Ex.* 5. The manager or designated member of Brooklin Center LLC was the same relative under whose name he opened the Massachusetts account. *Id.* An Ellsworth, Maine attorney is the only other name that appears on the publicly-filed corporate documents in Maine. *Id.*

The net effect of these series of corporations and transfers would have been to launder the money from BBY to a Massachusetts bank account ostensibly owned by his relative to a Maine LLC again ostensibly owned by the same relative. As Mr. Nygren had actual control of both the Massachusetts bank account and the Maine LLC, by the time the money emerged from Brooklin Center, LLC, there would be no reason to believe it was connected to Mr. Nygren. Furthermore, Mr. Nygren then

applied substantial portions of the funds in the Massachusetts account or Brooklin Center, LLC's accounts for his own personal use. *Prosecution Version* at 2 ("Nygren acknowledged using half the money to buy the Brooklin General Store, and acknowledged spending the other half on personal expenses, including $70,000 for his daughter's wedding"); s*ee Pacheco-Martinez*, 791 F.3d at 176 ("Various checks were drawn on these accounts referencing what the government characterizes as 'thinly-disguised personal uses'").

Taken together, although not each of these means would be extraordinarily sophisticated, the cumulative effect would have been to "facilitate [tax evasion] and to help conceal his [income and assets]." *See George*, 841 F.3d at 61. The overall scheme is more sophisticated than each of these efforts individually because it allowed Mr. Nygren to conceal large sums of money while enjoying the benefits of those assets. These facts satisfy the § 2T1.1(b)(2) enhancement.

### 2. Fraud: 2B1.1(b)(10)(C)

There is some superficial similarity or overlap between Mr. Nygren's execution and concealment of his tax evasion and the conduct associated with his fraud. Although the Government points to many of the same acts and bank accounts, all of the complex parts of the conduct were aimed at tax evasion, rather than fraud. Mr. Nygren needed his relative to open and give him control over a bank account because he could not open one himself as a result of the IRS collection efforts. Since Mr. Nygren used the real name of his consulting company for the bank account and put that name on the forged checks, a name the other BBY officers knew, this bank account offered no protection or concealment for the fraud. Mr. Nygren was neither

subtle nor clever in drawing down funds from the BBY checking account. BBY's owner himself said that Mr. Nygren could have easily stolen much more money over a longer period of time if he was careful, but instead he "ran the well dry." Once investigated, the fraud was apparent and it pointed in only one direction: to Mr. Nygren.

In short, the sloppy forgeries and the use of Nygren's actual consulting business name ensured that his fraud would be obvious as soon as anyone else checked the financial records. Furthermore, the pace and level of the thefts made detection inescapable once the company's funds were gone. The § 2B1.1(b)(10)(C) enhancement does not apply to Mr. Nygren's clumsy check forgeries and his unauthorized use of company credit cards.

The parties' dispute about whether the First Circuit rejected the "relativity test" does not change the Court's conclusion. *See Gov't's Reply* at 4. The First Circuit said, "The defendant need not have done any of the things listed in order to qualify for the enhancement, so long as the offense as a whole shows a greater level of planning or concealment than a typical fraud of its kind." *Pacheco-Martinez*, 791 F.3d at 179 (quoting *United States v. Knox*, 624 F.3d 865, 870–72 (7th Cir. 2010) (internal quotation omitted)). Later, the First Circuit wrote that there is no judicial support for the contention that courts should "apply a relative scale in making findings as to sophistication" and to conclude that a particular Ponzi scheme was just "run-of-the-mill" compared to other Ponzi schemes. *United States v. Reyes-Rivera*, 812 F.3d 79, 88 (1st Cir. 2016).

The Court resolves any tension between these statements by looking at the types of offenses grouped within U.S.S.G. § 2B1.1, which covers larceny, embezzlement and other forms of theft. A comparison at a low level of generality – a Ponzi scheme to typical Ponzi schemes or a check forgery scheme to typical check forgery schemes – would make sense if the guidelines punished more sophisticated frauds more severely by assigning more sophisticated frauds a higher base level. A comparison at a high level of generality, however, makes more sense for § 2B1.1, because all fraud-like offenses, regardless of level of sophistication, are assigned the same base offense level. The guidelines enhance the offense level based on separate attributes that vary across different "types of fraud," like the amount of loss, the number of victims, and the level of sophistication. The proper question, therefore, is not whether a Ponzi scheme is more sophisticated than a typical Ponzi scheme, but whether a Ponzi scheme is more sophisticated than a typical fraud or embezzlement. The *Pacheco-Martinez* Court's quotation suggesting a comparison to "a typical fraud *of its kind*" is thin support for rejecting *Reyes-Rivera*'s refusal to apply a "relativity" test for the § 2B1.1 and § 2T1.1 sophisticated means enhancements.

