COMMONWEALTH OF MASSACHUSETTS

SUFFOLK ss.

Office of Consumer Affairs
and Business Regulation
Docket Nos. 2019-014
2019-063

IN THE MATTER OF

**White House Construction, Inc. and
Giovanni Nardella
(HIC No. 177708)
Docket No. 2019-014**

**And**

**The Wilbur Group, Inc., Jose
Pineda, and Milton Marder
(HIC No. 190571)
Docket No. 2019-063**

# ORDER

## Procedural History

This matter came before the Office of Consumer Affairs and Business Regulation ("OCABR") as a result of a Complaint filed by ▉▉▉▉▉ ("Homeowner"). The Complaint and supporting documents alleged that **White House Construction, Inc. and Giovanni Nardella** (individually and collectively, "Contractor") **and The Wilbur Group, Inc., Jose Pineda, and Milton Marder** ("Respondents"), violated provisions of Massachusetts General Laws, Chapter 142A (M.G.L. c. 142A), the Home Improvement Contractor ("HIC") Act.[1]

On March 26, 2019, OCABR mailed Notices of Hearing to Homeowner, Contractor, and Respondents. The notices were sent to their respective and most recent addresses of record. The hearing was conducted as scheduled on May 3, 2019.[2]

---

[1] Complaint Docket No. 2019-063 also included Kyle Marder's name. However, the evidence and testimony presented did not reflect Kyle Marder's significant involvement in this matter. Jose Pineda was added as a Respondent, as he is listed as the responsible designated individual of his corporation, The Wilbur Group, Inc., under HIC reg. no. 190571.
[2] The hearing record was help open until May 17, 2019 for Homeowner and Contractor to submit certain additional evidence.

OCABR has jurisdiction and authority to conduct hearings relating to complaints of alleged violations of M.G.L. c. 142A, making OCABR the proper venue for the hearing at issue.

## Exhibits

Exhibit 1:  HIC Complaint for Case Docket No. 2019-014 received January 2019

Exhibit 1a: HIC Complaint 2019-014 narrative

Exhibit 2:  HIC Complaint for Case Docket No. 2019-063 received January 2019

Exhibit 2a: HIC Complaint 2019-063 narrative

Exhibit 3:  OCABR correspondence with Homeowner (re: additional information for Complaint)

Exhibit 4:  White House Construction, Inc. Construction Contract signed December 15, 2017

Exhibit 5:  White House Construction, Inc. Estimate signed December 15, 2017

Exhibit 6:  Change Order documents[3]

Exhibit 7:  Project timeline documents[4]

Exhibit 8:  Payment list and payment schedule document

Exhibit 8a: Check copies for payments to Contractor

Exhibit 8b: Credit card transactions for payments to servicers/suppliers

Exhibit 9:  Homeowner's communications with Contractor, Contractor's representatives, and Respondents[5]

Exhibit 9a: Homeowner's attorney termination letter to Contractor dated January 29, 2019[6]

Exhibit 10: Printout from salemnews.com (re: Steven Nygren embezzlement conviction)

---

[3] Estimate No. 1527 was timely submitted by Homeowner prior to the record closing and was added to Exhibit 6.
[4] Prior to the record closing on May 17, 2019, Homeowner indicated to OCABR that he submitted a final timeline produced by Steven Roberts (a/k/a Nygren), Contractor's accountant/finance manager and salesperson, which reflected a September 24, 2019 project completion date. However, OCABR did not receive such document.
[5] An additional May 2018 email chain with Steven Roberts (a/k/a Nygren) was submitted by Homeowner prior to the record closing on May 17, 2019 and was added to Exhibit 9 for clarity purposes.
[6] Exhibit 9a was submitted by Contractor prior to the record closing on May 17, 2019. Such document was included in the Exhibits as it was raised in testimony and added clarity to the record.

Exhibit 11:OCABR correspondence dated January and March 2019 (re: receipt of Complaint(s))

Exhibit 12:Contractor and Respondents' Response to Complaint by attorney

Exhibit 13:Notices of Hearing dated March 26, 2019 for May 3, 3019 hearing

Exhibit 14: ████████Property Record printout for ████████and ████████Property Record printout for ████████

Exhibit 15:OCABR database screen prints of registration history and information for Contractor

Exhibit 16:OCABR database screen prints of registration history and information for Respondents

Exhibit 17:Bankruptcy printout from PACER Case Locator (indicating Contractor and Respondents have not filed or recently filed for bankruptcy)[7]

Exhibit 18:Homeowner's color photograph copies

Exhibit 19:Homeowner's own breakdown of work not completed and costs associated with incomplete work according to the Contract and Change Orders[8]

Exhibit 20: "The Wilbur Group, Inc. Income by Customer Detail" document

Exhibit 21: Plans issued March 2, 2017 and March 29, 2018[9]

Exhibit 22: Building department printouts[10]

Exhibit 23:Contractor's bank statements from December 2017 to December 2018[11]

Exhibit 24:Contractor's attorney letters to Jonathan Mercer of Mercer Electric Inc. and Brenda Dion Nygren, with Ms. Nygren's attorney response[12]

---

[7] Respondent Milton Marder's bankruptcy printout was administratively added to the Exhibits post-hearing.

[8] Exhibit 19 was added for clarification purposes only. The Homeowner submitted an edited version of the breakdown prior to the record closing on May 17, 2019 as well.

[9] Exhibit 21 was timely submitted by Homeowner prior to the record closing on May 17, 2019.

[10] Exhibit 22 was timely submitted by Contractor prior to the record closing on May 17, 2019.

[11] The Contractor submitted the documents in Exhibit 23 prior to the record closing on May 17, 2019. The Contractor submitted records from December 2017 to December 2018 for the corporate account ending in 3559, and from December 2017 to July 2018 for the corporate account ending in 5276.

[12] The Contractor submitted the documents in Exhibit 24 prior to the record closing on May 17, 2019. Such documents are relevant to Contractor's claim regarding misappropriation of funds by Steven Roberts (a/k/a Nygren), and thus, were included in the Exhibits.

## Findings of Fact

1.  In 2017, Homeowner and his wife wished to have some major renovations performed to their early 1900's single family home in ▇▇▇▇▇ Massachusetts. (*For reference, see* Exhibit 14). After conducting an online search, they contacted Contractor about the project.

2.  The Homeowner and his wife hired Contractor to produce plans for the project, and paid $3,500.00 to Contractor for such plans in October 2018. (*See* Exhibits 8a and 21).

3.  The Homeowner and his wife had refinanced their home and wished to use the funds to remodel their kitchen, bathrooms, first floor, and install new windows and hardwood floors in the home, among other renovations they were able to afford within a $150,000.00 to $200,000.00 budget.

4.  On December 15, 2017, Homeowner and his wife signed a Construction Contract and Estimate (the "Contract") with Contractor's salesperson, who they knew as Steven Roberts. (*See* Exhibits 4 and 5).[13]

5.  According to the Contract, the work included: remodeling the first and second floor bathrooms with new tile and fixtures, remodeling the kitchen with new cabinets, counters, appliances and fixtures, replacing 19 windows in the home, installing some exterior and interior doors, installing hardwood floors on stair landings and refinishing floors in the home, painting walls and ceilings, constructing a rear deck, installing structural beams where needed and patching and fixing some subfloors, framing interior walls, installing a gas fireplace, and installing a new shed roof over an existing porch and rear addition. The Contract also noted work to patch vinyl siding around the new windows and doors installed, with a price yet to be determined. (*See* Exhibits 4 and 5).

6.  The project cost was $150,000.00 ("contract price"), including labor and most materials, and associated electrical and plumbing work. The Homeowner and his wife were responsible for providing the kitchen cabinets, counters, appliances, and fixtures, as well as the gas fireplace. The contract price also included a $5,500.00 discount by "Steve R." (*See* Exhibits 4 and 5).

7.  The Contract required a 30% deposit prior to the commencement of work. Thereafter, beginning the fourth week after construction commenced, Homeowner was to provide weekly payments of $5,900.00 until the project's completion. (*See* Exhibits 4 and 5).

8.  The Contract provided a start date on or before April 30, 2018,[14] and indicated the project would be substantially completed no later than 120 to 150 days after the project commencement, absent delays beyond Contractor's control. (*See* Exhibit 4 and 5).

---

[13] The Contract also referred to drawings and floor plans. It was unclear whether such drawings and plans referenced in the Contract are in the plans in Exhibit 21.
[14] The Contract gave a start date of 4/30/17, apparently in error.

9.   On December 18, 2017, Contractor deposited Homeowner's 30% deposit check in the amount of $45,000.00. (*See* Exhibit 8a).

10.   The project commenced sometime in April 2018, after Homeowner and his family moved out of the home to accommodate the renovations. On April 19, 2018, Homeowner and his wife signed a Change Order in the amount of $25,570.00 to include additional work on the second floor. The work involved painting ceilings, walls, and trims of three upstairs bedrooms, installing new entrance and closet doors as well as light fixtures in the bedrooms, replacing the floors with hardwood, framing a new closet wall for one of the bedrooms, installing a specialty trunk/window seat in another bedroom, and renovating a stairway. (*See* Exhibit 6).

11.   In May and June 2018, Contractor encountered unforeseen issues with the project, including discovered fire damage, termite damage, rotted wood, and leveling issues. Such discoveries resulted in additional work, including structural work, and costs to which Homeowner and his wife agreed. Consequently, with the second floor bedroom renovations and unforeseen work, the contract price increased by over $50,000.00. (*For reference, see* Exhibits 6 and 8).

12.   The additional work requested by Homeowner and his wife, and the unforeseen work, resulted in delays to the work progress. In May 2018, Steven Roberts gave Homeowner and his wife a timeline for the project and a payment schedule for weekly payments of $6,004.00 due to the increased costs. The timeline indicated the project would be completed by August 14, 2018, upon which a final payment of $23,405.00 would be due. (*See* Exhibits 7 and 9).

