## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA     )
                                   )
        v.                   )       1:16-cr-00106-JAW
                                   )
STEVEN NYGREN                 )

### ORDER ON MOTION FOR COMPASSIONATE RELEASE

An incarcerated individual moves for compassionate release to home confinement and a period of supervised release under 18 U.S.C. § 3582(c)(1)(A)(i). Though the incarcerated individual's severe obesity, chronic kidney disease, and hypertension present a serious case for compassionate release, the Court concludes that the likelihood he will reoffend, along with the short amount of time he has served in relation to the total length of his sentence, caution against release. The Court denies the motion.

## I.   PROCEDURAL BACKGROUND

On May 25, 2018, the Court sentenced Steven Nygren to ninety-five months of imprisonment concurrent with two sixty-month terms, five years of supervised release concurrent with two three-year terms, no fine, $815,496.27 restitution, and a $6500 special assessment for bank fraud in violation of 18 U.S.C. § 1344(2), access device fraud in violation of 18 U.S.C. § 1029(a)(2), and tax evasion in violation of 26 U.S.C. § 7201. *Min. Entry* (ECF No. 71); *J.* (ECF No. 74). On June 8, 2018, Mr. Nygren filed a notice of appeal. *Def.'s Notice of Appeal* (ECF No. 76). On August 6, 2019, the United States Court of Appeals for the First Circuit affirmed this Court's sentence. *J.* (ECF No. 91); *United States v. Nygren*, 933 F.3d 76 (1st Cir. 2019). The

Court received the mandate of the First Circuit on August 27, 2019. *Mandate* (ECF No. 92).

On May 22, 2020, Mr. Nygren filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *Emergency Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) in Light of Imminent Threat of Contracting COVID-19 Virus* (ECF No. 95) (*Def.'s Mot.*). On June 2, 2020, Mr. Nygren filed a supplemental brief to his compassionate release motion. *Pet'r's Suppl. Br. to Emergency Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) in Light of Imminent Threat of Contracting COVID-19 Virus* (ECF No. 99) (*Def.'s Suppl. Br.*). On June 9, 2020, the Government responded in opposition. *Gov't's Resp. to Def.'s Mot. to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)* (ECF No. 100) (*Gov't's Resp.*). Mr. Nygren filed a second supplemental brief on June 18, 2020. *Pet'r's Suppl. Br. # 2 to Emergency Mot. for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) in Light of Imminent Threat of Contracting COVID-19 Virus* (ECF No. 109) (*Def.'s Second Suppl. Br.*). On June 30, 2020, the Government filed a supplemental memorandum. *Suppl. Mem. in Support of Gov't's Resp. to Def.'s Mot. for Compassionate Release* (ECF No. 110) (*Gov't's Suppl. Mem.*).

## II.   POSITIONS OF THE PARTIES

### A.   Steven Nygren's Motion

Mr. Nygren asks "that his sentence be modified to Home Confinement or reduced" because prison conditions increase his risk of contracting COVID-19 and he has pre-existing conditions that increase his risks of suffering significant adverse

consequences from COVID-19. *Def.'s Mot.* at 1. He asserts that as of the date he filed his motion, the Federal Medical Center, Devens (FMC Devens)—the Bureau of Prisons (BOP) facility where he resides—"has reported 15 infected inmates and two staff, a far cry from the Warden's assertion that the facility is doing an extraordinary job." *Id.* He states that he "is a 53 year old, Caucasian male, who suffers from Hypertension and liver failure" and that the United States Centers for Disease Control and Prevention (CDC) and United States Surgeon General have identified these conditions as serious risk factors for COVID-19. *Id.*

Mr. Nygren states that he is incarcerated at FMC Devens and has a scheduled release date of October 2, 2025, which means that he "has served a little over 30% of his sentence." *Id.* at 1-2. He states that he filed a request for compassionate release with the warden of FMC Devens on April 4, 2020, which the warden denied on April 25, 2020. *Id.* at 2. Mr. Nygren then discusses the Court's authority to grant him compassionate release. *Id.* at 2-3.

Mr. Nygren asserts that his hypertension, liver failure, and previous stroke—in combination with the risk of COVID-19—present extraordinary and compelling reasons for his release. *Id.* at 3. He argues that FMC Devens' COVID-19 response violates the Eighth Amendment because they are not enabling social distancing and states that further exhaustion would be futile and the Court may excuse it. *Id.* at 3-5. He represents that the United States Surgeon General has stated that individuals with conditions like Mr. Nygren's who contract COVID-19 "could develop very severe symptoms and [are] more likely to die." *Id.* at 5. He argues that COVID-19 is

3

wreaking havoc at FMC Devens, that prisons are not environments where social distancing and other hygiene measures are practical, and that release of significant numbers of incarcerated individuals will save lives. *Id.* at 5-6.

Mr. Nygren further argues that the United States Attorney General "has directed the B[OP] to start releasing at risk inmates, based on certain Criteria" and that Mr. Nygren's recidivism risk is minimal. *Id.* at 7. He states that FMC Devens is "operating in defiance" of the Attorney General's direction, that other courts have released incarcerated individuals based in part on COVID-19, and that in addition to his health conditions, Mr. Nygren does not pose a danger to the community and has a release plan that will enable him to begin paying restitution. *Id.* at 7-10.

### B.    Steven Nygren's First Supplemental Brief

Mr. Nygren begins by giving background about COVID-19 in prisons and how courts across the country are reacting. *Def.'s Suppl. Br.* at 1-9. He then provides background about how COVID-19 affects older individuals, noting that he is fifty-three years old. *Id.* at 8-11. He then discusses the dangers of certain pre-existing conditions, including diabetes, heart conditions, and lung conditions. *Id.* at 11-13. Mr. Nygren points out that he is obese and notes that "[p]eople with obesity are more susceptible to contracting viruses and prone to complications from these viruses." *Id.* at 13-14.