The § 2B1.1 question here is whether Mr. Nygren's bank fraud was more sophisticated than a typical fraud, and the § 2T1.1 question is whether his specific tax evasion was more sophisticated than a typical tax evasion. The answer to the former question is no, and to the latter yes.

### B. Mr. Nygren's position of trust did not further the execution or concealment of his fraud activities.

The sentencing guidelines provide an increase to the offense level "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense . . . ." U.S.S.G. § 3B1.3. The Commentary explains that "[p]ublic or private trust refers to a position . . . characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, cmt. n.1. The Commentary differentiates between a bank executive committing a fraudulent loan scheme, who would receive the enhancement, and a bank teller embezzling money, who would not. *Id.* For an abuse of trust enhancement to apply, the position of trust "must have contributed in some significant way to facilitating the commission or the concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id.*

The sentencing court must engage in a two-step inquiry: (1) whether the defendant occupied a position of trust at all; and, if so, (2) whether the defendant used that position of trust to facilitate or conceal the offense. *United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998); *United States v. Gill,* 99 F.3d 484, 489 (1st Cir. 1996); *United States v. Santiago-Gonzalez,* 66 F.3d 3, 8 (1st Cir. 1995). The hallmark of a position of trust under § 3B1.3 is "'professional or managerial discretion.'" *United States v. Chanthaseng,* 274 F. 3d 586, 589 (1st Cir. 2001) (quoting *United States v. O'Connell,* 252 F.3d 524, 528 (1st Cir. 2001)). Employees in positions of discernable

discretion are typified by "significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Reccko,* 151 F.3d at 31. "In evaluating the first step of the § 3B1.1 enhancement analysis, 'the relevant inquiry . . . is whether a person *in fact* occupied a position of trust, rather than whether the person's title or official job description contained a discretionary element.'" *United States v. Sicher*, 576 F.3d 64, 72 (1st Cir. 2009) (quoting *Chanthaseng*, 274 F.3d at 589).

The Prosecution Version (which Mr. Nygren admitted was true at his Rule 11) describes his position at BBY as follows:

> In 2013, defendant Steven Nygren commenced work as a consultant for BBY at its office in Brooklin, Maine. In the summer of 2014, Nygren was hired as the company's financial manager. Nygren's duties as financial manager included maintenance of accurate financial records and controls, as well as reporting the company's financial status to ownership.

*Prosecution Version* at 1. It is undisputed that Mr. Nygren occupied a position of trust.[5] *Def.'s Opp'n* at 9 ("There is no dispute that Mr. Nygren maintained a position of trust with Mr. White, and BBY").

The Court, therefore, addresses only the second prong: whether he used the position of trust to facilitate or conceal the offense. Mr. Nygren emphasizes that he did not have check-writing authority for BBY's bank accounts, and that any employee

---

[5]    In 2013, the First Circuit concluded that this Court's sentencing findings on whether an employee occupied a position of trust within the meaning of § 3B1.3 were insufficient, vacated the sentence, and remanded with instructions. *United States v. Zehrung*, 714 F.3d 628 (1st Cir. 2013). Although the *Zehrung* Court addressed the first prong, its emphasis on the sentencing court's obligation to explain its reasoning is applicable to the second prong of § 3B1.3. Guided by *Zehrung*, this Court has endeavored to articulate in detail its findings on this and the other guideline issues to allow for appellate review.

could forge signatures on checks without the benefit of his position.[6] The Government has not demonstrated that knowing that BBY's checks required the signature of two of BBY's three authorized persons and forging the signature of two of these individuals to BBY checks involved the abuse of a position of trust. There is no evidence that Mr. Nygren learned about the two-signature requirement from his position of trust or that his position of trust helped him forge their signatures on BBY checks.