13.   In June 2018, Homeowner expressed his concern with the work progress and payment schedule to Steven Roberts. He felt that continuing to pay $6,004.00 weekly, where some of the work for which he paid had not commenced, did not make sense. Although Mr. Roberts indicated he did not understand why Homeowner was concerned about the advance payments, he agreed to reduce the weekly payments to $4,500.00. The Homeowner and Mr. Roberts agreed that the project would be completed by the end of September. (*See* Exhibit 9).

14.   The Homeowner and his wife became frustrated during the course of the project due to some delays which they believe were caused by workmanship issues and mistakes Contractor's workers made. They were unhappy with the time it took for Contractor to fix a sliding door installation, as well as in fixing some window installations.

15.   The Homeowner and his wife continued to make decisions regarding material choices and orders during the project, which also attributed to some delays in the work. When Homeowner and his wife returned from being away for a week in August 2018, they felt that work had not progressed as quickly as they had hoped. Consequently, they contacted Contractor regarding their concern. At that time, Contractor informed Homeowner and his wife that Mr. Roberts had a stroke.

16.    Shortly thereafter, Contractor informed Homeowner that he believed Mr. Roberts had misappropriated funds for the project. By the end of July 2018, Contractor had a total of less than $4,000.00 in his corporate accounts, although Homeowner had paid Contractor over $150,000.00 towards the contract price, change orders, and some extra costs by that time. (*See* Exhibits 8, 8a, and 23).

17.    Steven Roberts was hired by Contractor in 2016 to act as his salesperson, as well as his accountant and financial manager. He was also responsible for procuring labor for projects. The Homeowner had primarily communicated with Mr. Roberts until July 2018.

18.    Having paid Contractor such a large sum of money, Homeowner and his wife agreed to continue to work with Contractor to salvage the project. The Contractor subcontracted the services of Milton Marder, an employee of The Wilbur Group, Inc., to provide labor services and to manage the project. The Contractor and Marder had worked together on past projects. The Homeowner agreed to pay subcontractors and material suppliers directly. Such payments were to be credited towards the contract price and change orders. (*For reference, see* Exhibits 8, 8a, 8b, and 9).

19.    By December 2018, Homeowner and his wife had raised additional workmanship concerns to Contractor and Milton Marder, and wished to have their house completely sealed for the winter. They also were upset that they had to cover the full costs for some windows, a portion of which they believed Contractor had paid, and that their new tub had been damaged. The Homeowner and his wife believed they were owed some credits for these issues. Meanwhile, Milton Marder indicated to Homeowner and his wife that he lacked funds to cover all the labor and material expenses that he had hoped. He had used money from other projects to assist with Homeowner's renovations, resulting in insufficient funds for his other jobs. (*See* Exhibit 9).

20.    By late January 2019, tensions surrounding the financial issues for the project had heightened. The Homeowner had requested detailed plans from Contractor and Marder to bring the project to completion, and was dissatisfied with the document they produced. (*See* Exhibit 20). He and his wife were also upset that Contractor and Marder were requesting additional funds, even though they felt they had significantly overpaid for the work performed thus far. (*For reference, see* Exhibit 19). By that time, the excavation inspection, as well as the rough framing and insulation inspections, had passed for the work. However, no walls had been installed, bathroom fixtures and cabinets had not been installed, painting work was not done, and trims had not been installed, among other things. The house did not appear close to completion to Homeowner and his wife, although Contractor had estimated the project would take another month to complete. (*For reference, see* Exhibits, 18, 19, and 22).[15]

---

[15] The Homeowner and his wife were also upset that they had to pay some additional expenses for heating on the second floor, and they felt Contractor did not sufficiently assist them with this, though he had removed the baseboard heating from the second floor, which was not according to the plans. The Homeowner and his wife eventually consented to this change, as the building department suggested the second floor heating should be updated.

21.   On January 28, 2019, in response to Homeowner's indication that he would issue a complaint against Contractor, Milton Marder blamed Steven Roberts' deception for the delays in work progress and lack of funds. In an email to Homeowner, Marder indicated that he and Contractor continued to try to complete the project despite such issues, and were in the finishing stages of the project, but could not cover the finishing costs. He gave Homeowner the option of waiting for funds from his other jobs, but indicated Homeowner would have to wait an indeterminate amount of time. Marder also mentioned siding costs which were in addition to the contract price, and which he felt should be considered in regard to the project funding. By that time, Homeowner and Contractor had learned that Steven Roberts was actually Steven Nygren, and had begun a federal prison sentence in July 2018 for embezzlement in Maine. (*For reference, see* Exhibits 9 and 10).

22.   On January 29, 2019, Homeowner and his wife terminated Contractor from the project. They could not resolve the monetary issues with the project. (*See* Exhibit 9a). The Homeowner and his wife noticed additional workmanship problems thereafter. They also learned that Contractor had installed some CPVC piping versus the PEX piping specified in their Contract. (*See* Exhibits 4 and 5). The Contractor did not obtain Homeowner's consent for such change. (*For reference, see* Exhibit 18).

23.   By that time, Homeowner and his wife had paid approximately $182,134.00 towards an increased contract price of approximately $205,912.00. (*See* Exhibit 8). All the check payments, apart from payments Homeowner and his wife made directly to other servicers and suppliers for the project, were made payable to White House Construction. (*See* Exhibits 8, 8a, and 8b). As of the hearing date, Homeowner and his family had yet to move back into their Somerville home.

24.   The Homeowner and his wife never interacted or met with Jose Pineda.

25.   The Contractor employed the services of his attorney to investigate Steven Roberts' (a/k/a Nygren) financial activities for White House Construction, Inc., and continued to do so as of the hearing date. (*For reference, see* Exhibit 24).

26.   The Contractor was registered as a home improvement contractor with OCABR at the time the Contract was executed. HIC registration number 177708 was assigned to Contractor corporation White House Construction, Inc. on January 27, 2014 and expires on August 14, 2020. Contractor Giovanni Nardella, the corporation's sole officer, is listed as the responsible designated individual for the corporation registrant. Giovanni Nardella was previously assigned HIC registration number 170970 "doing business as" White House Construction from January 24, 2012 to January 24, 2014. (*See* Exhibits 15 and 16).

27.   The Contract did not contain one notable provision of the required consumer protection language provided for in M.G.L. c. 142A § 2(a) (8)[16]. (*See* Exhibits 4 and 5).

---

[16] M.G.L. c. 142A, § 2(a) (8) provides, in relevant part: There shall be a clear and conspicuous notice appearing in the contract: …of an owner's three-day cancellation rights under section forty-eight of chapter ninety-three, section fourteen of chapter two hundred and fifty-five D, or section ten of chapter one hundred and forty D as may be

### Discussion

The Contractor, Respondents, along with Kyle Marder, attended the hearing with their attorney. The Homeowner and his wife attended the hearing as non-party witnesses only. *See* 201 C.M.R. 18.03 (11).

OCABR has the authority to regulate any person that performs residential contracting services. M.G.L. c. 142A, §§ 1, 17.[17] In this case, the transaction at issue included Contractor's major interior and exterior renovations to Homeowner's single family home in ██████████ Massachusetts. Therefore, OCABR has subject matter jurisdiction over the Complaint.

OCABR has the burden of proof to show by substantial evidence that Contractor violated specific provisions of the HIC Act. *See* M.G.L. c. 30A, §14(7)(e). The Homeowner alleged that Contractor committed multiple violations of the HIC Act. In this case, OCABR met the burden of proof, in part, with respect to the allegations. An additional violation was also found from the evidence and testimony presented below.

The Homeowner also filed a Complaint against Respondents The Wilbur Group, Inc., Jose Pineda, and Milton Marder. However, the evidence and testimony presented showed that although Milton Marder had been involved with the project, he was not the contractor who signed the Contract, and no payments had been made to him. The services of Milton Marder and The Wilbur Group, Inc. had been subcontracted by Contractor, and Homeowner and his wife had never interacted with Jose Pineda. *See* Findings of Fact above. As such, Respondents are not appropriate Respondents in this matter. Consequently, the Discussion below will reference the allegations made against Contractor only.

I.    **Allegation(s) in Complaint**

   a.  **Abandoning or failing to perform without justification**

M.G.L. c. 142A, § 17(2) prohibits a home improvement contractor from abandoning or failing to perform a project without justification. A project is considered abandoned when a contractor wholly deserts a project, leaving it unfinished. A failure to perform a project, on the other hand, is found when a contractor fails to start the project or starts working on the project, but fails to take meaningful steps to complete it. A contractor's abandonment or failure to perform is justified only when the contractor has a good cause reason for halting the construction. It is also a violation of

---

applicable...; The Contract also needs to be updated to provide the current information for Home Improvement Contractor Registration inquiries.
[17] Residential contracting  is defined in part as, "the reconstruction, alteration, renovation, repair, modernization, conversion, improvement, removal, demolition, or the construction of an addition to any pre-existing owner occupied building containing at least one but not more than four dwelling units." M.G.L. c. 142A, § 1.

this provision for a home improvement contractor to make a material deviation from the contract plans or specifications without the homeowner's consent.[18]

In support of the allegation that Contractor abandoned or failed to perform the project, Homeowner and his wife testified in detail regarding their issues with Contractor's work progress, workmanship concerns, and finally, Contractor's lack of funds to proceed with the project in a timely manner. They conceded that delays were partially attributable to unforeseen work and their requested additional work, resulting in over $50,000.00 in additional costs. However, they were unhappy with the time it took to address some workmanship issues and mistakes during the project, and they believed they had been extremely patient in working with Contractor after they were informed of Steven Nygren's alleged misappropriation of funds. The Homeowner and his wife became frustrated as they felt they had significantly overpaid for the work performed by January 2019, and Contractor and Milton Marder continued to request more payments from them. Consequently, on January 29th, Homeowner and his wife terminated Contractor's services. *See* Finding of Fact Nos. 10 to 23.