### C.    The Government's Response

The Government argues that Mr. Nygren "has not met his burden to show extraordinary circumstances exist in his case to warrant the reduction in sentence"

and, even if he has, he "fails to meet his burden in showing that a reduction of sentence would be appropriate under any application of 3553([a]) factors, given his particular history, the facts surrounding the commission of his offenses, and that he has served less than 30 percent of his total sentence."[1]  *Gov't's Resp.* at 1.  The Government also states that the Court should deny Mr. Nygren's "alternative request for an order directing BOP to transfer him to home confinement."  *Id.*

The Government next lays out the background of Mr. Nygren's case and the BOP's response to COVID-19.  *Id.* at 1-8.  The Government states that Mr. Nygren has served only "29.1% of his projected statutory term," which is why—according to his BOP case manager—the BOP has not considered him for home confinement.  *Id.* at 7.  The Government expresses its view of the legal framework governing compassionate release motions.  *Id.* at 8-9.

The Government argues that "[t]he mere existence of the COVID-19 pandemic . . . could not alone provide a basis for a sentence reduction."  *Id.* at 11.  Though it acknowledges that severe obesity "is a risk factor that can in some cases lead to a finding of exceptional circumstances," the Government proceeds to encourage the Court to discount Mr. Nygren's obesity, arguing that he has lost weight in the past

---

[1]    The Government does not argue that Mr. Nygren has not complied with the exhaustion requirement of § 3582(c)(1)(A).  *Gov't's Resp.* at 1-20.  The Government is aware of the exhaustion issue and referred to it in its memorandum.  *Id.* at 8.  But the Government nowhere asserted that Mr. Nygren failed to exhaust his administrative remedies in this case.  *Id.* at 1-20.

The Court ruled recently in *United States v. Whalen*, No. 1:11-cr-00033, 2020 WL 3802714, at *7 (D. Me. July 7, 2020), that this exhaustion provision is a nonjurisdictional claim-processing requirement.  The Court also concluded that exhaustion is mandatory when asserted by the government, but that the government may waive or forfeit the exhaustion argument.  *Id.*  In *Whalen*, the Government expressly waived exhaustion as a defense.  *Id.*  Here, the Government failed to raise it as a defense to Mr. Nygren's petition and the Court therefore concludes that the Government has either waived or forfeited the exhaustion of administrative remedies issue in this case.

and may lose weight in the future.  *Id.* at 12-13.  The Government suggests the Court should also disregard Mr. Nygren's diagnosis of hypertension because it is primary hypertension, rather than pulmonary hypertension, and it is treated by medication. *Id.* at 13-14.  The Government further argues that Mr. Nygren is not old enough for his age to be a risk factor.  *Id.* at 14.  Taken together, the Government contends that Mr. Nygren's health conditions do not add up to extraordinary and compelling reasons for a sentence reduction.  *Id.*

Should the Court disagree with the Government's medical conclusion, however, the Government contends that the Court still should not release Mr. Nygren "because he has failed to demonstrate that he otherwise merits release under the [18 U.S.C.] § 3553(a) factors."  *Id.* at 15.  The Government contends that "the disease is sadly rampant in Essex County where [Mr. Nygren] says he would return to live."  *Id.* at 15-16.  The Government says that Mr. Nygren's "substantial history of defrauding others of money," as well as indications that Mr. Nygren "continued his fraudulent schemes and tax evasion throughout his sentencing process, and even after sentencing up to the time he self-reported to BOP," make him a danger to the community.  *Id.* at 16.  The Government points out that Mr. Nygren has made no restitution payments and notes that his release plan has him working from home, where he "committed a substantial portion of his criminal misconduct," and working in sales, "an occupation that often involves accepting forms of payment from customers who may not be aware of the defendant's history with other people's checks

and credit cards." *Id.* at 16-17. Finally, the Government argues that the Court has no authority to direct BOP to place Mr. Nygren in home confinement.[2] *Id.* at 17-18.

### D.   Steven Nygren's Second Supplemental Brief

Mr. Nygren begins by incorporating an attached offer of employment, stating that the Court should consider the employment offer despite the fact that "the business in question is connected to a prison acquaintance," as "[t]he business in question appears legitimate and historically appears to have significant revenues and multiple locations." *Def.'s Second Suppl. Br.* at 1; *see also id.*, Attach. 1, *Letter to Steven Nygren* (*Employment Letter*). Mr. Nygren states that this employment, "even if secured through prison connections, seems legitimate and in keeping with this food industry's needs and Mr. Nygren's skills." *Def.'s Second Suppl. Br.* at 1. Mr. Nygren asserts that he "has undertaken a program of self-improvement, including working with the prison's dog training program and Bible studies." *Id.* at 2. Finally, Mr. Nygren asserts, in response to the Government's point that his release plan has him going home to Essex County, Massachusetts (which the Government asserts had the third highest total of COVID-19 infections in Massachusetts), that FMC Devens is also located in Essex County and that "substantial members of the workforce must of necessity live and work outside the camp in Essex County."[3] *Id.* at 2.

---

[2]    The Court agrees with the Government's conclusion that it is without authority to order the BOP to designate Mr. Nygren to home confinement. Aside from 18 U.S.C. § 3582(c)(1)(A), Mr. Nygren does not provide the Court with any source of authority for the Court to order such relief, *see Def.'s Mot.*, and the Court is aware of none. *See, e.g.*, *United States v. Williams*, No. 3:14-cr-00217-RJC-DCK, 2020 WL 3803921 (W.D.N.C. July 7, 2020) ("only the BOP has the statutory authority to make the necessary assessment of whether to transfer the defendant to home confinement").

[3]    The Court takes judicial notice of the fact that FMC Devens is located in Middlesex, not Essex County, Massachusetts, *see FMC Devens*, BOP, https://www.bop.gov/locations/institutions/dev/ (last visited July 22, 2020). FMC Devens' correct county location does not affect the Court's ruling.

### E.     The Government's Supplemental Memorandum

The Government notes that "[o]n June 25, 2020, following the government's filing of its opposition . . ., the [CDC] updated its list of medical conditions that put individuals at increased risk for getting severely ill from COVID-19." *Gov't's Suppl. Mem.* at 1.  The Government points out the inclusion of obesity (a body mass index [BMI] greater than or equal to 30) and chronic kidney disease of any stage "among the risk factors for severe illness, that is, illness requiring hospitalization." *Id.*  The Government states that "the inclusion of hypertension as a possible risk factor," as opposed to the previous CDC guidance that listed only pulmonary hypertension, is "[a]lso of note . . .." *Id.*

The Government then reasserts that Mr. Nygren had "a BMI of more than 40" when it was last calculated and further notes that "[i]n January 2020 Mr. Nygren was also noted as having chronic kidney disease, stage 2 (mild)." *Id.* at 2.  The Government states it felt that it was appropriate to alert the Court to the changed CDC guidance but notes that the Government's view of Mr. Nygren's medical condition has not changed. *Id.*

### III.   LEGAL STANDARD

18 U.S.C. § 3582(c)(1)(A)(i) states:

> The Court may not modify a term of imprisonment once it has been imposed except that . . . in any case . . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in [18

> U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that . . . (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Where such a motion is properly before the Court, the Court must determine whether "extraordinary and compelling reasons warrant" the movant's release, considering in its determination "the factors set forth in section 3553(a)" and "applicable policy statements issued by the Sentencing Commission . . . ." *Id.*

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[4]  The Guidelines note that the movant must meet the "requirements of subdivision (2) . . . ." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018).  Subdivision (2) provides that the Court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . . ."