The question turns to whether the record reveals that Mr. Nygren used his position of trust to conceal his fraud. Even though the job description of Mr. Nygren's position as Financial Manager says that he acts in a "fiduciary capacity," it is Mr. Nygren's actual duties, not the job description, that controls. *See Gov't's Ex.* 14.1. Here, there is very limited information in the record as to BBY's business structure and the extent to which he was actually supervised. In Mr. White's sworn declaration, he states that Mr. Nygren "insisted that he have no check-writing authority, but otherwise he was responsible for reconciliations of accounts and was the person responsible to verifying that out-going payments were legitimate." *Gov't's Ex.* 14, ¶ 9. This statement poses the question as to whether it was Mr. Nygren's

---

[6] The record is confusing as to whether BBY had actually employed Mr. Nygren when he first began writing fraudulent checks. The Prosecution Version states that "[b]eginning in June, 2014, Nygren drafted a series of unauthorized checks drawn on BBY's operating account at Camden National Bank." *Prosecution Version* at 1. It also says that BBY did not hire Mr. Nygren until the summer of 2014. *Id.* If by "summer", the Prosecution Version means to say that Mr. Nygren began forging checks before he was even employed by BBY, the link between his employment and the forgeries is even more strained. However, during his later conversation with Mr. White, Mr. Nygren says that he began forging checks roughly two weeks after his employment with BBY. The lack of clarity runs against the imposition of the enhancement because it is the Government's burden to prove the applicability of the enhancement by a preponderance of the evidence.

position of trust that allowed him to perpetrate the fraud, the failure of others within BBY to perform their oversight functions, or some combination of the two.[7]

Based on an absence of evidence as to what duties Mr. Nygren actually performed at BBY and whether he was in fact unsupervised, the Court concludes that the Government has not demonstrated that the two-point enhancement under § 3B1.3 applies to the fraud counts.

### C. Mr. Nygren attempted to obstruct justice by malingering during competency evaluations.

The sentencing guidelines provide an increase to the offense level when:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense. . . .

U.S.S.G. § 3C1.1. The Commentary instructs that "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness," *id.* cmt. n.3, and the notes provide a non-exhaustive list of examples of such conduct. Examples include "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so," "committing, suborning, or attempting to suborn perjury," and "threatening the victim of the

---

[7]     Again, Mr. Nygren makes several assertions of fact in his memorandum that bear on this issue, but none is supported by the evidence in the record. *Def.'s Opp'n* at 11-12. For example, he says that financial statements were sent directly to Mr. White and that Frank Hull and Brent Morey routinely accessed the business account electronically. *Id.* at 11. As before, the Court may not accept mere statements by counsel as evidence. Despite the absence of record support for these assertions, the Court considered Mr. Nygren's points to assess whether the Government, which bears the burden of proof on this enhancement, presented evidence on the actual structure and oversight at BBY. The Court found almost nothing in the record.

offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction." *Id.* cmt. n.4. The list also includes "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding," "providing materially false information to a judge," and providing materially false information to a law enforcement officer or probation officer. *Id.*

Many courts have upheld the enhancement for obstruction of justice when defendants malingered in an attempt to convince the court that they were insane, not competent to stand trial, or deserving of a reduced sentence. *See e.g.*, *United States v. Bonnett*, 872 F.3d 1045, 1046-47 (9th Cir. 2017); *United States v. Wilbourn*, 778 F.3d 682, 684 (7th Cir. 2015) *United States v. Cline*, 332 F. App'x 905, 910 (4th Cir. 2009) (unpublished); *United States v. Batista*, 483 F.3d 193, 197-98 (3d Cir. 2007); *United States v. Binion*, 132 F. App'x 89, 92-93 (8th Cir. 2005) (unpublished); *United States v. Patti*, 337 F.3d 1317, 1325 (11th Cir. 2003); *United States v. Greer*, 158 F.3d 228, 237 (5th Cir. 1998).

Several cautioned against hasty application of the enhancement based on competency issues. For example, in *Wilbourn*, the Seventh Circuit reasoned:

> The defendant's second argument, which has greater merit, is that if exaggerating one's mental deficits at a competence hearing is deemed obstruction of justice . . . defendants and their lawyers will be reluctant to request such a hearing even if they have solid grounds for the request. They will be afraid that the judge, if he decides that the defendant is competent to stand trial after all, will decide that he requested the hearing only to delay or derail the criminal proceeding. But that is just to say that when in doubt about the bona fides of the defendant's behavior at the competence hearing the judge should not find an obstruction of justice.