The Contractor and Milton Marder testified they were close to completing the project, they had completed the hardest parts of the project, but that they lacked the funds to pay for certain items due to Steven Nygren's misconduct, and their inability to continue to use funds from other projects. They insisted they were willing to finish the project. The corporate bank records submitted by Contractor revealed a zero balance in one account by December 2018, and less than a $1,000.00 balance in another account by the end of July 2018. *See* Exhibit 23.[19] The Contractor testified that Nygren had disappeared in July 2018, his wife indicated Nygren had a stroke, and that he did not learn of Nygren's misappropriation of funds until August. The Contractor also testified he did not know of Nygren's actual last name, and that he was in federal prison, until January 2019.

There was insufficient evidence to refute Contractor's account regarding his knowledge of Nygren's identity and his claims that Nygren misappropriated funds. Furthermore, although Homeowner and his wife were reasonably frustrated with the circumstances, and their termination of Contractor was also reasonable, the delays in the work progress could not solely be attributable to Contractor. Moreover, although Contractor certainly may have been negligent in failing to check on his business' financial records, Nygren's alleged misconduct resulting in insufficient funds could provide a reasonable justification for Contractor's inability to proceed with the project without more resources.

Claims regarding workmanship issues are not within OCABR's jurisdiction to address. Such claims may be more appropriately resolved through arbitration or court proceedings, or, if the claims involve building code violations or structural concerns, they may be directed to the Office of Public Safety and Inspections' Board of Building Regulations and Standards (BBRS). As such,

---

[18] The complete provision of M.G.L. c. 142A, § 17(2) reads: Abandoning or failing to perform, without justification, any contract or project engaged in or undertaken by a registered contractor or subcontractor, or deviating from or disregarding plans or specifications in any material respect without the consent of the owner.

[19] Some of the bank records showed checks paid to a Brenda Nygren as well as Mercer Electric, which appeared to be signed by Contractor Giovanni Nardella. Contractor's attorney indicated that Contractor was unaware who such individuals were and why payments were being made to them. Some of the checks and transfers were also made to Steven Nygren and John Nygren. It was unclear from the hearing record whether Contractor also disputed these payments, and whether he alleged that Steven Nygren forged his signature on the checks.

based on the totality of the circumstances, this Hearing Officer cannot find there is substantial evidence to conclude that Contractor abandoned or failed to perform the project without justification, in violation of § 17(2).

Nevertheless, Contractor admitted that he did not consult with Homeowner and his wife prior to installing CPVC pipes, contrary to the Contract specifications for pex piping.[20] Although Contractor indicated he believed the CPVC piping was a superior product, while Homeowner disagreed with his assessment, Contractor should have received the approval of Homeowner and his wife for such change. As such, **Contractor is found in violation of § 17(2) for materially deviating from specifications without Homeowner's consent.**

### b. Failing to pay for materials or services rendered

The Homeowner alleged that Contractor violated M.G.L. c. 142A, § 17(14) which prohibits a home improvement contractor from: "failing to pay for materials or services rendered in connection with his operating as a contractor...where he has received sufficient funds as payment for the particular construction work, project or operation for which the services or materials were rendered or purchased." Thus, contractors who deliver construction materials or subcontract services without eventually paying for such materials or services once in receipt of adequate funds from the homeowner are in violation of § 17(14). In support of this allegation, Homeowner testified that one of the subcontractors had filed a lien against his house for Contractor's alleged failure to pay the company for their services on the project. The Contractor indicated there is pending litigation for such matter, and he disputes such nonpayment or that a contract even existed between himself and the servicer/subcontractor. Consequently, without more, there is insufficient evidence to find a violation of this provision. **As such, no violation of § 17(14) can be found.**

### c. Demanding or receiving payment in violation of M.G.L. c. 142A, §2(a)(6) (prohibited under M.G.L. c. 142A, §17(16))

Section 17(16) prohibits a home improvement contractor from receiving a deposit required under the contract of greater than one-third of the contract price in advance of the commencement of work or exceeding the actual cost of any specially ordered or custom made materials which must be ordered in advance of the commencement of work. Demanding or receiving final payment prior to the completion of the contract to the parties' satisfaction is also prohibited. The Homeowner referenced his belief that he overpaid Contractor for the services performed, and he believed Contractor and Marder should not have requested further payments from him in January 2019. Such evidence does not support a violation of this provision, but rather references a monetary dispute outside the scope of the HIC enforcement hearing. **As such, no violation of §17(16) is found.**

---

[20] The Contract indicates PVC drain pipes would be installed, but Contractor never testified that the CPVC pipes Homeowner alleged Contractor installed without his and his wife's consent were actually drain pipes.

## II.   Additional Allegation(s)[21]

During the hearing, this Hearing Officer raised the issue of whether Contractor violated other provisions of the HIC Act. Authority exists to raise additional violations during the hearing as long as the Contractor has sufficient notice of the proceeding. *See John R. Elander & Son, Inc. v. Luther*, 74 Mass App. Ct. 1114 (2009) (affirming the finding that Plaintiffs had sufficient notice of additional violations raised by the Hearing Officer at the hearing as they were on notice that the contract itself was deficient in at least two ways and failed to show that their defense suffered due to the lack of notice); *See also Langlitz v. Bd. of Registration of Chiropractors*, 396 Mass. 374, 377 (1985) (finding that due process only requires notice to provide information that allows the party(ies) "to understand the substance and nature of the grounds upon which they are called to answer"). The Contractor had sufficient notice of the violations, as the Complaint itself made Contractor aware of (1) possible defects in the Contract, and (2) the reasonable possibility that any other relevant matter in connection with the contracted for work would surface in the ordinary course of a hearing. *See John R. Elander & Son, Inc. v. Luther*, 74 Mass App. Ct. at 1115.

### a.  Violations of contractual terms under M.G.L. c. 142A, §2

The testimony and evidence substantially established that Contractor executed a Contract for residential contracting that did not include a term required by M.G.L. c. 142A, § 2. As noted in Finding of Fact No. 27 above, the Contract failed to provide Homeowner and his wife with important information on canceling the Contract within three business days.[22] **Accordingly, violations of § 2 and § 17(17)[23] are found.**

### <u>Administrative Penalties</u>

## I.   Enforcement action(s) against Contractor   (Case Docket No. 2019-014)

For each violation of the HIC Act that is established by substantial evidence, the Hearing Officer may impose an administrative penalty of up to two thousand dollars ($2,000.00). M.G.L. c. 142A, § 18.. *See also* 201 C.M.R. 18.03(4). In addition, the Hearing Officer may reprimand a registrant or suspend or revoke a registrant's HIC certificate of registration. *Id.* The Hearing Officer has the authority and discretion to institute any of these measures. 201 C.M.R. 18.03(2). In determining whether to impose an administrative penalty, the Hearing Officer shall consider the seriousness of the violation, the deleterious effect of the violation on the homeowner, any good faith on the part of the contractor or subcontractor, and the contractor's or subcontractor's history of previous violations. M.G.L. c. 142A, § 18.

---

[21] The Homeowner also alleged Contractor made material misrepresentations regarding Steven Nygren, a claim which was not substantially supported with the evidence and testimony presented. Any building code violations alleged by Homeowner may be more appropriately referred to the BBRS.

[22] For a sample contract conforming to the requirements of M.G.L. c. 142A, please refer to the OCABR website link: https://www.mass.gov/files/documents/2017/09/27/HIC%20FAQs.pdf

[23] § 17(17) prohibits violations of any other provision of M.G.L. c. 142A.

With regard to materially deviating from specifications without Homeowner's consent, this Hearing Officer assesses an ADMINISTRATIVE PENALTY of $600.00. This Hearing Officer found this violation to be notable as Homeowner reasonably believed PEX piping would be installed in his home based on the Contract's terms. The Contractor's absence of a violation history, as well as the totality of the circumstances in this matter, were considered in determining this penalty.

With regard to the deficiency in Contractors' Contract, this Hearing Officer assesses an ADMINISTRATIVE PENALTY of $400.00. This Hearing Officer found this infraction to be notable because the omitted provision from the Contract, had it been included, would have served to better educate and inform Homeowner and his wife before they contracted with Contractor. Once performing residential contracting services, Contractor was required to comply with the HIC Act at all times.

II.      Enforcement action(s) against Respondents The Wilbur Group, Inc., Jose Pineda, and Milton Marder  (Case Docket No. 2019-063)

Based on the lack of evidence and testimony presented showing that Respondents The Wilbur Group, Inc., Jose Pineda, and Milton Marder were the home improvement contractor(s) with which Homeowner and his wife contracted, as well as any intentional material misrepresentations on Respondents' part in assisting Contractor in procuring the Contract, Case Docket No. 2019-063 is hereby DISMISSED.

<u>Conclusion</u>

Accordingly, in light of the nature of the violations in this matter and the potential negative effect on Homeowner and his wife established by the facts of this Complaint, <u>an ADMINISTRATIVE FINE in the total amount of ONE THOUSAND DOLLARS ($1,000.00) is hereby assessed against CONTRACTOR WHITE HOUSE CONSTRUCTION, INC. and GIOVANNI NARDELLA.</u> This fine shall be paid in the form of a certified check or money order made payable to the Commonwealth of Massachusetts.[24] **This payment must be made within thirty (30) days of the date of this decision.** Failure to pay $1,000.00 by **August 1, 2019** may result in the referral of this matter to the Attorney General's office for further enforcement action and/or criminal prosecution. Payment shall be mailed to:

**Office of Consumer Affairs and Business Regulation**
**Home Improvement Contractor Program**
**1000 Washington Street, Suite 710**
**Boston, MA 02118**

---

[24] Please include the Complaint number on the check.