Section 3142(g) sets forth the factors a court must consider before releasing a person pending trial and these standards are incorporated into the assessment of a request for compassionate release.  They include (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to

---

[4]     The Court acknowledges that the Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP ACT; its provisions are therefore not directly related to the unique circumstances presented by a global pandemic.  Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion.

any person or the community that would be posed by the person's release.  18 U.S.C.

§ 3142(g).  Regarding the history and characteristics of the person, the statute

provides that the court must consider:

> (A)   the person's character, physical and mental condition, family ties,
> employment, financial resources, length of residence in the
> community, community ties, past conduct, history relating to
> drug or alcohol abuse, criminal history, and record concerning
> appearance at court proceedings; and

> (B)   whether, at the time of the current offense or arrest, the person
> was on probation, on parole, or on other release pending trial,
> sentencing, appeal, or completion of sentence for an offense under
> Federal, State, or local law . . ..

18 U.S.C. § 3142(g)(3)(A-B).

Once a court has made its dangerousness determination, § 1B1.13 provides

that the court should determine whether "extraordinary and compelling reasons"

exist to release the defendant.  U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt.

n.1 (U.S. SENTENCING COMM'N 2018).   The policy statement provides that

"extraordinary and compelling reasons" may exist under any of the following

circumstances:

> (A)   **Medical Condition of the Defendant.—**

> > (i)   The defendant is suffering from a terminal illness (*i.e.*, a
> > serious and advanced illness with an end of life trajectory).
> > A specific prognosis of life expectancy (*i.e.*, a probability of
> > death within a specific time period) is not required.
> > Examples include metastatic solid-tumor cancer,
> > amyotrophic lateral sclerosis (ALS), end-stage organ
> > disease, and advanced dementia.

> > (ii)   The defendant is—

> > > (I)   suffering from a serious physical or medical
> > > condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)   **Age of the Defendant.**—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)   **Family Circumstances.**—

(i)   The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)   **Other Reasons.**—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* § 1B1.13 cmt. n.1(A-D).   The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* § 1B1.13 cmt. n.2.  Finally, the policy statement states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* § 1B1.13 cmt. n.3.

The movant has the burden of showing that she or he is entitled to a sentence reduction, and "the Court 'has "broad discretion in deciding whether to grant or deny a motion for sentence reduction."'" *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 WL 3104043, at *5 (D. Me. June 11, 2020) (quoting *United States v. Britton*, No. 18-cr-108-LM, 2020 WL 2404969, at *2 (D.N.H. May 12, 2020)).

## IV.   FACTUAL BACKGROUND

### A.   The Presentence Investigation Report

In sentencing Mr. Nygren, the Court relied upon a Revised Presentence Investigation Report (PSR) prepared by the United States Probation Office (PO). Although the Court resolved several legal issues at Mr. Nygren's sentencing hearing, Mr. Nygren admitted the accuracy of the factual contents of the PSR. *See Tr. of Proceedings* at 7:03-25 (ECF No. 89) (*Sentencing Tr.*). To the extent Mr. Nygren did have objections that he appealed, the First Circuit affirmed the Court's resolution of those objections. *Nygren*, 933 F.3d at 89.

#### 1.   Steven Nygren's History and Characteristics

Mr. Nygren is a fifty-three-year-old male born in Lynn, Massachusetts. *PSR* at 3. The PSR says that Mr. Nygren's wife, Brenda Nygren, felt he "was not raised in a wonderful or nurturing environment." *Id.* ¶ 59. He last had contact with his father in 2013. *Id.* Mr. Nygren is one of five children born to his parents, who divorced in 1997. *Id.* ¶¶ 59-60. Mr. Nygren and his wife said that all his basic needs were met and he was never abused. *Id.* ¶ 59.

Mr. Nygren graduated from Lynn English High School in 1985 and is a 1991 cum laude graduate of Suffolk University with a Bachelor of Science in Business Administration. *Id.* ¶ 75.

Mr. Nygren married Anne Nygren in 1989 and they had two children together. *Id.* ¶ 61. The two divorced in 1997; Mr. Nygren asserts the divorce was based on "his alcoholism, dishonesty, infidelity, and ego." *Id.* Mr. Nygren married Brenda Nygren later in 1997. *Id.* ¶ 62. The two have one child together, and Ms. Nygren has two children from a previous relationship. *Id.* Ms. Nygren stated that, prior to his stroke, she and Mr. Nygren were separated and she anticipated that they would probably divorce; after his stroke, she described him as "a different person" who is "kind, considerate, conscientious, [and] thoughtful" and "is trying to be a better husband and father." *Id.* ¶ 64.

According to the PSR, at the time of sentencing, Mr. Nygren described himself as being in "poor to fair" health. *Id.* ¶ 65. He said he was 5' 10" tall and weighed 300 pounds. *Id.* He suffered a stroke in April 2016 which, according to his wife, caused him to "die[] twice." *Id.* ¶ 66. He was first admitted to Massachusetts General Hospital in April 2016, before transfering to Spaulding Rehabilitation Hospital as an in-patient until May 2016. *Id.* He continued as an outpatient at Spaulding until February 1, 2017, when he was finally discharged from treatment. *Id.* Mr. Nygren had to re-learn many basic tasks after his stroke, but by the time of his final discharge from Spaulding Rehabilitation Hospital, the PSR says that he had regained a remarkable 99% of his pre-stroke physical capacity. *Id.*

13

The impact of the stroke on his mental capacity was more difficult to assess because Mr. Nygren presented unusual inconsistencies in testing throughout his rehabilitation and the PSR concluded that the validity of his mental health scores was "notably suspect." *Id.* At an extended sentencing hearing, the Court concluded, after hearing the testimony of two experts, that Mr. Nygren's inconsistent effort during mental capacity testing amounted to a willful attempt to obstruct justice and, after hearing additional evidence, the Court also denied Mr. Nygren a three-level reduction for acceptance of responsibility. *Sentencing Tr.* at 8:02-128:08. Mr. Nygren appealed these legal conclusions to the First Circuit and the First Circuit affirmed this Court's conclusions. *Nygren*, 933 F.3d at 82-89. For purposes of this motion, this case history confirms that the Court cannot draw any solid conclusions about Mr. Nygren's current mental capacity because of his deliberate attempt to obstruct justice while being tested and because no new evidence of his true mental capacity has been presented in this motion.