*Wilbourn*, 778 F.3d at 684.  The Fifth Circuit also explained, "Of course, our finding that § 3C1.1 may be applied to malingerers is not meant to encourage or justify automatically increasing sentences for all defendants who seek a competency hearing and ultimately are found competent."  *Greer*, 158 F.3d at 237; *see also Batista*, 483 F.3d at 198.  Noting that defendants have a constitutional right not to be tried if they are incompetent, the *Greer* Court wrote that "[i]t is well-established that § 3C1.1 cannot be applied to punish a defendant for the exercise of a constitutional right."  *Id.*

> Despite recommending a cautious approach, the courts agree that:
>
> While a criminal defendant possesses a constitutional right to a competency hearing if a bona fide doubt exists as to his competency, he surely does not have the right to create a doubt as to his competency or to increase the chances that he will be found incompetent by feigning mental illness.

*Id.*

Mr. Nygren is correct that most cases involve defendants who completely fabricated their mental illness or competency issues, whereas here, there is no dispute that Mr. Nygren did suffer a stroke that caused serious impairments for a period of time.  The cases, however, do not suggest a distinction between feigning incompetence by making up conditions out of whole cloth as opposed to exaggerating the severity or persistence of symptoms.  At most, this distinction underscores the need for caution in cases of exaggeration.

The Court reviewed Mr. Nygren's medical records and series of psychiatric evaluations.  Despite the uncertain arc of stroke recovery, the Court finds that Mr. Nygren was malingering in order to delay or avoid the criminal proceedings against him.  The rehabilitation records and the series of neuropsychological tests in May,

July, August, and September 2016 show steady improvement after the stroke, followed by a decline in memory and cognitive performance conveniently timed around the initiation of federal criminal proceedings.

On October 18, 2016, Mr. Nygren moved to continue his initial appearance and arraignment based on a recent report from his expert witness. *Opposed Mot. to Continue Initial Appearance/Arraignment* (ECF No. 14). On October 15, 2016, Mr. Nygren's own expert noted that his testing performance could suggest exaggerating memory problems and not putting forward sufficient effort during test taking. *First Donnelly Report* at 7. Dr. Donnelly's October 15, 2016 report states, "On the Test of Memory Malingering, there was a suggestion that he may not have given his best performance and that there was a possibility that he was exaggerating the extent of his memory loss."[8] *Id.* at 10. On December 21, 2016, the Court granted Mr. Nygren's December 12, 2016 motion to determine competency. *Oral Order Granting Mot. to Determine Competency* (ECF No. 33). Subsequently, the Government moved for a competency evaluation, and on January 12, 2017, the Court granted the Government's motion. *Order Dismissing as Moot Def.'s Mot. for Oral Argument/Hr'g, Granting Def.'s Mot. to Determine Competency and Exclude Time Under the Speedy Trial Act, and Granting Gov't's Mot. for Psychiatric Exam* (ECF No. 36).

---

[8]     In his opposition, Mr. Nygren states that "Dr. Donnelly authored a supplemental report on June 16, 2017, upon re-examination and review of updated records, and concluded Nygren demonstrated legal competency. Dr. Donnelly adheres to the opinion that it cannot be concluded either way whether Mr. Nygren was malingering." *Def.'s Opp'n* at 15-16. Mr. Nygren's reference to the malingering opinion in the June 16, 2017 Donnelly opinion contains no specific citation to the Donnelly report. The Court reviewed the June 16, 2017 Donnelly report and found no reference to malingering one way or the other.

On April 25, 2017, Dr. Kissin noted that when Mr. Nygren was assessed using the Test of Memory Malingering and the Validity Indicator Profile, his "scores on the measures showed evidence of underperformance on cognitive measures and deliberate feigning of memory deficits." *Kissin Report* at 12. She further observed that Mr. Nygren's memory problems were "focused narrowly on facts related to the instant allegations against him" and that "such selective memory impairment is inconsistent with any known memory functions . . . ." *Id.* at 23. Mr. Nygren's other memory abilities and cognitive performance were generally good by this time, so his scores on tests designed to detect malingering are damning. His scores were "significantly below those that would be expected even of individuals presenting with the most severe effects of traumatic brain injury." *Id.* at 12.

On June 16, 2017, the Court held a competency hearing just before the Rule 11. *Minute Entry* (ECF Nos. 44, 47). After assessing Dr. Donnelly's reports, Dr. Kissin's report and the medical records, the Court found that Mr. Nygren was competent. *Id.* Immediately thereafter, Mr. Nygren entered a plea of guilty to all charges. *Id.*

During the period from October 2016 through April 2017, when Mr. Nygren's competency was at issue, Mr. Nygren malingered during two psychological examinations, the October examination of his own psychologist and the April examination of the Government's psychologist. Even approaching the issue with great caution, the Court finds a pattern of malingering to delay or avoid criminal

proceedings which requires the imposition of a two-point enhancement for

obstruction of justice.[9]

### D. Mr. Nygren is not entitled to a reduction in offense level for acceptance of responsibility.

The sentencing guidelines provide an increase to the offense level "[i]f the

defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G.