**Case Docket No. 2019-063 against THE WILBUR GROUP, INC., JOSE PINEDA, AND MILTON MARDER  (HIC No. 190571) is DISMISSED.**

**SO ORDERED.**

**Office of Consumer Affairs and Business Regulation
by its designee,**

**Rakhi Lahiri, Esq.
Hearing Officer**

**Dated: July 1, 2019**

**Appellate Rights of the Contractor(s)/Respondent(s):** The Contractor(s)/Respondent(s) may file a motion for reconsideration within thirty (30) days of the receipt of this decision. Under the pertinent provisions of the Code of Massachusetts Regulations, 801 C.M.R. 1.01(7)(l), the motion must identify a clerical or mechanical error in the decision or a significant factor the Agency or the Presiding Officer may have overlooked in deciding the case. A motion for reconsideration shall be deemed a motion for rehearing in accordance with M.G.L. c. 30A, § 14(1), for the purpose of tolling the time for appeal. Notwithstanding the foregoing, in accordance with M.G.L. c. 30A, § 14, any person aggrieved by this decision may appeal the decision to a court of competent jurisdiction within thirty (30) days of the receipt of this decision.

**To the Homeowner(s)/Complainant(s):** Pursuant to 201 C.M.R. 18.03 (11), <u>Status of the Complainant as a Non-Party</u>, please be advised that, for the purpose of the complaint process, the status of one who files a complaint is that of a witness, not a party. **Because only parties have the right to appeal any final agency decision, the Homeowner(s)/Complainant(s) may not appeal this order.**

5/9/2019                          Citizenserve Online Portal



LOGOUT, GIO

▼

## ☁ VIEW PERMIT

Home / Services / Permitting / View Permit

💳 Make a payment

📄 Upload documents

💬 Leave message

**Permit #:** B17-002418
**Project #:** 17-023528
**Status:** Issued
**Balance Due:** $0.00
**Address** ███████████████
**Description:** First floor remodel



Permit        Reviews        Documents        Inspections

5/9/2019                                    Citizenserve Online Portal

| Inspection Type | Inspector | Date | Status |
|---|---|---|---|
| Preliminary | | 01/22/2019 | Complete |
| Insulation | | 01/15/2019 | Pass |
| Rough Frame | | 12/04/2018 | Pass |
| Excavation | | 08/16/2018 | Pass |

2015 COPYRIGHT BY ONLINE SOLUTIONS, LLC





OFFICE OF CONSUMER AFFAIRS AND BUSINESS REGULATION

2019-014 and 2019-063____

| HEARING LOCATION:<br>**Office of Consumer Affairs and Business Regulation**<br>**1000 Washington St, Boston, MA** | BEFORE:<br>**Rakhi Lahiri, Esq.** |
|---|---|
| CONTRACTOR(S):<br>**White House Construction, Inc. and Giovanni Nardella (HIC No. 177708)**<br><br>**and Wilbur Group, Inc. and Jose Pineda and Milton Marder (HIC No. 190571)** | DATE:<br>**May 3, 2019 at 10:30 a.m.** |

The following were present:

Petitioner/Homeowner:

| Print Name | Relationship to Petitioner/Homeowner | Sign Name |
|---|---|---|
| ███████████ | ███████ | █████████ |
| ███████████ | ███████ | █████████ |
| | | |
| | | |
| | | |

Respondent/Contractor:

| Print Name | Title or Relationship to Respondent/Contractor | Sign Name |
|---|---|---|
| Giovanni Nardella | Contractor | *[signature]* |
| Att. James M. Joe | Lawyer | *[signature]* |
| Milton Marder | Sub Contractor | *[signature]* |
| Kyle Marder | Sub contractor | *[signature]* |
| Jose Pineda | | *[signature]* |
| | | |

*Commonwealth of Massachusetts*



**OFFICE OF CONSUMER AFFAIRS AND BUSINESS REGULATION**

Docket No(s):___**2019-014 & 2019-063**___

| HEARING LOCATION: | BEFORE: |
|---|---|
| **Office of Consumer Affairs and Business Regulation** <br> **1000 Washington St, Boston, MA** | **Rakhi Lahiri, Esq.** |

| CONTRACTOR(S): | DATE: |
|---|---|
| **White House Construction, Inc. and Giovanni Nardella (HIC No. 177708)** <br><br> **and Wilbur Group, Inc. and Jose Pineda and Milton Marder (HIC No. 190571)** | **May 3, 2019 at 10:30 a.m.** |

# EXHIBIT LIST

1.  HIC Complaint Form for Case Docket No. 2019-014 received January 2019 3 pages

1a. Complaint 2019-014 narrative                                              5 pages

2.  HIC Complaint Form for Case Docket No. 2019-063 received January 2019 3 pages

2a. Complaint 2019-063 narrative                                              2 pages

3.  OCABR correspondence with Homeowner (re: additional information for Complaints) 2 pages

4.  White House Construction, Inc. Contract signed 12/15/17          11 pages

5.  White House Construction, Inc. estimate signed 12/15/17          3 pages

6.  Change Orders                                                            7 pages

7.  Project timeline document                                               2 pages

8.  Payment list and payment schedule document                       1 page

8a. Check copies for payments to White House Construction          10 pages

8b. Credit card transactions for other payments                        4 pages

9.  Communications with respondents                                     13 pages

10. Printout from salemnew.com (re: Steven Nygren)                  3 pages

11. OCABR correspondence dated January and March 2019 (re: receipt of Complaint) 5 pages

12. Respondents' response to Complaints by attorney                  4 pages

13. Notices of Hearing dated 3/26/19 for 5/3/19 hearing             16 pages

14. ██████ Property Record printout for ██████ and ██████ operty record printout for ██████

15. HIC database printouts for Respondent Nardella's registration history and information 10 pages (inc 177708—exp 8/14/20)

15a. HIC database printouts for Respondent Pineda's registration history and information 7 pages (inc 190571—exp 2/6/20)

16. Mass Sec of State Corp database printouts for "White House Construction, Inc." and The Wilbur Group, Inc."                                                                           6 pages

17. PACER Bankruptcy Case Locator printouts (indicating no bankruptcy petition filed by Nardella and Pineda)                                                                           2 pages

# COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF CONSUMER AFFAIRS AND BUSINESS REGULATION
1000 Washington Street, Suite 710
Boston, MA 02118
TEL (617) 727-3074  FAX (617) 727-3771

r

ractor

## 2019-014

RECEIVED

OFFICE OF CONSUMER AFFAIRS

MR 18

To file a complaint against a home improvement contractor, fill out this form completely and submit it to the Office of Consumer Affairs and Business Regulation ("OCABR"). OCABR will review all complaints. The submission of a complaint will not automatically result in a hearing against a contractor. If OCABR determines that your complaint is appropriate for a hearing, your complaint may result in disciplinary action against the contractor's registration and/or administrative fines. You will be notified in writing if a hearing is scheduled to address your complaint. You will be asked to testify at that hearing. Please refer to the OCABR website (www.mass.gov/oca) for additional information about OCABR's home improvement contractor complaint process.
**FILING A COMPLAINT WITH OCABR WILL NOT RESULT IN A MONETARY AWARD FOR YOU. IF YOU SEEK A MONETARY AWARD, CONTACT OCABR'S ARBITRATION & GUARANTY FUND PROGRAMS.**

**1. Your information: (Please type or print neatly)**        *Physical address*

Name: _____

*Mailing address*
Current address: _____

Address of building at issue: _____

Number of dwelling units in the building at issue: _1_   Is it a residential property? (circle) (Yes)  No

Is the building at issue your primary residence or did you intend for it to become your primary residence? (circle) (Yes)  No

Day phone: _____   Fax: _____   E-mail: _____

**2. Contractor Information:**

Contractor name: Giovanni Nardella

Business name (if any): White House Construction, Inc.

Business address: 15 Liberty Ave, Medford, MA 02155

Phone: (617) 684-5183

Date contract signed: 12 / 15 / 2017   Amount of contract: $150,000, $205,912 w/ Change orders

Home Improvement Contractor Registration (HIC) # 177708

To the best of your knowledge, has the contractor filed for bankruptcy? (circle)  Yes  (No)

**3. Other Information:**

If you have included photographs with your complaint, do you want OCABR to return them to you later? (circle)  Yes  No  (N/A)

EXHIBIT
1 1/3

**4. Complaint Information:** <u>Please circle the number</u> of any of the following acts that you allege took place in your dealings with the contractor. You must circle at least one allegation.

1. Operating without a certificate of registration;

2. Abandoning or failing to perform, without justification, any contract or project engaged in or undertaken by a registered contractor or subcontractor, or deviating from or disregarding plans or specifications in any material respect without the consent of the owner;

3. Failing to credit to the owner any payment they have made to the contractor or his salesperson in connection with a residential contracting transaction;

4. Making any material misrepresentation in the procurement of a contract or making any false promise of a character likely to influence, persuade or induce the procurement of a contract;

5. Knowingly contracting beyond the scope of the registration as a contractor or subcontractor;

6. Acting directly, regardless of the receipt or the expectation of receipt of compensation or gain from the mortgage lender, in connection with a residential contracting transaction by preparing, offering or negotiating; or attempting to or agreeing to prepare, arrange, offer or negotiate a mortgage loan on behalf of a mortgage lender;

7. Acting as a mortgage broker or agent for any mortgage lender;

8. Publishing, directly or indirectly, any advertisement relating to home construction or home improvements which does not contain the contractor's or subcontractor's certificate of registration number or which does contain an assertion, representation or statement of fact which is false, deceptive, or misleading;

9. Advertising in any manner that a registrant is registered under this chapter unless the advertisement includes an accurate reference to the contractor's or subcontractor's certificate of registration;

10. Violation of the building laws of the commonwealth or of any political subdivision thereof; *If your complaint alleges structural violations of Massachusetts State Building Code, those allegations will be referred to the Board of Building Regulations and Standards (BBRS), within the Department of Public Safety (DPS), for possible action against the contractor's construction supervisor license or you may proceed by filing your own separate complaint to DPS/BBRS*

11. Misrepresenting a material fact in obtaining a certificate of registration;

12. Failing to notify the OCABR of any change of trade name or address as required by section thirteen;

13. Conducting a residential contracting business in any name other than the one in which the contractor or subcontractor is registered;

14. Failing to pay for materials or services rendered in connection with his operating as a contractor or subcontractor where he has received sufficient funds as payment for the particular construction work, project or operation for which the services or materials were rendered or purchased;

15. Failing to comply with any order, demand or requirement lawfully made by the administrator or fund administrator under and within the authority of this chapter;

16. Demanding or receiving payment in violation of clause (6) of paragraph (a) of section (2),   which states: "Any deposit required under the contract to be paid in advance of the commencement of work under said contract shall not exceed the greater of one-third of the total contract price or the actual cost of any materials or equipment of a special order or custom made nature, which must be ordered in advance of the commencement of work, in order to assure that the project will proceed on schedule. No final payment shall be demanded until the contract is completed to the satisfaction of the parties thereto;"

17. Violating any other provision of Chapter 142A.  (Please specify below)
   a. Failing to present the homeowner with a written contract for residential contracting work exceeding $1,000 as required by section 2
   b. Failing to include required terms in a written contract for residential contracting work exceeding $1,000 as required by section 2
   c. Other provisions of Chapter 142A (please specify in your detailed narrative in Section 5 of this form)

2/3

5. Please provide a <u>detailed</u> narrative of the acts or omissions committed by the contractor that lead you to file this complaint. If necessary, please attach any additional pages. Your complaint <u>will not be processed</u> without a detailed narrative.