Regarding physical issues other than the minimal sequelae of his stroke, the PSR does not describe his diagnoses, but it does list his then-current medications. *PSR* ¶ 68. These included four prescribed medications for high blood pressure and one for high cholesterol. *Id.* The PSR does not mention any problems with liver disease.

Regarding his mental health, the PSR reflects a history of depression, for which he was receiving treatment as of the time of the PSR. *Id.* ¶¶ 70-71.

Mr. Nygren has a history of substance abuse. *Id.* ¶ 74. He began drinking alcohol and smoking marijuana at thirteen or fourteen and used both substances daily prior to his stroke. *Id.* After his stroke, he stopped using both substances. *Id.* For a brief period of time in the 1980s, Mr. Nygren used cocaine on weekends. *Id.* Mr. Nygren also has a gambling addiction, estimating that from 2000 until 2016, he spent and/or lost more than one million dollars annually. *Id.* He "has not participated in formal substance abuse or gambling treatment, but now attends AA, NA, or GA meetings multiple times a week." *Id.*

### 2. Criminal History

This was not Mr. Nygren's first entanglement with the judicial system. Of note, when he was thirty, he allegedly assaulted and battered Anne Nygren. *Id.* ¶ 54. The charges were dismissed, but he was issued a civil restraining order to have no contact with Anne or his two children.[5] *Id.* When he was thirty-one, he allegedly issued a check for $750 on an account with insufficient funds. *Id.* ¶ 55. The charges were dismissed when he paid $700 in restitution. *Id.* When he was forty-six, Mr. Nygren admitted to committing larceny of less than $250 and was given a diversionary disposition of a continuance without a finding. *Id.* ¶ 50. This charge

---

[5]      In *United States v. Marrero-Pérez*, 914 F.3d 20 (1st Cir. 2019), the First Circuit wrote that "as a matter of judicial policy, in this case and henceforth, no weight should be given in sentencing to arrests not buttressed by convictions or independent proof of conduct." *Id.* at 22. It is not clear that the First Circuit's prohibition would extend to a motion for compassionate release. *See United States Díaz-Rivera*, 957 F.3d 20, 26-27 (1st Cir. 2020) (discussing *Marrero-Pérez*). Nor is it clear that it would apply to the Court's consideration of the issuance of a civil restraining order against Mr. Nygren. *See* PSR ¶ 54. However, as the Court explains later, it has not held this old arrest and civil restraining order against Mr. Nygren for purposes of evaluating his risk of recidivism. The 1998 dismissed charge for issuing an insufficient funds check is a closer call because it presages some of his later fraudulent conduct. PSR ¶ 55. But as the more recent misconduct is much more significant, the Court focused on it and has not considered this dismissed charge in evaluating the merits of Mr. Nygren's motion.

was dismissed in 2016.  *Id.*  Mr. Nygren was subject to this sentence during part of the timeframe in which he committed some of the crimes of which he is currently convicted, resulting in an increase to his criminal history score.  *Id.* ¶ 51.

Mr. Nygren was scored as a Criminal History category II.  *Id.* ¶ 52.

### 3.    Nature and Circumstances of the Offenses

### a.    Bank and Access Device Fraud

Mr. Nygren became the chief financial officer of the Brooklin Boat Yard (BBY) in Brooklin, Maine, in the summer of 2014.  *Id.* ¶ 5.  On September 10, 2015, Mr. Nygren asserted to J. Steven White, owner of the BBY, that the BBY needed to deposit another $100,000 into its business account in order to make payroll.  *Id.*  Mr. White was suspicious of this because he had a $600,000 line of credit at BBY's bank. *Id.*  When he contacted the bank, he was told that almost this entire line of credit had been depleted, and that money was sent via check from the BBY account every week into a business account named "Continuum" at a separate bank in Massachusetts. *Id.*  Mr. White reviewed the cancelled checks and told authorities he suspected that Mr. Nygren had been forging checks from BBY's account and depositing them into the Continuum account for approximately fourteen months.  *Id.*  Mr. Nygren did not have signatory authority for checks drawn on the BBY account.  *Id.*

On September 13, 2015, Mr. White invited Mr. Nygren to his home for a business discussion.  *Id.* ¶ 6.  With Mr. White's permission, the Maine State Police placed a listening device in Mr. White's home and recorded Mr. Nygren admitting to stealing money from BBY and Mr. White, asking Mr. White to help him commit

suicide, and implying that if BBY pursued him criminally, he would make things "ugly" for BBY, referring to "tax issues" the company apparently tried to avoid in the past. *Id.* On September 16, 2015, authorities obtained and executed both arrest and search warrants for Mr. Nygren at his home, seizing four firearms, some ammunition, and an unknown but seemingly small quantity of marijuana. *Id.* ¶ 7.