§ 3E1.1. The Commentary explains:

> Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct . . . will constitute significant evidence of acceptance of responsibility . . . . However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

*Id.* cmt. n.3.

The Application Notes also explain that "[c]onduct resulting in an

enhancement under § 3C1.1 [for obstruction of justice] ordinarily indicates that the

defendant has not accepted responsibility for his criminal conduct." *Id.* cmt. n.4.

"There is a logical inconsistency between, on one hand, attempting to obstruct justice,

and, on the other hand, accepting responsibility in a timeous manner." *United States*

*v. Gonzales*, 12 F.3d 298, 300 (1st Cir. 1993). "There may, however, be extraordinary

cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply," U.S.S.G. §

3E1.1 cmt. n.4, "[a]lthough practice has proven such largesse to be hen's-teeth rare."

---

[9]     Since the Court finds the enhancement warranted for malingering, it does not discuss the Government's arguments regarding illegal witness influence. The Court listened to the recording of Mr. Nygren's conversation with BBY's owner and seriously doubts whether the Government's parsing of the exchange is a fair interpretation, but the Court need not expound on the issue.

*United States v. Maguire*, 752 F.3d 1, 6 (1st Cir. 2014). "A defendant must carry the burden of proving that his case is 'extraordinary' and, thus, that it comes within the narrow confines of the exception." *Gonzales*, 12 F.3d at 300.

Mr. Nygren did eventually plead guilty to the instant offenses after he received the results of the BOP psychiatric evaluation and his own expert's second evaluation. There is also evidence that he has made significant progress toward treating his alcohol and gambling addictions following his arrest and stroke. Nevertheless, Mr. Nygren has not met his burden of showing that his case is an extraordinary one where the reduction for acceptance of responsibility applies despite the enhancement for obstruction of justice. Mr. Nygren's pattern of attempts to delay or avoid criminal responsibility through further deception and evasion, core aspects of his wrongful conduct for fraud and tax evasion, undermines his assertions that he has fully accepted responsibility. Mr. Nygren's post-arrest misuse of business funds also bolsters the Court's doubts as to Mr. Nygren's sincerity regarding his purported acceptance of responsibility for his criminality.[10]

Accordingly, the Court finds that Mr. Nygren is not entitled to a two-point reduction in the offense level under U.S.S.G. § 3E1.1. However, the Court will

---

[10] The Government asserts that Mr. Nygren's post-arrest dealings with Rapid Financial constitute an independent basis for denying the § 3E1.1 reduction because it constituted further bank fraud, one of the instant offenses. *See United States v. Robinson*, 433 F.3d 31, 38 (1st Cir. 2005) ("The district court thought that Robinson's ongoing violation of the very protective order for whose violation he was then incarcerated was flatly inconsistent with an acceptance of responsibility for the prior violation of that protective order. That determination appears to us to be utterly supportable"). There is some dispute about the facts of this incident and whether it actually constituted bank fraud, but under Mr. Nygren's own admission, at the very least, he diverted business funds from the Brooklin General Store for personal use. That is still inconsistent with true acceptance of responsibility.

consider Mr. Nygren's decision to plead guilty to all sixty-five counts of the indictment during its assessment of the statutory factors in 18 U.S.C. § 3553(a).

**E.    Mr. Nygren's criminal history is not underrepresented or overrepresented by the guideline calculation.**

The guidelines allow a sentencing court to apply an upward departure "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes . . . ." U.S.S.G. § 4A1.3(a)(1). This allows a court to adjust the defendant's criminal history category to that of "defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." *Id.* § 4A1.3(a)(4)(A). Among the information that may form the basis of an upward departure is "[p]rior similar adult criminal conduct not resulting in a criminal conviction." *Id.* § 4A1.3(a)(2)(E); *United States v. Eustis*, 680 F. App'x 1, 3 (1st Cir. 2017) (unpublished).

The Commentary lists several examples of circumstances that may warrant an upward departure:

(i)    A previous foreign sentence for a serious offense.
(ii)   Receipt of a prior consolidated sentence of ten years for a series of serious assaults.
(iii)  A similar instance of large scale fraudulent misconduct established by an adjudication in a Securities and Exchange Commission enforcement proceeding.
(iv)   Commission of the instant offense while on bail or pretrial release for another serious offense.