*Please see attached.*

6. I hereby affirm that the information contained in this complaint package is true and accurate to the best of my knowledge and belief.
Signed under pains and penalties of perjury.

Signature                                   *1 28, 19*
                                            Date

7. Please submit the complaint application, and all supporting documentation, e.g., building application, court judgments, contract, photographs (limited to 5 photographs), and the like (the documents or photographs should **NOT** be stapled) to:

**Office of Consumer Affairs and Business Regulation**
**Program Coordinator HIC Complaint Program**
**1000 Washington Street, Suite 710**
**Boston, MA 02118**

3

*3/3*

To:    Office of Consumer Affairs and Business Regulation, Commonwealth of MA

From:█████████████

RE:    Complaint against White House Construction, Inc.
       Contract for the renovation of our single-family home at █████████████
       MA████████

Date:  January 28, 2019

We are filing this complaint against White House Construction, Inc. under the following, "Complaint Information" categories:

2.     Abandoning or failing to perform …

14.    Failing to pay for materials or services…

16.    Demanding or receiving payment in violation of clause (6) …

Here's their contact information:

    White House Construction, Inc
    15 Liberty Ave
    Medford, MA 02155
    Giovanni Nardella, 781-698-9848, gio@whitehouseconstruction.com
    HIC# 177708

Enclosed please find copies of the agreements, formal communications between us and White House Construction, Inc., as well as a few emails related to the project and this complaint.

In the fall of 2017 we negotiated with White House Construction to renovate our home at 8 Hammond Street, Somerville, MA. White House Construction is owned by Giovanni Nardella, and at the time the business manager was Steve "Roberts". We were told that "Steve Roberts" is the uncle of Gio Nardella.

*We eventually learned for the first time on January 23, 2019 that "Steve" was Steve Nygren, convicted fellow who was headed to prison on July 20, 2018. See Steve Nygren of Salem, MA, age 51. We now know that during our entire interaction with Steve and White House Construction, Steve was a convicted felon headed to prison, with a long history of embezzlement and fraud.*

Then, this morning as I'm finalizing this complaint, we learned that Milton Marder referred to below is also a convicted felon:

https://www.claimsjournal.com/news/east/2004/11/09/47548.htm

Here's our story.

In a nutshell, we initially wanted to spend about $150,000 on our 2-story, single-family colonial. Our priorities were all new windows, a new kitchen, 2 new bathrooms, new floors and stairs, then whatever else they could offer within our budget. After extensive design work with an



architect we met through White House, they presented us with the attached agreement for $150,000 and we signed it. We paid a deposit of $45,000 to Steve "Roberts" Nygren in December 2017.

Just prior to construction we expanded the project to include new floors in the bedrooms and some other modifications, adding $27,570 to the overall project cost. Demolition began in April 2018, and weekly payments of $6,004 began on May 10, 2018. We were presented with a project timeline that showed completion just prior to September 2018 with a final payment of $23,405 at project completion.

In May and June we were presented with several change orders. We did manage to negotiate reduced costs on some of these items, then paid $24,842 for these change orders. Copies of these change orders are available upon request if needed.

During this time the project quickly fell behind schedule. We communicated our concerns with the business manager for White House Construction, Steve "Roberts" Nygren, suggesting we should suspend payments until the project was back on track. He pushed back, hard, implying that we did not understand how projects work, and that we had already agreed to the payment plan. We felt intimidated, and feared that they might stop work on our home. We wanted to trust them. We did get the weekly payments reduced to $4,500. Please see attached email correspondence from Steve "Roberts" Nygren dated June 20, 2018 that highlights the tone of our conversations regarding payments to date and moving forward.

In late July and early August we had vacation plans out of town, and continued making the weekly payments while away. That was very foolish, in hindsight. When we finally reconnected with Gio Nardella in August, he told us that Steve "Roberts" had had a stroke, and was no longer involved with the company, and that he had mismanaged the money. Our money was gone. Gio brought on board a man named Milton from the Wilbur Group. We never learned his last name until recently, and through web searched figured out he is Milton Marder. His company is The Wilbur Group registered in the name of Kyle Marder:

        The Wilbur Group, Inc.
        563 NANTASKET AVE
        HULL, MA 02045
        Milton's Cell: 978-304-2211
        HIC# 190571 – Kyle Marder

We now know that Milton Marder is a convicted felon.

Gio and Milton told us lots of stories about what Steve did with the money, but we have never received any definitive information about what happened. They always insisted that nothing illegal occurred. We assumed they were covering old depts with our funds and after Steve left the company the house of cards collapsed. We now know that Steve was a confessed felon, and headed to jail during the entire time we knew him!

2/5

Gio and Milton proposed that moving forward, Milton would cover the cost of labor utilizing his workforce if we would pay directly for materials and some sub-contractors out of the remaining funds on the contract with White House. We agreed to this plan, in principal. Our home was gutted, the windows were gone, leaving large window openings exposed to the elements. With each rain shower the water came in. We felt vulnerable and in a corner.

On August 17 we finalized the window order with Gio Nardella, and paid our portion of the costs directly to Harvey Building Products -- our personal additional costs for the windows being roughly $10,000 for black exterior windows that include fake window panes, "simulated divided lites". Gio was supposed to pick up the remaining cost of $8,851. Then, when the windows were due to arrive eight weeks later, Gio informed us that he never paid his portion of the cost, and we were unable to take delivery of the windows. We were very upset, to say the least! The following Monday Gio did make a modest payment of around $1,000 on the windows, and we picked up the difference of $7,612.

Following this difficult meeting we drafted the attached memo of Oct. 20, 2018, and requested a formal reply. Milton replied via email on October 25, 2018, which is also attached. In that email Milton still claims that White House Construction did nothing illegal, and also claims to still not know the truth about Steve "Roberts" Nygren. In hindsight, much of the content of this email does not make sense. There is likely more to the story.

Then, soon after, we learned that a company called Canaan Construction had put a lien on our house because White House Construction had not paid them in full for sub-contracted work on our home. Our lawyer looked into this, and since there was not a formal signed contract between White House Construction and Canaan Construction they could not put a lien on our home. We believe that the lien has been resolved. But in early January 2019 we learned that we are being sued by Canaan Construction for the outstanding payments of $9,300 on an agreement of $24,800. This is still an open issue for us.

The heating system has also been another major problem. In late October we were told by White House that getting the heat up and running again was not part of the original agreement, and we would be responsible for that portion of the project. The contract talks about "plumbing," but there's no mention of heat systems. Our assumption was that we could continue to use of our functioning boiler and new hot water heater as part of our new renovation. It is also clearly marked in the second floor project plan, "Baseboard Heat to Maintain," but all the hydronic heating systems were ripped out of the entire house during demolition. In addition, White House Construction was unable to find for us *any* plumber to even present us with a written quote for our heating system. They did find a plumber for the water and sewer, also named "Milton," but he never presented us with a written proposal for the heating system, even after repeated requests. In December as winter set in we found a plumber on our own, and at the advice of the ███████████ building Inspector, ████████ chose to install a complete new boiler and hot water system.

We were caught off guard regarding the need for a complete new heating system. We hired White House Construction to renovate our home, and we relied on them to provide advice and guidance on all of our project needs. We read our contract and estimate many, many times, and

3/5

it never dawned on us that we would be responsible for installing all new baseboard heat throughout the entire house, and that they would not even refer us to qualified plumbers to propose options for us. White House should not have removed all the hydronic lines and radiators in our home without first consulting with us on our options. The new system has cost us over $20,000, above and beyond our original plans. Again, we hired White House Construction in good faith that they would support and advise us on our entire project, and not walk away from one of the most critical pieces of infrastructure for a New England home, heat! Steve "Roberts" Nygren may have embezzled funds from White House Construction, but Gio Nardella was always to licensed builder supervising the project. It was his responsibility to understand and manage all the details of our renovation. His indifference to our need to have a functional heating system had nothing to do with Steve "Roberts" Nygren.

Another issue has just been discovered by us. The quote calls for "water lines to be pex", but CPVC was used instead. We have now learned that many plumbers no longer use CPVC, and PEX is considered a superior product.

Since October we've been continuously stressing that they please, move quickly to close up the exterior of the house before the winter! The windows arrived in October, and it wasn't until mid-January that the upper floors and front had siding, and the back of the first floor was tarped over just in time before the first winter storm of the season. We stop by the property nearly every day, and they appear to send no more than 2 workers at a time, for a few hours a day, a few days a week. Finally, the week before the first storm of the season, they finished the siding on the 2nd and 3rd floors, and tarped over the remaining exposed sections on the back of the house.