Further investigation by the FBI revealed that the Continuum bank account belonged to Ann S. Borders, Mr. Nygren's aunt. *Id.* ¶ 8. At Mr. Nygren's request, Ms. Borders opened and named the account, allowed Mr. Nygren to use it (including providing him with a debit card for the account and a signature stamp allowing him to issue checks drawn on the account), and deposited checks into and issued checks drawn on the account. *Id.* Ms. Borders also opened an email account for Mr. Nygren. *Id.* Investigators determined that Ms. Borders did not act with criminal intent or conspiratorial knowledge. *Id.* A portion of the money that entered the Continuum account from BBY was sent to a separate account at another bank in Maine owned by Ms. Borders and Brooklin General, the general store in Brooklin beneficially owned by Mr. Nygren through a limited liability company. *Id.* Mr. Nygren used this money to pay personal expenses and expenses for Brooklin General. *Id.* These personal expenses included private schooling for a child, jewelry, approximately $70,000 on a daughter's wedding, meals at restaurants, and scratch-off lottery tickets. *Id.* A review of BBY's account revealed that Mr. Nygren issued sixty-three checks totaling $732,156.95 to the Continuum account between June 2014 and September 2015. *Id.* ¶ 9. A review by BBY of the company's internal account revealed

an additional $83,339.32 that Mr. Nygren fraudulently charged on two credit accounts for BBY from December 2014 to September 2015. *Id.*

### b. Tax Evasion

Mr. Nygren had been in collection status with the Internal Revenue Service (IRS) since 2005, and collection efforts continued through December 2012. *Id.* ¶ 10. As of May 3, 2012, according to a demand letter the IRS sent Mr. Nygren, he owed the IRS $1,053,346.31. *Id.* In November 2009, Mr. Nygren met with the IRS and agreed to an installment payment agreement, but he only made one payment pursuant to this agreement before defaulting. *Id.* ¶ 12. Shortly after entering into this agreement, Mr. Nygren purchased a Mercedes for $16,000. *Id.*

On December 20, 2010, and again on January 11, 2011, Mr. Nygren reported to an IRS revenue officer that he was unemployed, did not possess any bank accounts or assets of any substantial value, and occasionally had a single client who paid him $1200 per week. *Id.* ¶ 13. Subsequent investigation by the IRS revealed that Mr. Nygren, through his Continuum corporation, was hired by the Wolfington Group in Augusta, Maine, in March 2010. *Id.* Mr. Nygren was initially hired as a subcontractor rather than an employee and was paid $4000 a week, but on August 2, 2010, he was converted to an employee of the Wolfington Group and paid an annual salary of $200,000. *Id.* This employment lasted until October 2011, when he resigned following detection by the Wolfington Group that he embezzled or stole $6000 from them. *Id.* Further, Mr. Nygren's employment checks were initially deposited into his wife's account. *Id.* On December 16, 2010, six days before his meeting with the

18

revenue officer, Mr. Nygren directed the Wolfington Group to begin to deposit his salary in a new account rather than his wife's account. *Id.* Mr. Nygren never reported this new account to the IRS. *Id.*

In 2011, the IRS discovered that all of Mr. Nygren's assets were solely in his wife's name. *Id.* ¶ 14. That same year, the IRS sought and received approval to seek nominee liens and levies for bank accounts and other assets held in Ms. Nygren's name. *Id.* Upon being notified of this, Mr. Nygren met with an IRS revenue officer and agreed to a payroll deduction from his pay from the Wolfington Group. *Id.* Mr. Nygren likely forged portions of a form necessary to effectuate this agreement on behalf of the Wolfington Group, and when the IRS contacted the Wolfington Group to issue a wage levy, the Wolfington Group informed the IRS that Mr. Nygren's employment had terminated. *Id.* The Wolfington Group also reported that Mr. Nygren had provided them with a Social Security Number that turned out to be false. *Id.*

On August 10, 2012, Mr. Nygren met again with an IRS revenue officer and told the IRS that he was unemployed with minimal income and that he and his wife possessed no bank accounts. *Id.* ¶ 15. By September 2012, Mr. Nygren was working as a consultant for Michael Hines, owner of Bonded Transmission in Framingham, Massachusetts, but he did not deposit any of his employment income checks into banks; instead, he would travel to the bank on which the checks were drawn and convert the payments to cash. *Id.* Mr. Nygren never reported this employment to the IRS and was terminated in the summer of 2013 for embezzlement and/or theft.

*Id.* Mr. Nygren similarly declined to inform the IRS of other employment income. *Id.* ¶¶ 16-17.

## B.    Guideline Calculations

The Court calculated a total offense level of twenty-eight and a Criminal History Category of II for a guideline range of imprisonment of 87 to 108 months, a period of supervised release of two to five years, a fine of $25,000 to $63,000, and a special assessment of $6500. *Statement of Reasons*, Attach. 1, *Findings Affecting Sentencing* (ECF No. 75). Mr. Nygren's guideline range included an enhancement for obstruction of justice based on Mr. Nygren's decision to feign incompetence after his stroke. *PSR* ¶¶ 19-22. As a result of this enhancement, Mr. Nygren did not receive a downward adjustment for acceptance of responsibility. *Id.* ¶¶ 23-24.

## V.    DISCUSSION

The Court first addresses Mr. Nygren's motion using the criteria of the applicable statutes and Guidelines and then reviews whether he has otherwise made the case for compassionate release.

## A.    Danger to the Community

Beginning with the first factor under the policy statement of the Guidelines, the Court concludes that Mr. Nygren has not satisfied his burden to establish that if he were released, he would not pose a danger to the safety of any other person or the community. In making this assessment, under 18 U.S.C. § 3142(g), the Court is directed to determine whether a defendant has a history of controlled substance offenses or crimes of violence. The Court is also directed to consider "whether, at the

time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . . ."  18 U.S.C. § 3142(g)(3)(B).

The Court does not believe that Mr. Nygren poses a risk of flight.  With the exception of the one-week period between his arrest and bail and the monthlong period in which he was detained for a competency evaluation, *see PSR* ¶¶ 1-2, Mr. Nygren spent the entire two-and-a-half years between his arrest and sentencing on release.  The Court does not recall any issues with Mr. Nygren's release that raise concerns that if released, he would flee.