*Id.* § 4A1.3 cmt. n.2.

The Government provided evidence of a series of sketchy business dealings and complaints against Mr. Nygren that the Government argues amount to serious thefts

and fraud for which Mr. Nygren was never charged because he paid back the money or otherwise avoided responsibility. The Court reviewed these exhibits and both sides' arguments. There is an unusual pattern of questionable incidents, but the Court is not convinced that this evidence is sufficient to warrant an upward departure.

To place this issue in context, as noted earlier, Mr. Nygren's criminal history category is II. On February 3, 2014, Mr. Nygren was arrested and charged in Framingham, Massachusetts with larceny of less than $250. *Presentence Investigation Report* (*PSR*) ¶ 50. On March 13, 2014, he was convicted of the charge and the matter was continued without finding until September 12, 2014. *Id.* The matter was dismissed on September 7, 2016. *Id.* The PO assigned one criminal history point for this conviction; however, because he was on probation at the time of his commission of the instant offenses, the PO assessed two additional criminal history point pursuant to U.S.S.G. § 4A1.1(d) for a total criminal history score of three and a criminal history category of II. *PSR* ¶ 51-52. The question is whether given Mr. Nygren's prior conduct, his criminal history category II "substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1).

There are troubling aspects to the Government's position. First, the details of much of the uncharged conduct are uncertain and contested, surely a factor in prosecutorial decisions not to bring charges. There is the potential for worrisome

incentives for the government and the misapplication of judicial resources[11] if courts increase criminal history scores based on conduct not adjudicated in a timely manner. If conduct was sufficiently serious to merit consideration at this sentencing, it is odd that it was not prosecuted when it happened. Although prosecutorial decisions are often multi-factorial, the decision not to proceed raises a question as to whether prosecution was originally deemed justified. This situation poses the obvious question: if not then, why now?

Furthermore, a defendant who faces sentencing on a serious federal charge may be required to defend charges about incidents occurring years before. Here, both the Wolfington Group and Kevin Michaud incidents involved events that ended in 2012. *Gov't's Ex.* 25, 33. In addition, the Government brings these matters forward at the sentencing hearing where the standard of proof is more likely than not, and a defendant finds himself defending not merely his federal criminal charge but also his life history.[12]

Second, these incidents say little about Mr. Nygren's "likelihood to recidivate." *See* U.S.S.G. § 4A1.3(a)(4)(A). This sentence will be Mr. Nygren's first serious confrontation with law and the first time he has faced the likelihood of criminal penalties like incarceration.[13] Before the instant offenses, Mr. Nygren was accused

---

[11]    The point is highlighted by the considerable time spent and ink spilled by the parties attempting to dissect the details of ancillary events that potentially span all levels of culpability from serious misconduct to minor contract disputes.

[12]    This is not to say that a prior record of inappropriate conduct may be extremely relevant at a criminal sentencing. For example, evidence of prior sexual contact with children may be extremely relevant in sentencing a child sex offender.

[13]    As noted earlier, Mr. Nygren was convicted of larceny of less than $250 in February 2014, but the charge was continued without finding, so he has never before incurred a serious penalty.

of considerably smaller thefts and either returned any money or the other party did not press the matter. This distinguishes Mr. Nygren's prior conduct from the four examples in the commentary; each describes situations where a defendant faced significant criminal or administrative penalties for prior conduct not accounted for in the guidelines criminal history score, and then re-offended with the charged offense. The Court is not convinced that Mr. Nygren's prior uncharged acts are as probative as the examples which the Sentencing Commission suggested warrant an upward departure.

The Court concludes that an upward departure is not needed to properly estimate the seriousness of Mr. Nygren's prior record and his likelihood to recidivate.

## V. CONCLUSION

The Court concludes that Mr. Nygren: (1) did employ sophisticated means in the course of his tax evasion pursuant to U.S.S.G. § 2T1.1(b)(2) but not his fraud pursuant to § 2B1.1(b)(10)(C); (2) did not further the execution and concealment of his fraud activities through the abuse of a position of trust pursuant to § 3B1.3; (3) did attempt to obstruct justice pursuant to § 3C1.1 by malingering during competency evaluations; (4) did not sufficiently accept responsibility pursuant to § 3E1.1; and (5) does not have a criminal history category that substantially underrepresents the seriousness of his criminal history or his likelihood to recidivate pursuant to § 4A1.3(a).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of April, 2018