Based on our detailed accounting, as of January 29 we have paid White House Construction $182,134 toward the overall revised contract of $205,912, leaving $23,778 left in the White House agreement. Informal estimates we've received are that we're only $40%-50% complete at this point. Note that our payments to White House do not include our additional costs that we agreed to cover (such as black exterior windows, etc.) and do not yet consider the additional costs for a complete new heating system throughout the house that we had to cover as noted above.

On Monday, January 14 we began expressing our concerns directly with the ███████████ Building Inspectors, interim directo███████████ and the inspector assigned to our projec ████████████. On Tuesday, January 21 Edmund met on-site with Floyd Richardson. Floyd pointed out many items that he had shared with Gio Nardella that needed to be fixed, and also identified several other areas that needed to be address.

Then, on Wednesday night, January 22, Edmund met with Gio and Milton. Prior to the meeting, Edmund asked that Gio and Milton please come prepared with a detailed accounting of the payments so far, as well as a project plan for completing the project. But all they came with was a torn, half-sheet of paper of additional labor costs they wanted paid. Edmund stepped them through the detailed project costs to date (see attached), and firmly stated that we would not cover any additional costs moving forward until the project was completed. Edmund also went over the many items identified by inspecto███████████ that needed correction. It was during this angry conversation that Milton shared the information about Steve Nygren being in

4/5

jail, claiming that Steve had stolen money for him as well. This was the first time we learned the truth about Steve "Roberts" Nygren.

In summary, Gio Nardela and White House Construction are not living up to the terms of our agreement, and may be involved with intentional fraud. We were working with them in good faith for 6-months to get out of the cash-flow hole since August, 2018, but little has changed. They have failed to pay or resolve disputes with sub-contractors resulting in a lawsuit against us (Complaint Information #14), White House continues to expect us to pay for sub-contractors and materials beyond the agreed upon terms in the contract (Complaint Information #16), and the time committed to our project is vastly inadequate (Complaint Information #2). And now we know that Steve Nygren was headed to jail during the entire period we knew him. And now we know that Milton Marder is a convicted felon as well.

We request immediate action against Gio Nardella and White House Construction, and we're happy to provide more information or meet in person if that's helpful.

We're also filing a separate complaint against The Wilbur Group.

The ███████ Police CAD Incident Report is #19004305.

Thank you. We look forward to hearing from you.

Sincerely,





**COMMONWEALTH OF MASSACHUSETTS**
**OFFICE OF CONSUMER AFFAIRS AND BUSINESS REGULATION**
1000 Washington Street, Suite 710
Boston, MA  02118
TEL (617) 727-3074  FAX (617) 727-3771
www.mass.

**Home**

**2019-063**

M.G.L.

RECEIVED
Jan 30, 2019
OFFICE OF CONSUMER AFFAIRS

To file a complaint against a home improven _____ and submit it to
the Office of Consumer Affairs and Business Regulation ("OCABR"). OCABR will review all complaints. The
submission of a complaint will not automatically result in a hearing against a contractor. If OCABR determines that
your complaint is appropriate for a hearing, your complaint may result in disciplinary action against the contractor's
registration and/or administrative fines. You will be notified in writing if a hearing is scheduled to address your
complaint. You will be asked to testify at that hearing. Please refer to the OCABR website (www.mass.gov/oca) for
additional information about OCABR's home improvement contractor complaint process.
**FILING A COMPLAINT WITH OCABR WILL NOT RESULT IN A MONETARY AWARD FOR YOU. IF YOU
SEEK A MONETARY AWARD, CONTACT OCABR'S ARBITRATION & GUARANTY FUND PROGRAMS.**

**1. Your information:** (Please type or print neatly)   *Physical Address*

Name: ███████████

*Mailing*
Current address: ███████████

Address of building at issue: ███████████

Number of dwelling units in the building at issue: __/__   Is it a residential property? (circle) (Yes)  No

Is the building at issue your primary residence or did you intend for it to become your primary residence? (circle) (Yes)  No

Day phone: ███████   Fax ███████   E-mail ███████

**2. Contractor Information:**

Contractor name: *Milton Marder + Kyle Marder*

Business name (if any): *The Wilbur Group, Inc*

Business address: *365 Nantasket Ave, Hull MA 02045*

Phone: *(978-304-2211   (Contract w/ White House Construction)*

Date contract signed: *12-15-17*   Amount of contract: $ *150,000*

Home Improvement Contractor Registration (HIC) # *190571*

To the best of your knowledge, has the contractor filed for bankruptcy? (circle) Yes (No)

**3. Other Information:**

If you have included photographs with your complaint, do you want OCABR to return them to you later? (circle) Yes  No (N/A)

1

EXHIBIT
2 1/3

4. **Complaint Information:** <u>Please circle the number</u> of any of the following acts that you allege took place in your dealings with the contractor. You must circle at least one allegation.

1. Operating without a certificate of registration;

2. Abandoning or failing to perform, without justification, any contract or project engaged in or undertaken by a registered contractor or subcontractor, or deviating from or disregarding plans or specifications in any material respect without the consent of the owner;

3. Failing to credit to the owner any payment they have made to the contractor or his salesperson in connection with a residential contracting transaction;

4. Making any material misrepresentation in the procurement of a contract or making any false promise of a character likely to influence, persuade or induce the procurement of a contract;

5. Knowingly contracting beyond the scope of the registration as a contractor or subcontractor;

6. Acting directly, regardless of the receipt or the expectation of receipt of compensation or gain from the mortgage lender, in connection with a residential contracting transaction by preparing, offering or negotiating; or attempting to or agreeing to prepare, arrange, offer or negotiate a mortgage loan on behalf of a mortgage lender;

7. Acting as a mortgage broker or agent for any mortgage lender;

8. Publishing, directly or indirectly, any advertisement relating to home construction or home improvements which does not contain the contractor's or subcontractor's certificate of registration number or which does contain an assertion, representation or statement of fact which is false, deceptive, or misleading;

9. Advertising in any manner that a registrant is registered under this chapter unless the advertisement includes an accurate reference to the contractor's or subcontractor's certificate of registration;

10. Violation of the building laws of the commonwealth or of any political subdivision thereof; *If your complaint alleges structural violations of Massachusetts State Building Code, those allegations will be referred to the Board of Building Regulations and Standards(BBRS), within the Department of Public Safety (DPS), for possible action against the contractor's construction supervisor license or you may proceed by filing your own separate complaint to DPS/BBRS*

11. Misrepresenting a material fact in obtaining a certificate of registration;

12. Failing to notify the OCABR of any change of trade name or address as required by section thirteen;

13. Conducting a residential contracting business in any name other than the one in which the contractor or subcontractor is registered;

14. Failing to pay for materials or services rendered in connection with his operating as a contractor or subcontractor where he has received sufficient funds as payment for the particular construction work, project or operation for which the services or materials were rendered or purchased;

15. Failing to comply with any order, demand or requirement lawfully made by the administrator or fund administrator under and within the authority of this chapter;

16. Demanding or receiving payment in violation of clause (6) of paragraph (a) of section (2), which states: "Any deposit required under the contract to be paid in advance of the commencement of work under said contract shall not exceed the greater of one-third of the total contract price or the actual cost of any materials or equipment of a special order or custom made nature, which must be ordered in advance of the commencement of work, in order to assure that the project will proceed on schedule. No final payment shall be demanded until the contract is completed to the satisfaction of the parties thereto;"

17. Violating any other provision of Chapter 142A. (Please specify below)
   a. Failing to present the homeowner with a written contract for residential contracting work exceeding $1,000 as required by section 2
   b. Failing to include required terms in a written contract for residential contracting work exceeding $1,000 as required by section 2
   c. Other provisions of Chapter 142A (please specify in your detailed narrative in Section 5 of this form)

2

2/3

5. Please provide a <u>detailed</u> narrative of the acts or omissions committed by the contractor that lead you to file this complaint. If necessary, please attach any additional pages.  Your complaint <u>will not be processed</u> without a detailed narrative.

*See attached*

6. I hereby affirm that the information contained in this complaint package is true and accurate to the best of my knowledge and belief. Signed under pains and penalties of perjury:

_____                    1 , 28, 19
Signature                                                              Date

7. Please submit the complaint application, and all supporting documentation, e.g., building application, court judgments, contract, photographs (limited to 5 photographs), and the like (the documents or photographs should NOT be stapled) to:

**Office of Consumer Affairs and Business Regulation**
**Program Coordinator HIC Complaint Program**
**1000 Washington Street, Suite 710**
**Boston, MA  02118**

3

3/3

EXHIBIT

2a 1/2

To:     Office of Consumer Affairs and Business Regulation, Commonwealth of MA
From:   ████████████████████████
RE:     Complaint against The Wilbur Group, Inc.
Date:   January 28, 2019

We are filing this complaint against The Wilbur Group, Inc. under the following, "Complaint Information" categories:

4.    Making any material misrepresentation …
13.   Conducting a residential contracting business in any name other…
16.   Demanding or receiving payment in violation of clause (6) …

*Related Complaint*

Here's their contact information:

The Wilbur Group, Inc.
563 NANTASKET AVE
HULL, MA 02045
Milton's Cell: 978-304-2211
thewilburgroup@yahoo.com
http://www.wilburgroup.us
HIC# 190571 – Kyle Marder

Our contact with The Wilbur Group is with Milton Marder, who we assume is related to the HIC# holder Kyle Marder. Milton appears to be the primary representative of The Wilbur Group, as the phone number and email address listed on the website go to him.

We also just discovered on January 28, 2019 that Milton Marder was convicted of fraud in 2005!

https://www.claimsjournal.com/news/east/2004/11/09/47548.htm

Our contract is with White House Construction, but Milton has been representing White House in the work of our home since August 2018, attended most in-person meetings, and been included in all communications. Milton has served as the primary agent representing White House Construction in our e-mail and text communications.