Similarly, Mr. Nygren does not have a history of violent crime or controlled substance offenses.  While the PSR does note one dismissed charge of assault and battery against his ex-wife, *see PSR* ¶ 54, this charge is over twenty years old and Mr. Nygren has had no similar charges or convictions.  Given the age of the earlier incident and the absence of any intervening allegations, the Court is not overly concerned that Mr. Nygren has a propensity for physical violence and does not consider it a factor in evaluating his pending motion.  Mr. Nygren has a significant history of alcohol and marijuana abuse.  *Id.* ¶ 74.  However, the PSR reported that he stopped drinking alcohol and smoking marijuana after his stroke.  *Id.*  Mr. Nygren also has a gambling addiction, which has not, to the Court's knowledge, been treated and raises some concern about his likelihood of recidivism—although this concern is tempered somewhat by his reported attendance at Gamblers Anonymous meetings.  *Id.*

21

The crux of the issue that Mr. Nygren's proposed release presents for the Court is the concern that he represents a danger of recidivism upon release. During the sentencing hearing on May 25, 2018, the Court reviewed in detail Mr. Nygren's horrendous record of gaining the trust of others, of obtaining positions of financial authority within businesses, and of defrauding the people who had entrusted him using often sophisticated schemes of financial deception. *Sentencing Tr.* at 177:06-185:04. From 2010 to 2015, when he was arrested for defrauding the BBY of over $800,000, Mr. Nygren defrauded others. *Id.* His schemes involved forging federal tax forms, setting up dummy accounts in the name of his trusting aunt, providing a false social security number to an employer, forging unauthorized checks from an employer to a dummy corporation that he controlled, hiding his income and assets in his wife's name, and all the while lying to the IRS about his own assets and income. Mr. Nygren's financial misdeeds were sophisticated and traded on personal trust.

Then, when the owner of the BBY discovered the catastrophic financial impact of Mr. Nygren's egregious actions had wrought upon the business, Mr. Nygren threatened his friend and employer that if he turned him in to the police, "things would get ugly" for BBY. *Id.* at 179:25-180:03. Mr. Nygren, having stolen hundreds of thousands of dollars from the owner, set about smearing him, insinuating that the Boat Yard's financial problems were its own fault, that it had lost millions of dollars on the last two expensive boats, and darkly accusing the owner of affairs with women. *Id.* at 189:03-12.

22

Furthermore, the motivation for Mr. Nygren's history of fraudulent schemes was purely selfish. He spent the money to fund his own village store, to pay for his daughter's expensive wedding, on costly jewelry, and at local restaurants. *Id.* at 178:17-179:11; *PSR* ¶ 8.

During his sentencing hearing, the Court expressed the direct concern that when Mr. Nygren was released from prison, he would return to defrauding people. *Sentencing Tr.* at 189:13-18. The Court remains concerned about recidivism today because Mr. Nygren is a highly intelligent and accomplished man who has a way of inveigling his way into the financial lives of others and cheating them. Mr. Nygren has lost none of his ability to inflect financial fraud upon his release.

Given this history, the Court was surprised to see that Mr. Nygren proposes, as part of his release plan, accepting a job working as a salesman. Mr. Nygren did not provide the Court with a detailed job description, other than that the position is titled "Internet Sales and Marketing Director." *Def.'s Second Suppl. Br.*, Attach. 1, *Letter to Steven Nygren*. But the Court infers that—as the Government states—sales jobs "often involve[] accepting forms of payment from customers who may not be aware of [Mr. Nygren's] history with other people's checks and credit cards." *Gov't Resp.* at 17. Far from being reassured by Mr. Nygren's proposal, the Court is concerned by this further evidence of his lack of self-reflection.

Additionally, the Court notes that Mr. Nygren committed portions of his fraudulent scheme while on probation for a Massachusetts offense. *See PSR* ¶ 50. This fact makes it difficult for the Court to trust that Mr. Nygren would be deterred

from further criminal acts by the fact that he was on supervised release. The Court finds that Mr. Nygren poses a significant risk of economic harm to the community if released.

### B.    The 3553(a) Factors

The Court has already laid out the nature and circumstances of Mr. Nygren's offense, his history and characteristics, and the Court's belief—at the time of sentencing and today—that Mr. Nygren's sentence was necessary both to reflect the seriousness of Mr. Nygren's crime and to protect the public from future crimes by him. The Court's analysis of the sentencing factors in 18 U.S.C. § 3553(a) has not changed since it sentenced Mr. Nygren, and the Court continues to believe that Mr. Nygren's middle-of-the-guideline-range sentence was no more or less severe than necessary.

### C.    Steven Nygren and COVID-19

#### 1.    Steven Nygren's Medical Conditions

In Mr. Nygren's motion, he only briefly refers to his medical condition, stating that he "suffers from Hypertension and liver failure" and that he has previously suffered from a stroke. *Def.'s Mot.* at 1, 3. In his first supplemental memorandum, Mr. Nygren refers to his age and his obesity. *Def.'s Suppl. Br.* at 8, 13-14. The Government, in its responses, refers also to Mr. Nygren's obesity, hypertension, and chronic kidney disease. *Gov't's Resp.* at 12-14; *Gov't's Suppl. Mem.* at 1-2.

The Court begins with Mr. Nygren's age. It is true that "[a]s [one] get[s] older, [one's] risk for severe illness from COVID-19 increases," and that fifty-three-year-old

24

individuals are at more risk for severe illness than those younger than them.  *Older Adults*,   CDC,   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited July 22, 2020).  But as Mr. Nygren himself notes, the most troubling statistics relate to individuals who are sixty-five years old or older.  *See Def.'s Suppl. Br.* at 10.  The Court does not find the Mr. Nygren's age— on its own or in combination with his other conditions—creates a basis for his compassionate release motion.

Mr. Nygren's other conditions, however, create a more compelling case.  Mr. Nygren's severe obesity and chronic kidney disease are two of the eight conditions the CDC lists as putting people of any age at increased risk of severe illness from COVID-19, and his hypertension is a further aggravating factor.  *People with Certain Medical Conditions*,   CDC,   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 22, 2020).

Turning first to obesity, the CDC lists obesity, "defined as a body mass index (BMI) of 30 or above," as a risk factor for "severe illness from COVID-19" for people of any age.  *Id.*  For obesity, the CDC recommends that a person "[f]ollow your healthcare provider's recommendations for nutrition and physical activity, while maintaining social distancing precautions."  *Id.*  Regarding kidney disease, again, the CDC recognizes that "[h]aving chronic kidney disease of any stage increases your risk of severe illness from COVID-19" for people of any age.  *Id.*  Finally, the CDC has recognized Mr. Nygren's third underlying medical condition, hypertension, as a

condition that "might" place a person at increased risk of severe illness from COVID-19 for people of any age. *Id.*

According to the BOP medical record, as of February 25, 2020, Mr. Nygren weighed 290 pounds. *BOP Med. Record* at 30 (ECF No. 102) (*BOP Medical Records I*). Mr. Nygren appears to be 5' 11" tall.[6] The Court accepts the Government's BMI calculation for Mr. Nygren of 40.4. *Gov't Resp.* at 12-13. The CDC defines obesity as having a BMI in excess of 30 and severe obesity in excess of 40. *Id.* at 12. Mr. Nygren falls in the severe obesity category, though at the low end of the range. As the CDC's breakpoint for increased risk for severe illness from COVID-19 is a BMI of 30, Mr. Nygren fits well within the enhanced risk. By the Court's own calculation, at 5' 11", Mr. Nygren would have to weigh just under 215 pounds to avoid being in an enhanced risk category due to his weight.