Attached is a copy of our complaint against White House Construction, which provides the details of our situation. Our main concerns regarding Milton Marder are summarized below:

- On December 15, 2017 we signed a contract with White House Construction, signed by "Steve Roberts". We were told that "Steve Roberts" is the uncle of the owner of White House Construction, Gio Nardella.
- The project started in April 2018, with a finish date of September 2018, but quickly got behind schedule. Then in August 2018 we were told that Steve "Roberts" had had a stroke, had mismanaged funds, and Milton was brought in to help finish the project.
- Milton offered to cover the labor costs from his workforce if we paid for materials and some sub-contractors. We agreed to this, in principal, but made it clear we would not dip into final payment due at the completion of the project.
- The project moved very slowly. As winter set in we had to find our own plumber to install heat. We also had to pressure Milton and Gio to close up the exterior of the house, which finally happened on

2/2

January 17, 2019. The quality of the work suffered in many areas. In short, after 10 months from start of renovation (on what was projected as a 4-month construction timeline) we were not even at the half way mark, and spent 90% of project cost with many aspects of the 40% of construction being done poorly and needing to be redone (uneven stairs, sub-floors, etc.)

- During the week of January 14 Edmund informed the ▮▮▮▮▮ Building Inspector of our concerns, and met on-site privately with the inspector assigned to our project. Milton and Gio learned about our complaints to ▮▮▮▮▮▮ nspectional Services, and then a few days later I received this very aggressive text message from Milton:

- Text from Milton, Saturday morning, January 19, 8:00am:

  o *"Edmund I placed numerous calls to you of which you never had the courtesy to call me back. We have done everything you have asked of us and more and now when we are coming to the finish round you haven't been responsive at all. Gio sent u Roxil order for ceiling to get going on the ceiling insul. No response. We passed the insul inspection and could be hanging board but for some reason you are dragging ur feet. We need to meet as soon as possible so that we can finish. There are lots of cost issues to discuss. This is all on you now."*

- Then, on Wednesday night, January 22, Edmund met with Gio and Milton. They did not arrive with a detailed accounting or project plan as requested. All they came with was a torn, half-sheet of paper of additional labor costs they wanted paid! Edmund made it clear that we would not be covering any of their costs moving forward, as we had already dipped into the final payment for the renovation. Milton and Gio became quite angry. It was during this angry conversation that Milton shared the information about Steve "Roberts" Nygren being a convicted felon, and in jail. See Steve Nygren of Salem, MA, age 51.

Now that we see that Milton Marder is also a convicted felon, it makes some sense why they did not tell us that Steve Nygren had embezzled funds. Who knows what these people have been up to in their construction projects around the area. Please see some of the communications with Milton and White House Construction – I have more if you need it. The most recent came in this morinng as I finalize this complaint. At the advice of the ▮▮▮▮▮ Police, I'm not going to communicate with Milton or Gio at all moving forward, and leave that to our attorney and other MA public officials.

We have filed a complaint with the ▮▮▮▮▮ Police Department referring to Gio Nardella, Steve Nygren and Milton Marder, CAD Incident Report #19004305.

We are filing a separate Consumer Affairs complaint against White House Construction, Inc.

> White House Construction, Inc
> 15 Liberty Ave
> Medford, MA 02155
> Giovanni Nardella, 781-698-9848, gio@whitehouseconstruction.com
> HIC# 177708

Thanks. We look forward to hearing from you.

1/28/19

**EXHIBIT**

3 1/2

**Ormont, Estee (SCA)**

| | |
|---|---|
| **From:** | ██████████████████ |
| **Sent:** | Monday, March 25, 2019 4:08 PM |
| **To:** | Ormont, Estee (SCA) |
| **Subject:** | Re: COMPLAINT AGAINST THE WILBUR GROUP, INC. |

Hello Estelle,

Thanks for being in touch.

██████████ ██████████ is our primary residence, and that property is being renovated. My family is currently living at ██████████ during the renovation. In the meantime, with have the ██████████ for our mail, as we do not receive mail at our █████

I have owned ██████████████ since 2003. I don't have a copy of the deed handy, but I can check my files back at ██████████ in the coming days.

I'm glad that this complaint against the Wilbur Group is moving forward. My primary complaint is against White House Construction, the company we initially hired to renovate our home at ██████████ ██████████

Fortunately, we have found a new contractor, and we're on track to complete our home by mid-June.

Thanks,
Edmund Jones

On Mar 25, 2019, at 3:57 PM, Ormont, Estee (SCA) <estee.ormont@state.ma.us> wrote:

Mr. Jones,

We have received your complaint against the above contractor. Just couple of questions, you list the ██ ██████████ your primary residence? Correct? You also list Physical address as ██████████ ██████████ You also have ██████████ as your mailing address. Please provide me your deed of the property in which you indicate the project of done? Do you rent this property? Have you just purchased to live in this property?

Thank you,

*Estelle Ormont, Program Coordinator*
Home Improvement Registration/Complaint Division
Office of Consumer Affairs & Business Regulation
1000 Washington Street, Room 710
Boston, MA 02116
Tel # 617-973-8738
Fax# 617-727-9932

Email – estee.ormont@mass.gov



2



White House Construction, Inc.

December 14, 2017

# WHITE HOUSE CONSTRUCTION, INC.

*Presidential Service and Quality.*

**15 Liberty Ave**
**Medford, MA 02155**
**Phone: (617) 684 – 5183**
**Fax: (617) 776 - 6561**
**www.WhiteHouseConstruction.com**



## Construction Contract

**Date:**

12-11-17

**Owners:**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Project Location:**

▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

White House Construction, Inc.

December 14, 2017

## Construction Contract

Construction Contract by and between ██████████████████ having an address at ████████████ ██████████████ (hereinafter collectively referred to as "Owner") and White House Construction, Inc., having a mailing address at White House Construction, 15 Liberty Ave, Medford, MA 02155 (hereinafter referred to as "Contractor").

1) **Compliance**
   This Construction Contract is in compliance with the Ninth Edition of the Massachusetts State Building Code (One and Two Family Dwelling Code) 780 CMR 110.R6.5 as adopted by the Massachusetts State Board of Building Regulations and Standards.

   a) All home improvement contractors and subcontractors shall be registered by the director. Any inquiries about a contractor or subcontractor relating to a registration should be directed to:

   > Director
   > Home Improvement Contractor Registration
   > One Ashburton Place, Room 1301
   > Boston, MA 02108
   > (617) 727 – 8598

   b) Licenses and Registrations
      i) Massachusetts Construction Supervisor License – Unrestricted: 106035
      ii) Massachusetts Home Improvement Contractor Registration: 177708
   c) Certifications
   d) Permit Notice
      i) Required construction-related permits to be obtained by Contractor are listed in the Project Specifications.
      ii) Owners who secure their own construction-related permits or deal with unregistered contractors will be excluded from the guaranty fund provisions of M.G.L. Chapter 142A.

2) **Scope of Work**
   Contractor's Work to be performed in accordance with the drawings and floor plans prepared for Owner by architect, which are attached hereto as Exhibit 1 and incorporated herein by reference, and in any written change orders (signed by both Owner and/or architect and Contractor) after execution of this Construction Contract; Specifications; and Standards; (the Plans, Specifications, Standards, and Change Orders hereinafter

2

White House Construction, Inc.

December 14, 2017

collectively referred to as the "Plans and Specifications"). Also, attached to this agreement is estimate 1126 (the "Estimate") which clearly outlines the work to be done in conjunction with the drawings and floor plans. In the event of a conflict between the Estimate and the Plans and Specifications, the Plans and Specifications shall be controlling.

3) **Materials and Workmanship**

Contractor agrees to perform Contractor's Work in a good, workmanlike manner. All equipment, materials, and articles incorporated into the Residence are to be provided by the contractor. The contractor may provide the supplier information to the owner to choose from but the responsibility of procuring all of the materials for the project falls on the contractor. Materials are to be new and shall conform the requirements of the Plans and Specifications. Construction work will occur Monday through Saturday between the hours of 7:00 am and 5:00 pm.

4) **Time of Completion**

Performance of Contractor's Work shall commence on or before 4/30/17. The building permit application will be submitted within two days after receipt of signed contract and deposit. The construction project shall be substantially completed no later than 120-150 days after commencement, (hereinafter the "Completion Date"). If Contractor is delayed in completing Contractor's Work by reason of strikes, work stoppages, inability to procure materials, restrictive governmental acts or regulations, riots, war, flood, or any other reasons beyond Contractor's reasonable control, Contractor may extend the Completion Date for such time as is reasonably required to enable Contractor to complete Contractor's Work. . In the event that Contractor requests an extension pursuant to the terms of this clause for a period of time exceeding thirty days or if Contractor requests any subsequent extension of time to complete work, then Owner may, at owners sole election and upon written notice to Contractor, terminate this agreement. In the event that this agreement is terminated pursuant to the terms of this clause, Owner shall pay to Contractor for the proportion of construction completed through the date of termination under this clause. The amount to be paid to Contractor shall be agreed to in a writing signed by both Contractor and Owner. Any dispute arising under the terms of this clause shall be governed by the terms of clause 13 below.

5) **Contract Price**

Contractor agrees to complete all work under this agreement for the total sum of $150,000.00, which includes all labor AND materials as outlined in estimate 1126 attached to this agreement. Prior to commencement of Contractor's work, Owner shall pay the Contractor a deposit of 30% of contract price upon approval of this contract. This will secure the homeowner's time frame to begin construction before 4/30/17 without having to re-price the estimate and allow the project to continue with the agreed upon price in estimate #1126. This will also allow the contractor to secure the building permit, personnel, give deposits to all necessary subcontractors, materials and all else required to begin in a timely fashion. Beginning the fourth week after construction commences and to continue weekly the contractor will submit weekly invoices to the owners for $5900.00 and those will be paid every week that construction is ongoing at the property until final contract price is met. Every week, starting on week four the contractor will provide the owner a weekly progress report via a weekly progress meeting and discussion of the anticipated schedule of going forward, as well as any outstanding issues or issues that may have arisen. The contractor agrees to notify the owner any time the

White House Construction, Inc.