Turning to his kidney disease, the CDC initially classified only those individuals with chronic kidney disease who required dialysis as being at heightened risk for severe illness from COVID-19. However, in the newest CDC iteration, having chronic kidney disease "of any stage increases" a person's risk for severe illness from COVID-19. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 22, 2020). According to the CDC website,

---

[6]     There is some evidence that Mr. Nygren is 5' 10", not 5' 11". *Compare* PSR ¶ 65 and Ex. 6, *BOP Medical Records* at 4 (ECF No. 107) (*BOP Medical Records II*), *with BOP Medical Records II* at 1. He may be somewhere in between and one physicians' assistant may measure up and another measure down. In any event, the one-inch difference is not material and the Court has used 5' 11" for BMI purposes.

there are five stages of kidney disease, with stage one being normal kidney function and stage five kidney failure. *See Chronic Kidney Disease Surveillance System*, CDC, https://nccd.cdc.gov/CKD/help.aspx?section=F#3 (last visited July 22, 2020).   As of January 17, 2020, the BOP medical record characterizes Mr. Nygren's chronic kidney disease as Stage 2. *Gov't's Suppl. Mem.* Attach. 1, *BOP Medical Record* ("Chronic kidney disease, stage 2 (mild)").  The CDC describes Stage 2 as "mild reduction in kidney function (eGFR 60-89 ml/min per 1.73 m2) and persistent (≥3 months) proteinuria." *See Chronic Kidney Disease Surveillance System*, CDC, https://nccd.cdc.gov/CKD/help.aspx?section=F#3 (last visited July 22, 2020). Although Mr. Nygren has Stage 2 chronic kidney disease, a mild reduction in kidney function, under current CDC guidance, places him in the higher risk category.

Mr. Nygren also has hypertension and he is daily taking three prescribed medications for this condition and a low dose of aspirin. *BOP Medical Records II* at 23 ("Essential (primary) hypertension").  According to the CDC, hypertension "may increase your risk of severe illness from COVID-19." *See People with Certain Underlying Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 22, 2020).

Finally, as Mr. Nygren has more than one underlying medical condition, the CDC says that "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Id.*

Based on the medical records in this case and the CDC guidance, the Court finds that Mr. Nygren is at greater risk than the average inmate of suffering a severe illness should he contract COVID-19.

### 2. Steven Nygren's Medical Conditions and the Positions of the Parties

The Government asks the Court to "find that the defendant's obesity is a condition from which he is expected to recover, and therefor[e] does not create an exceptional circumstance in the context of COVID-19." *Gov't's Resp.* at 12. The Government bases this request on the fact that in January 2020, Mr. Nygren was eight pounds heavier than he was in February 2020, and that when he initially reported to prison in 2018, he weighed eighty pounds more than he did in February 2020. *Id.* at 12-13. The Government states that "there is scant reason to believe this condition will not improve from severe obesity in the near future, if Mr. Nygren so desires." *Id.*

The Court views as gratuitous the Government's position that Mr. Nygren could alter his weight classification "from severe obesity in the near future" if he only "so desires." Whatever the Government's counsel may think of obesity as a legitimate medical condition, it strikes the Court as inappropriate for the Government to imply that Mr. Nygren deserves his current enhanced risk to severe illness from the COVID-19 pandemic because obesity is, in the AUSA's personal opinion, a matter of Mr. Nygren's personal choice. Put another way, the Court rejects the Government's position that it should deny Mr. Nygren's petition and place him at risk of severe

28

medical consequences, even death, because in the Government's moralistic view, he lacks sufficient self-control.

The CDC itself does not agree with the Government. The CDC describes adult obesity as a "complex health issue resulting from a combination of causes and individual factors such as behaviors and genetics." *Adult Obesity Causes & Consequences*, CDC, https://www.cdc.gov/obesity/adult/causes.html (last visited July 22, 2020). The CDC goes on to say that these "[b]ehaviors can include physical activity, inactivity, dietary patterns, medication use, and other exposures." *Id.* The CDC states that "[a]dditional contributing factors include the food and physical activity environment, education and skills, and food marketing and promotion." *Id.* The CDC does not state or imply what the Government is arguing here: that Mr. Nygren's obesity is simply a matter of his lack of will and discipline.

Moreover, it is irrelevant whether Mr. Nygren may at some undefined point in the future lose the seventy-five pounds necessary for him to fall below the CDC's higher risk classification for severe COVID-19 illness based on his height and weight. According to the medical record, Mr. Nygren managed to lose eighty pounds during the first two years of his incarceration. If it takes him another two years to achieve an equal result, the Court hopes and expects that two years hence, the COVID-19 pandemic will not be afflicting humanity as it is today, and the combination of his weight and the pandemic will not be a basis for compassionate release. But the Court is presented with Mr. Nygren's motion for compassionate release based on how things are, not how they might be.

Finally, even if the AUSA were correct about obesity as a personal choice (and the Court does not find he is), the Court rejects the notion that for purposes of deciding petitions for compassionate release, it should differentiate between medical conditions that include personal decision-making as a factor and those that do not. To do so would remove compassion from compassionate release.

Mr. Nygren's hypertension and chronic kidney disease further underscore the extreme risk he faces. Given Mr. Nygren's current medical conditions, the Court finds that, should Mr. Nygren contract COVID-19, he is very likely to suffer extreme ill effects, possibly including death.

### 3.  FMC Devens and COVID-19

The Court turns to how likely it is that Mr. Nygren will contract COVID-19 while incarcerated. The Government argues that the BOP has taken "significant measures to protect the health of the inmates in its charge" and that although "[u]nfortunately and inevitably, some inmates have become ill," the BOP's COVID-19 response is "designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution." *Gov't's Resp.* at 2-5.

The relevant data for purposes of evaluating Mr. Nygren's risk of contracting COVID-19 are the statistics from FMC Devens where he is currently incarcerated. According to the BOP, there are 920 total inmates at FMC Devens, 838 at the FMC and 82 at the Camp. *See FMC Devens*, BOP, https://www.bop.gov/locations/institutions/dev/ (last visited July 22, 2020). The Court assumes that the relevant number is 838. The most recent statistics from FMC

Devens state that seven inmates have tested positive for COVID-19 but have not yet recovered, two inmates have died from the virus, and forty-six inmates have recovered.  *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited July 22, 2020).

These statistics may be viewed in different ways.  The percentage of inmates who are currently known to be positive is 0.8% (7 ÷ 838 = .0084), an extremely low number.[7]  The percentage of inmates who have tested positive is much higher at 6.6% (55 ÷ 838 = .0656).  The fact that out of fifty-five inmates who tested positive two have died is tragic, but it is a low number relative to the total population of FMC Devens, about .24% (2 ÷ 838 = .0024).  The fact that out of fifty-five inmates who have tested positive, forty-six have recovered is encouraging.  Mr. Nygren is critical of the BOP response to the COVID-19 pandemic and implies that the Court should grant his compassionate release petition because the BOP "cannot/has not prevent[ed] the spread—or even limit[ed]—the spread of COVID-19 in Fort Devens."  *Def.'s Suppl. Mot.* at 5.  But this argument misses the mark.  Assuming the Court could find that the BOP has not performed as well as might be hoped in responding to the COVID-19 pandemic, the Court does not know why it should consider this factor as a basis to grant or deny Mr. Nygren's petition for compassionate release.  A petition for compassionate release is not a class action challenging the BOP response to the pandemic, and the Court does not view the petition as a vehicle to punish or reward

---

[7]     The Court acknowledges that this number is likely not a full reflection of the current number of COVID-19 cases at FMC Devens as the facility is not, to the Court's knowledge, conducting full-scale testing of every inmate.

the BOP for its response to the pandemic.  The narrow questions are what degree of risk Mr. Nygren faces while incarcerated at Devens, what degree of risk he would encounter in home confinement, and whether the differential militates in favor of his compassionate release.

### 4.    Salem, Massachusetts versus FMC Devens

If released, Mr. Nygren would not enter into a world free from COVID-19, and the place Mr. Nygren proposes to go necessarily poses some COVID-19 risk.  One question is whether the risk from where he intends to reside is lower than the risk at FMC Devens.  Given the defined risk presented by continued incarceration at FMC Devens, the Court should assess whether the place where Mr. Nygren would live upon release would have a COVID-19 risk qualitatively and quantitatively different from Devens, what the extent of the difference is, and how the Court should factor this difference into its overall assessment.

To this end, Mr. Nygren's petition contains almost no evidence from which the Court can gauge the comparative risk.  Mr. Nygren proposes to work as a salesperson upon release.  *Def.'s Mot.* at 9 ("Mr. Nygren proposes to work at home, doing a sales a job offer he already has").  In his supplemental filing, Mr. Nygren reveals that he has been hired to work at a pizza and roast beef restaurant chain as "Internet Sales and Marketing Director."  *Employment Letter* at 1.  Mr. Nygren proposes living in Salem, Massachusetts with his wife and children upon release.  *Def.'s Mot.* at 9.  He says his wife will pick him up at Devens and drive him to their home, where he will self-quarantine for fourteen days.  *Id.* at 10.

32

But Mr. Nygren has presented the Court with virtually no information from which it could compare the quantum of risk presented by FMC Devens and by his residence. Salem, Massachusetts is in the same state as FMC Devens but a different county and city. The record contains no information by which the Court could evaluate the degree to which the incidence of COVID-19 is lower in Essex County and the town of Salem than at FMC Devens. The PSR describes Mr. Nygren's family, but other than his wife, the Court does not know whether the family housing situation is the same now as described in the August 2017 PSR.[8] Even if the Court assumed that Mr. Nygren would have greater freedom living at his home in Salem, Massachusetts to avoid COVID-19, the Court cannot from this record draw any meaningful conclusions about the degree to which his risk would be reduced from home confinement.[9] Based on the record in this case, the Court finds that if released to home confinement, Mr. Nygren would have some degree of lower risk of contracting COVID-19 than he would have if he remained at FMC Devens, but it is unable to quantify that reduced risk.

---

[8]     In August 2017, the PSR revealed that Mr. and Ms. Nygren lived with two others, a twenty-nine-year-old son who worked in the Merchant Marine, and a sixteen-year old daughter who was a student. *PSR* ¶ 62. Ms. Nygren was not working but was a full-time occupational therapy student in August 2017. *Id.* Mr. Nygren's motion does not provide any updates about the status of his living arrangements. Whether Ms. Nygren is now working, whether their son continues to work for the Merchant Marine, and whether their daughter is now working, going to school or staying at home are not matters of record.

[9]     To prove a petition for compassionate release, a petitioner would not be required to demonstrate unequivocally that his proposed living situation is safer than prison, but some effort must be made so that the Court can make this judgment based on record evidence and not surmise.

33

### 5. Prison or Home Confinement

The Court concludes that Mr. Nygren suffers from a combination of medical conditions, including severe obesity, chronic kidney disease, and hypertension, that put him at increased risk for extreme consequences if he contracts COVID-19. The Court further concludes that Mr. Nygren is more likely to contract COVID-19 if he remains in prison, where his ability to social distance is inherently impaired, than if released to home confinement, where his ability to do so must be enhanced. Having concluded there is some reduced risk from home confinement as opposed to prison, the Court can draw no conclusions about the extent of reduced risk because the record does not allow for any conclusions.

### D. The Balance Weighs in Favor of Denying Steven Nygren's Motion

Mr. Nygren's medical conditions and the inherent danger of being incarcerated in BOP facilities at this time present a serious case for compassionate release. However, the Court is unable to release Mr. Nygren into the community because it fears that it would be just a matter of time before he perpetrated another financial fraud against another trusting soul. On balance, Mr. Nygren has failed to prove his entitlement to compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

## VI.   CONCLUSION

The Court DENIES Steven Nygren's Emergency Motion for Modification of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) in Light of the Imminent Threat of Contracting the COVID-19 Virus (ECF No. 95).

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of July, 2020

35