December 14, 2017

estimate may change due to cost of labor or materials. Once project commences a timeline, or schedule of events will be provided by the contractor.

6) **Terms**

a) **Progressive Payments:** Owner shall make payments on account of this Construction Contract in accordance with the terms outlined in #5 above.

b) **Finance Charges:** A 1.5% per month carrying charge shall be applied to outstanding balances over 30 days.

7) **Modifications**

There shall be no modification, amendment, or change order made relative to this Construction Contract, Contractor's Work, or the Plans and Specifications without the express mutual modification signed by Owner and Contractor.

a) **Required Change Orders:** The Specifications represent Contractor's best effort to be complete in detailing the scope of work to be performed. However, this contract is based solely on observable conditions of the structure in its status at time of Contract preparation. If additional concealed, unknown conditions are discovered in the course of construction, Contractor shall point out these conditions to Owner so Owner and Contractor can execute a Change Order for any additional work. Such orders shall specify additional fees, materials, labor and services, and shall modify and become part of this contract. Additional costs, if any, shall be paid for by Owner in advance of execution of work specified in said Change Order. Failure of Contractor to request such payments in advance shall not be deemed a waiver of payments due. Any delays in Contractor's Work caused by required change orders shall not be deemed the responsibility of Contractor, and shall automatically extend the time of completion. Additional time required shall be expressly stated within the Change Order. Contractor shall not commence any work pursuant to any requested Change Order until such Change Order is executed by the Owner. Owner shall not be responsible to pay Contractor for work commenced pursuant to an unapproved Change Order. Unapproved Change Orders shall not be deemed to modify this agreement and Contractor expressly waives any claim at law or in equity with respect to work completed pursuant to any unapproved Change Order.

b) **Additional Work Authorizations:** In the event that required work cannot be priced in advance of completion of such work, (i.e. discovery of rot needing repair), an Additional Work Authorization shall be executed. Such orders shall describe work to be completed, and shall specify method of calculating additional fees, materials, labor and services to be charged upon completion, and shall modify and become part of this contract. Payment shall be due upon presentation of Contractor invoice. Any delays in Contractor's Work caused by required change orders shall not be deemed the responsibility of Contractor, and shall automatically extend the time of completion. Additional time required shall be estimated and expressly stated within the Additional Work Authorization. Contractor shall not commence any work pursuant to any requested Work Authorization until such Work Authorization is executed by the Owner. Owner shall not be responsible to pay Contractor for work commenced pursuant to an unapproved Work Authorization. Unapproved Work Authorizations shall not be deemed to modify this agreement and Contractor expressly waives any claim at law or in equity with respect to work completed pursuant to any unapproved Work Authorization.

Construction Contract

White House Construction, Inc.

December 14, 2017

c) **Requested Change Orders:** If after the execution of this agreement, Owner requests changes to the same, Owner shall sign a Request for Change Order Pricing describing the nature of work and authorizing Contractor to price such change. Owner and Contractor shall execute all such requests as written Change Orders. Such orders shall specify materials, labor and services, and shall modify and become part of this contract. Additional costs, if any, shall be paid for by Owner in advance of execution of work specified in said Change Order. Failure of Contractor to request such payments in advance shall not be deemed a waiver of payments due. Any delays in Contractor's Work caused by change order requests shall not be deemed the responsibility of Contractor, and shall automatically extend the time of completion. Additional time required shall be stipulated within the Change Order. . Contractor shall not commence any work under any Owner Requested Change Order until such change order has been executed by Owner.

## 8) Additional Contractor Responsibilities

a) **Project Management and Facilitation:**
   i) Contractor shall continuously employ a sufficient number of competent employees and subcontractors so as to ensure completion of Contractor's Work by the stated completion date or any extension thereof. Contractor, in subcontracting any portion of Contractor's Work, shall not be relieved from responsibility for the work performed or materials supplied by any subcontractor and shall be bound by the terms of this Construction Contract notwithstanding any subcontract. Contractor shall properly direct and control any subcontractors, being responsible for the coordination of Contractor's Work and any subcontractor's work.
   ii) Contractor represents that it owns or has available the proper tools and equipment to perform Contractor's Work.
   iii) Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures and for coordinating all portions of Contractor's Work; including but not limited to: timely ordering of products and materials and coordination of their deliveries; coordination of trade specific and provisional services; coordination of and participation in required inspections; and troubleshooting of unforeseen circumstances or circumstances beyond Contractor's control.
   iv) Contractor shall provide Owner, Owner's Bank, and their agents with access to the work site at all reasonable times for purposes of conducting inspections and monitoring the progress of Contractor's Work.

b) **Provisional Services and Materials:**
   Unless otherwise directed by the Plans and Specifications, Contractor shall provide the following at the contractor's expense:
   i) Construction equipment transportation and materials delivery;
   ii) Consumable construction supplies and fuels, and one-time-use materials as needed to properly perform Contractor's Work;
   iii) Portable toilet service for workers use, if necessary or requested.

c) **Protection and Safety**

White House Construction, Inc.

December 14, 2017

Unless otherwise directed by the Plans and Specifications, Contractor shall provide the following at the contractor's expense:

   i) Provide supervisory oversight to assure safe workman practices and worksite conditions;
   ii) Erect temporary steps, railings, platforms, and other structures and signage as needed to promote safety during work progress;
   iii) Ensure appropriate handling of and maintain orderly storage of on-site construction equipment and materials to promote efficiency and safety during work progress;
   iv) Provide tarps and coverings as needed to protect structures and materials from outdoor weather conditions;
   v) Appropriately protect existing finished floors around work areas and over passageways to work areas and cover existing immovable fixtures;
   vi) Erect temporary barriers as best as possible to separate and seal work areas from areas of Owner occupancy;
   vii) Keep driving and parking areas clear of construction fasteners that might puncture equipment and vehicle tires.

d) **Cleaning**
   Unless otherwise dictated by the Plans and Specifications, Contractor shall:
   i) Leave the worksite picked up, organized, and secure every day work is performed;
   ii) Leave the worksite swept, raked, organized, and secure for each weekend;
   iii) Cover any fixtures or areas that may be adversely affected by plasterwork;
   iv) Clean up immediately after all plasterwork;
   v) Remove all rubbish and waste material and leave premises clean and ready for use upon completion of Contractor's Work.

e) **Assignment of Contract:**
   Contractor shall not assign this Construction Contract or part hereof without the written consent of Owner.

f) **Materials become Property of Owners:**
   When Contractor shall have received payment of any requisition; all materials referenced therein shall become the property of Owner and shall not be removed from the Premises.

g) **Care of Premises:**
   From the time of the commencement of Contractor's Work until Contractor's Work is completed and accepted by Owner, Contractor shall have the care of the Premises subject to the rights of the Owner.

9) **Additional Owner Responsibilities**
   Unless otherwise dictated by the Plans and Specifications, Owner shall be responsible for the following:

   a) Providing Utilities service as needed and as practical for Contractor's use in performance of Contractor's work;
   b) Relocation of any small plants requiring delicate handwork as needed prior to commencement of Contractor's Work;
   c) Maintenance of decorative landscape plants temporarily moved and stored to allow performance of Contractor's Work;

White House Construction, Inc.

December 14, 2017

d) Moving and storage of personal property as needed to allow unobstructed work areas prior to commencement of Contractor's Work in a particular area;

e) Owner assumes responsibility for replacement of lost or damaged items that are not removed from the affected areas and/or areas that Contractor must access in order to perform construction services;

f) Providing unimpeded access to the work site, including clearing of snow from driveways, at all reasonable times for purposes of enabling Contractor's Work and allowing inspections;

g) Attendance at all predetermined meetings.

h) Making and authorizing selections from the appropriate Contractor-designated vendors by the deadline date specified by Contractor;

i) Keeping pets, family, and third party individuals out of and safely away from areas where construction work is underway;

j) Working in coordination with Contractor to resolve unforeseen and/or unplanned circumstances;

k) Where specifications call for Owner to provide any materials or information, Owner shall be responsible for supplying such materials or information in a timely manner to allow for ordering and installation;

l) Unless otherwise directed by Contractor, Owner shall not make inquiries with or give direction to any outside service contractor or Contractor personnel subordinate to the Project Supervisor.

m) Delays in construction or commencement of construction caused by Owner's failure to be timely in the above provisions shall not be deemed the responsibility of Contractor, and shall automatically extend the time of completion. Additional costs to Contractor, including but not limited to lost income created by untimely execution of the above Owner responsibilities, shall be borne by Owner.

n) The Owner is responsible for all of the costs associated with the necessary additional requirements from the structural engineer.

## 10) Authority and Duties of Inspectors

Owner and Inspectors employed by Owner shall be authorized to inspect all of Contractor's Work and all materials furnished. Such inspection may extend to all or any part of the work and preparation, fabrication, or manufacture of materials to be used in the performance of Contractor's Work. In the case of any dispute arising between Contractor and any inspector as to materials furnished, or the manner of performing the work, the inspector shall have the authority to reject materials or suspend work until Contractor and Owner resolve the dispute. Owner and Inspectors employed by Owner are not authorized to revoke, alter, enlarge, or release any requirements of the Plans and Specifications, nor to approve or accept any performance of Contractor's Work, or to issue instructions contrary to the Plans and Specifications. Any changes in construction that are required by a local Inspector after construction are the responsibility of the contractor.

## 11) Insurance and Liability

a) Responsibility for Loss or Damage: Owner shall not be responsible or accountable for any losses or damages that shall happen to Contractor's Work until Owner accepts such work. Owner shall not be responsible or accountable for any losses or damages that shall happen to Contractor's materials, tools, or equipment employed during the course of this Construction Contract.

b) Contractor's Insurance: